IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWEST AIRLINES PILOTS ASSOCIATION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § § | CIVIL ACTION NO. 3:21-cv-2065 |
| SOUTHWEST AIRLINES CO., | § § § | |
| Defendant. | § § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Southwest Airlines Pilots Association (hereinafter "SWAPA" or "Plaintiff"), by and through its President Casey Murray, and by and through its attorneys, Gillespie Sanford LLP, files this First Amended Complaint and Jury Demand against Southwest Airlines Co. ("Southwest Airlines" or "Defendant"), seeking declaratory and injunctive relief. SWAPA would show the following:

### I.  PARTIES, JURISDICTION, AND VENUE

1.      SWAPA is a not-for-profit labor organization with its principal offices located at 1450 Empire Central Drive, Suite 737, Dallas, TX 75247. SWAPA is the sole collective bargaining unit under the Railway Labor Act ("RLA"), 45 U.S.C. § 151-188, for the more than 9,000 pilots of Southwest Airlines.

2.      Southwest Airlines is a domestic for-profit corporation, organized and existing under the laws of the State of Texas and having offices and its principal place of business at 2702 Love Field Drive, Dallas, Texas 75235. Southwest Airlines is a "common carrier" by air engaged

in interstate and foreign commerce under 42 U.S.C. § 1981 and is subject to the provisions of the RLA.  Southwest Airlines does business in the state of Texas and within the Northern District of Texas.  Venue is proper in the Northern District of Texas against Southwest Airlines under 28 U.S.C. § 1391(b) because jurisdiction is not dependent on diversity of citizenship and Southwest Airlines is doing business within this district and Southwest Airlines resides in this district. Defendant Southwest Airlines may be served via its registered agent for service, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

3.        This Court has subject matter jurisdiction under the RLA, 45 U.S.C. §§ 151 *et seq.,* pursuant to 28 U.S.C. § 1331.  This Court also has jurisdiction herein pursuant to 28 U.S.C. § 1337, as this is an action arising under a statute that regulates commerce and/or protects trade and commerce against restraints, namely, the RLA.  Plaintiff's claims are also brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seek a declaration as to the parties' rights and obligations under the RLA.  SWAPA is entitled to such a declaration because the instant dispute is an actual and existing controversy.

4.        Venue exists in this district and division under 28 U.S.C. § 1391 and 38 U.S.C. § 4323(c).

## II.  NATURE OF THE ACTION

5.        SWAPA brings this action against Defendant Southwest Airlines for declaratory and injunctive relief pursuant to 28 U.S.C. § 2201, the Declaratory Judgment Act, and 45 U.S.C. §§ 151-188, the Railway Labor Act.  45 U.S.C. §§ 156 and 181.

6.        SWAPA and Defendant Southwest Airlines are parties to a collective bargaining agreement negotiated for the period September 1, 2012 through August 31, 2020 ("the current

CBA"). Pursuant to the terms of the RLA, the current CBA has continued in effect after August 31, 2020, even as the parties (SWAPA and Southwest Airlines) have carried on negotiations to reach a new collective bargaining agreement pursuant to the RLA's Section 6 dispute resolution process. *Detroit & T.S.L.R.R. v. UTU,* 396 U.S. 142, 149-53 (1969).

7.     Among other things, Section 6 of the RLA requires the parties to maintain *status quo* until a new agreement is reached, which means that rates of pay, rules and working conditions shall not be altered by the carrier until a new agreement is reached. *Id.*

8.     The parties now have a "major" dispute within the meaning of the RLA and relevant case law, namely negotiations to amend the applicable collective bargain agreement ("CBA") pursuant to the RLA's dispute resolution process.   More specifically, Defendant Southwest Airlines has issued and implemented several unilateral changes to the pay, rules and working conditions of the pilots in violation of the RLA and contrary to the *status quo*.   Southwest Airlines unilaterally implemented an Infectious Disease Control Policy that significantly altered the working conditions, rules, and rates for pay for Pilots.   For one, it gave Defendant Southwest Airlines the unbargained-for right to take away flying awarded to Pilots at its pleasure. Additionally, it gave Defendant Southwest Airlines the unbargained-for right to take Pilot benefits to subsidize the carrier's operational quarantines.   In doing so, Defendant Southwest Airlines has given itself *force majeure* rights, also unbargained-for.   Since the original filing of this lawsuit, Southwest Airlines has continued to take unilateral actions in violation of the RLA by rolling out a VPPP program, the Flight Crew Training Instructors Program, and a mandatory vaccine policy. These new unilateral policies will be described in more detail below.

### III.    FACTS

**SWAPA AND SOUTHWEST AIRLINES ARE ENGAGED IN A "MAJOR" DISPUTE**

9.    The CBA covered the period from September 1, 2012 through August 31, 2020. Sixty days prior to the expiration of the term of the CBA, SWAPA served its notice to Southwest for an early reopener on November 1, 2019, pursuant to CBA Section 28, which provides that "[e]ither party may give written notice of its desire to modify the Agreement at least sixty (60) days prior to March 1 of each year beginning March 1, 2020."

10.    On January 9, 2020, the parties met at Southwest Airlines headquarters to begin direct negotiations under Section 6 of the RLA.

11.    From the very start of direct negotiations, Defendant Southwest Airlines disregarded its obligations under the RLA to maintain *status quo* and its duty to engage in good faith bargaining.  Several times, SWAPA had to send written demands to Defendant Southwest Airlines for the carrier to cease its unilateral actions to change the CBA while in Section 6 negotiations.

12.    By its letter dated January 10, 2020, SWAPA complained of Defendant Southwest Airlines' attempt to change and negotiate new working rules and pay changes directly with check airmen under the guise of a "Check Airmen scheduling test."

13.    By its letter dated January 27, 2020, SWAPA complained of Defendant Southwest Airlines' unilateral change to a delayed implementation of the Pilots' deferral rate change to their 401(k) accounts, without bargaining with SWAPA and demanded that Defendant Southwest Airlines honor the *status quo*.

14.     By its letter dated February 27, 2020, SWAPA complained of Defendant Southwest Airlines' change of its pharmacy benefits manager, which resulted in the reduction of drug benefits for the Pilots, again without bargaining with SWAPA.

15.     Then during the rise of the COVID-19 pandemic, Defendant Southwest Airlines threatened furloughs and sought sizable concessions from its labor groups.  Of significance is the fact that the CBA bargained for by the parties does <u>not</u> contain a *force majeure* clause.  Without a *force majeure* clause, Defendant Southwest Airlines could <u>not</u> be relieved of its obligation to perform its contractual obligations based on extraordinary, uncontrollable circumstances.

16.     When COVID hit full force in March 2020, Southwest Airlines' pattern of taking without bargaining continued.  In the pandemic, the world became shuttered and air travel plummeted.  Defendant Southwest Airlines, however, had contractual obligations to meet pay guarantees for its Pilot group.  Its answer was to act as though it had *force majeure* rights by declaring an emergency and implementing an Emergency Time Off ("ETO") program, and later an Emergency Extended Time Off ("ExTO") program, that offered Pilots the option to not fly and not be paid in contravention to the terms and conditions of the CBA.  By its letter dated March 26, 2020, SWAPA objected to these programs as another *status quo* violation and demanded bargaining.  In response to SWAPA's demand, Defendant Southwest Airlines did come to the bargaining table and negotiated with SWAPA on the ETO program.  The parties' agreement was memorialized in the ETO MOU (Memorandum of Understanding), fully executed on May 27, 2020.

17.     For the subsequently imposed ExTO program, SWAPA also tried to reach an MOU with Defendant Southwest Airlines but was unsuccessful because Defendant Southwest Airlines took the position that bargaining was not necessary.  Management's anti-union sentiment against

SWAPA was high.  Ultimately, no agreement on the ExTO program was ever reached.  Pilots have not only taken time off on ExTO under this extra-contractual program, but many have already left and been recalled.  Defendant Southwest Airlines saw no issue with using the pandemic (despite the absence of a *force majeure* clause) to bargain directly with Pilots for working conditions, rules and pay that was beyond the scope of the CBA (and despite the RLA's bargaining and non-interference duties).

18.     Around the same time, on March 11, 2020, Defendant Southwest Airlines further availed itself of *force majeure* rights by issuing an emergency pandemic policy that it is using to improperly and illegally trump the CBA.  As part of its "proactive steps to protect Employees in the workplace in the event of an infectious disease outbreak," Defendant Southwest Airlines included information that one would expect in such a company pandemic policy.  It adopted the Center for Disease Control ("CDC") guidelines on how to prevent the spread of infection in the workplace, such as frequent hand washing and avoiding close contact with people who are sick.

19.     The policy also provided for situations where employees are to be quarantined for both contracting an infectious disease and having been exposed to an infectious disease.  Therein, Defendant Southwest Airlines expressly reassured all employees that they "will be paid" for any missed work if they got sick from an infectious disease or if they were directed to quarantine by the CDC or Defendant Southwest Airlines. It is this pay reassurance that Defendant Southwest Airlines used later to take away Pilot pay, a right that Defendant Southwest Airlines does not have vested in the CBA.

20.     At the time, the pay reassurance was critical to preventing Defendant Southwest Airlines' operations from grinding to a complete stop, as tens of thousands of people were dying from the COVID-19 virus and hospitals had to turn away patients because they ran out of hospital

beds.  Schools, government buildings, and courts closed their facilities to the public and restaurants and numerous other businesses largely shut down.  It was under these conditions that Defendant Southwest Airlines needed its front-line employees to continue to report for duty and for its Pilots to keep flying the airline's fleet of 737s to keep the airline operational.

21.     The Pilot work group is amongst the most at-risk work groups immediately after first responders and healthcare employees.  While management employees protected themselves by closing headquarter offices to work from home and met virtually, but Pilots, along with other front-line workers, did not have that option.  Pilots, especially, were at a heightened risk due to the nature of their work.  During flight operations, Pilots are confined to the cockpit for long hours, which makes it impossible for Pilots to maintain safe social distancing under both the CDC Guidelines and Defendant Southwest Airlines' Infectious Disease Control Policy.  Additionally, while management employees sheltered at home, Pilots were on the road every day, in airport terminals, at hotels with drastically reduced services, and crammed into hotel shuttles to and from their day of work.  While management employees with minor children (now no longer in schools), were able to work with their kids at home, Pilots could not, and their families and children were equally put at risk of infection each time the Pilots returned home from a trip.

22.     During this time, state and local governments around the country were issuing progressively stricter rules against being in public.  However, because of their role in global transportation, Pilots were deemed an "essential critical infrastructure workforce."  As they flew their trips, Pilots had to carry on their persons a copy of an official letter from CEO Gary Kelly – regarding "Movement of Supplies and Personnel Related to Critical Infrastructure," issued on or about March 23, 2020 – to prove that they were exempt from state and local laws that prohibited individuals from being in public and to avoid arrest if stopped by local law enforcement authorities.

23.     Indeed, conditions were so dangerous for SWA Pilots that SWAPA had to make a demand on Defendant Southwest Airlines to protect crew health and safety.  In its April 20, 2020 letter, SWAPA demanded, among other things, for Defendant Southwest Airlines to sanitize the aircraft cockpit daily, to provide Pilots with personal protective equipment ("PPE") (which was extremely scarce), and to provide Pilots with notification when they had been exposed to infected crew or passengers that was consistent across all eleven of Defendant Southwest Airlines' domiciles.  SWAPA had received membership complaints that notification by chief pilots varied depending on which domicile the Pilot was based in, and even within the same domicile, notification may have been different from chief pilot to chief pilot or assistant chief pilots.

24.     Since March 2020, the COVID pandemic has gone through several surges and peaks. After the first spike in the summer of 2020, America braced itself for a second spike during the fall.  Vaccination relief did not come until first quarter of 2021, and even then, vaccine supply was extremely limited, on an Emergency Use Approval only, and not available to the general public. As vaccine supplies increased across the country, the airlines saw increased demand in travel.

25.     The relief from vaccines, however, was short-lived when the Delta variant of the coronavirus emerged, proving to be far superior in transmission than the original virus, being twice as contagious and able to be transmitted through "fleeting" contact.  Today, the number of people infected with the Delta variant is increasing, once again crowding hospitals beyond capacity. Other mutations of the coronavirus are popping up around the world.  The first case of the Lambda variant in the U.S. has shown up at the Houston Methodist Hospital.  Studies show that Lambda may be resistant to vaccines.

26.     Throughout the pandemic, SWAPA Pilots have continued to come to work and perform their duty. Many have had close contact with infected individuals while at work. They have gotten infected. A few have died. Many more have not recovered well enough to fly.

27.     As soon as the pandemic hit, Defendant Southwest Airlines began stockpiling cash from all available sources, including the Payroll Support Program ("PSP") for the airline industry as part of the federal Coronavirus Aid, Relief, and Economic Security ("CARES") Act. Defendant Southwest Airlines went from having a cash balance of $4.1B in 2019 to over $24B during the pandemic.

28.     Despite being cash positive, Defendant Southwest took advantage of the COVID pandemic. In October 2020 Southwest demanded concessions from all of its labor unions, including SWAPA. Defendant Southwest Airlines again made an "enterprise decision" to seek a 10% pay cut from each unionized worker, including Pilots. Within the Pilot group, Management sought a 10% pay cut and also demanded to add a *force majeure* clause into the CBA, which it did not have.

29.     In response, SWAPA stood up against Defendant Southwest Airlines' demands, pointing out the lack of justification for the concession demands and giving management alternative concrete solutions to create efficiencies and savings for the airline to weather the pandemic and compete. Defendant Southwest Airlines was not receptive to SWAPA's solutions, and on December 3, 2020, sent WARN Act notices to 1,221 Pilots, notifying them that they would be furloughed over the Christmas holidays.

30.     As the pandemic dragged on, Defendant Southwest Airlines began experiencing staffing issues. These staffing issues were a direct result of the extra-contractual ExTO program rolled out unilaterally by Defendant Southwest Airlines. Once again, SWAPA had anticipated

these staffing issues months earlier and offered solutions to management.  As hundreds of flights were being (and continued to be) canceled and Pilots are being overworked on the line and stranded overnight, all the while still at risk of COVID, and ever more with the Delta and Lambda strains, SWAPA has been vocal in demanding action by management.  It is an understatement to say that the anti-union sentiment against SWAPA has continued to build throughout the pandemic.

31.     Southwest Airlines' attitude toward Pilots is cavalier, indicating that Management thinks it can act unilaterally, during this global emergency and has hidden behind its "enterprise decision" excuse to refuse to bargain with SWAPA.  However, Defendant Southwest Airlines did in fact bargain for and reach agreement with the flight attendants' union over these exact same issues.

32.     Tellingly, during this same period, other airlines met with their respective labor unions and bargained for new working conditions and rules that were impacted by the pandemic.  American Airlines, United Airlines, and Delta Airlines are amongst those airlines with letters of agreement in place to cover the working conditions, rules and pay related to COVID.  Unlike the case for Defendant Southwest Airlines, such codifications at the other airlines have greatly encouraged vaccinations by the pilots of those airlines and the reduction of the chances of COVID-19 transmission in the interstate transportation environment.

33.     Defendant Southwest Airlines' response to the cost of operating the airline in the pandemic was to shift that cost to its unionized labor.  Despite its reassurances that employees will be paid for the company's operational changes due to COVID, Defendant Southwest Airlines targeted Pilots.

34.     Despite claiming that its Infectious Disease Control Policy was an "enterprise decision" applicable to all employees, Defendant Southwest Airlines imposed random and

unilateral changes to how the policy applied (or not) to Pilots, all without bargaining.  Once again, Pilots were told different things depending on domicile and chief pilots.  SWAPA leadership reached out to their counterparts at the airline to voice objections over Defendant Southwest Airlines' failure to bargain and taking of rights.  Each time, they were rebuffed.

35.    By December 2020, Defendant Southwest Airlines began directing Pilots into mandatory quarantine and only those Pilots who had crew close contact were paid for the work they missed.  The company forced hundreds of pilots into unpaid time off.  By June 16, 2021, Defendant Southwest Airlines continued directing Pilots into mandatory quarantines, but stopped paying them for missed work.  This all was being done verbally by management chief pilots.

36.    On May 11, 2021, Defendant Southwest Airlines revised its Infectious Disease Control Policy.  One glaring change was made.  The critical reassurance that employee "will be paid" for COVID-related events was removed.  Instead, it now says "may" be paid at Defendant's discretion.

37.     In a "major dispute" situation both sides must maintain the *status quo*. *Detroit & T.S.L.R.R. v. UTU,* 396 U.S. 142, 149-53 (1969). The equivalent violation to that of Defendant Southwest Airlines, where it has proceeded with unilateral action to change its contractual obligations without a *force majeure* clause, would be for SWAPA to openly threaten to strike if management refuses to bargain, a threat that Defendant Southwest Airlines would surely seek to enjoin as unlawful until all Section 6 procedures are fully exhausted.  See *Chicago and North Western Railway Co. v. United Transportation Union*, 402 U.S. 570, 91 S. Ct. 1731 (1971).

38.    Defendant's illegal tactics are a form of asymmetrical warfare in negotiations.  If unrestrained, Defendant's illegal tactics will cause irreparable harm to SWAPA and the pilots it represents.  Defendant's tactics are designed to, and if unrestrained will, force concessions from

SWAPA that normal, lawful *status quo* bargaining would not produce, and where the additional concessions forced by Defendant's unlawful tactics cannot be quantified for later monetary remedy.

39.    In light of recent announcements by large corporations, including United Airlines, of their vaccine mandates, on August 11, 2021, SWAPA's President, Captain Casey Murray, reiterated the need for the parties to come to the table and bargain over the mandates already unilaterally imposed by Defendant Southwest Airlines, and those which may be imposed, that alter Pilots' working conditions, rules and pay.  As Captain Murray advised, "a dedicated meeting to address the above is critical," and "SWAPA stands ready to seek relief from the federal court if management takes such unilateral action and refuses to bargain."

40.    Defendant Southwest Airlines' response of August 21, 2021 disagreed, stating that negotiations were not required, as "current CBA contains broad language granting management the right to unilaterally take action on those issues."

41.    After these failed attempts to convince Management to negotiate and reach agreement with SWAPA over Pilots working conditions, rules and pay, SWAPA had no choice but to seek court intervention and assistance in upholding the Railway Labor Act.  SWAPA filed the instant lawsuit on August 31, 2021. (Docket No. 1)

42.    In response to the lawsuit, instead of coming to the bargaining table, Management has doubled down on its unilateral actions which continue to violate the RLA. On September 15, 2021, Defendant Southwest Airlines unilaterally implemented its "Vaccine Participation Pay Program" or "VPPP", another policy that changed Pilots working conditions, rules, and pay.

43.    This new program offered Pilots additional pay to get vaccinated, and also threatened to take away Pilots' pay if they are not vaccinated by a deadline.  This new policy was

not bargained for with the Union.  Instead, Defendant Southwest Airlines merely gave SWAPA a "heads up" the day before, on September 14, 2021, that Management would be rolling it out without giving the Union any details.  By unilaterally implementing this policy, Defendant Southwest Airlines was, in essence, negotiating directly with the Union's membership to change its working conditions, rules, and pay.

44.     Defendant Southwest Airlines' unilateral vaccine incentive program was imposed after SWAPA filed the instant lawsuit on August 30, 2021.  Since then, the parties have met twice virtually to discuss COVID-related issues. In those virtual calls, on September 2 and 7, 2021, SWAPA tried to engage Management in negotiations to reach agreement.  The Union presented Management with a draft MOU that covered the COVID-related issues that have been festering since March 2020.  Defendant Southwest Airlines did no more than allow SWAPA to present the Union's draft MOU.  Management provided no counteroffer.  Management also hid its intent to implement yet another unilateral program, only days later.

45.     As soon as SWAPA learned of Management's plan to roll out its unilateral Vaccine Incentive Plan, SWAPA's President, Captain Casey Murray, wrote to Captain Bob Waltz, Southwest Airlines' Vice President of Flight Operations, to demand confirmation that the Vaccine Participation Pay Program did not apply to Pilots.  Captain Murray's letter stated that, "[t]o roll out a program unilaterally under these circumstances is clear evidence of bad faith bargaining by the Company and de facto negotiating directly with SWAPA's membership, illegal under the RLA as the parties are in Section 6 negotiations."  SWAPA sent Southwest Airlines a cease-and-desist letter on September 14, 2021.

46.     Defendant Southwest Airlines responded to the Union's cease and desist letter on September 17, 2021.  In its response, rather than ceasing and desisting, Southwest Airlines instead

described Management's new unilateral pay policy and acted as if the Company could unilaterally roll out the program.

47.     The following Thursday, on September 23, 2021, SWAPA learned unofficially that Management had plans to start training Pilots to be flight crew training instructors, a job function traditionally performed by non-SWAPA employees and represented by a separate labor union, (TWU 557 – the Southwest Flight Crew Training Instructors Union).  SWAPA immediately sought clarification from Defendant Southwest Airlines, who admitted that Management had indeed solicited SWAPA Pilots to take on this new job function that would change those Pilots' working conditions, rules, and rates of pay.  While SWAPA appreciated Defendant Southwest Airlines' need for more instructors to clear up the training logjam it was experiencing from having Pilots return from ExTO (the earlier unilateral program by Management that paid Pilots outside the CBA for an extended leave of absence), the Union disagreed with Management once again negotiating directly with the Pilot group to create a new category of job function without the Union's agreement.  SWAPA objected that this was another unilateral violation of the RLA by Southwest Airlines.

48.     Tellingly for purposes of this litigation, Defendant Southwest Airlines had not engaged SWAPA regarding this plan to roll out new job duties and pay even though Southwest Airlines had been planning this (behind closed doors) for months.

49.     In response, SWAPA proposed an Instructor MOU that the parties agreed to on September 24, 2021.  That MOU now awaits ratification by the SWAPA Board of Directors as part of the Union's governance process.  Unfortunately, the fact that this Flight Crew Training Instructors program was another unilateral imposition by Management in a long string of unilateral action is jeopardizing the likelihood of the Instructor MOU being approved through union

governance because the negotiations of the MOU happened *after* Southwest rolled out the new unilateral plan rather than beforehand as required by the RLA.

50.     The most recent unilateral action by Southwest Airlines, was just this past Friday afternoon, on October 1, 2021, when Defendant Southwest Airlines gave SWAPA a "heads up" that planned to roll out a vaccine mandate.  This heads up, like those in the past, was unilateral, was without specifics, and with the communication that the policy announcement was imminent.

51.     On October 3, 2021, SWAPA President, Captain Casey Murray, wrote a letter, this time to Gary Kelly, the Chief Executive Officer at Defendant Southwest Airlines, to voice the Union's fierce objections to Management's open disregard for its obligation under the RLA to bargain in good faith.  The Union demanded that Southwest cease and desist from rolling out the vaccine mandate without bargaining and reaching agreement with SWAPA.  Captain Murray notified Mr. Kelly of the Union's intent to seek injunctive relief against Defendant Southwest Airlines to compel Management to stop taking unbargained-for rights.

52.     On October 4, 2021, despite SWAPA's objections, Defendant Southwest Airlines announced its unilateral vaccine mandate, which made vaccination a new condition of employment for Pilots and threatened termination for non-compliance, all of which conflicts with the parties' CBA and all of which has not been negotiated with nor agreed to by SWAPA.  Gary Kelly made the announcement of the unilateral policy at 2:00 p.m.  That morning, Defendant Southwest Airlines had a call with SWAPA to "brief" the Union regarding Defendant's new unilateral vaccine mandate.  There was no give and take within the briefing.  Instead, Management hurriedly dumped its plans on the Union.  By this eleventh hour, there was no time nor opportunity for any meaningful dialogue or input, let alone bargaining.

53.     That same afternoon, on October 4, 2021, Captain Alan Kasher, Executive Vice President of Daily Operations, joined a SWAPA Board of Directors meeting.  In that meeting, Captain Kasher fielded many questions and concerns by the SWAPA Board members.  It was highlighted that Southwest Airline's biggest competitors (United Airlines, Delta Airlines, and American Airlines) had all collectively bargained regarding COVID protocols and programs.  Each of the other airlines had reached out to their respective labor unions at the onset of the pandemic and by May 2020 had negotiated COVID-related letters of agreement prior to changing the working conditions, rules, and pay of their unionized work force.  When asked point blank, Captain Kasher could only admit that Southwest Airlines was wrong in failing to collectively bargain.

54.     Southwest Airlines' cavalier disregard for the RLA has significant consequential and detrimental impact on SWAPA and its membership.  Southwest Airlines' continued and repeated unilateral actions have wholly upended the *status quo* and effectively destroyed the Union's ability to collectively bargain on behalf of its members in compliance with the RLA.

55.     Defendant Southwest Airlines has openly disregarded its legal duty under the RLA to bargain with SWAPA.  Defendant's pattern of taking unilateral action against the Pilot work group during the pandemic is a flagrant violation of Section 6 *status quo*.  Defendant Southwest Airlines' claim that it can avail itself to relief from its contractual obligations to Pilots under management rights turns the RLA on its head.

56.     With each of these unilateral actions, the phones and emails at SWAPA are being flooded with questions and concerns from its membership.  The resulting chaos of these and a multitude of unanswered questions have resulted in a drain on SWAPA's limited resources and the Union's ability to represent its membership.  This bargaining structure, or lack thereof, is not what was envisioned by the drafters of the RLA.

57.     The only way to remedy this situation and protect the integrity of good faith bargaining is for this Court to order Southwest to stop its unilateral action and to bargain with SWAPA to reach agreement.

## GOVERNING LAW

58.     The instant labor dispute is governed by the provisions of the RLA, which defines two types of disputes that may arise between covered employers and the labor organizations representing their employees. 45 U.S.C. § 151 (a)(4) and (a)(5). Disputes falling under Section 151 (a)(4) ("concerning rates of pay, rules, or working conditions") have been coined by the United States Supreme Court as "major" disputes.  *Elgin, Joliet and Eastern Railway Company v. Burley,* 325 U.S. 711, 723, 65 S. Ct. 1282, 1289-90 (1945).  A "major" dispute concerns contract formation or the amendment of a collective bargaining agreement, and the resolution of such disputes is governed by § 6 of the RLA, 45 U.S.C. §§ 156, 181*; Western Airlines, Inc. v. International Brotherhood of Teamsters*, 480 U.S. 1301, 1302 (1987). The RLA establishes "major" dispute resolution procedures, including, but not limited to, negotiation between the parties, mediation before the NMB, and voluntary interest arbitration. *Consolidated Rail Corporation v. Railway Labor Executives' Association,* 491 U.S. 299, 109 S. Ct. 2477 (1989).  Where an employer asserts a contractual right to take contested action, the ensuing dispute is "minor," under Railway Labor Act, if the action is arguably justified by terms of parties' collective bargaining agreement.  In contrast, if the employer's claims are frivolous or obviously insubstantial, the dispute is "major." *Id.* at 306.  The Supreme Court has ruled: "In a situation in which a party asserting a contractual basis for its claim is 'insincere' in so doing, or its 'position [is] founded upon insubstantial grounds,' the result of honoring that party's characterization would be to undercut 'the prohibitions of § 2, Seventh, and § 6 of the Act' against unilateral imposition of new contractual terms." *Id.*

59.     While parties are engaging in the RLA's "major" dispute resolution procedures, they "are obligated to maintain the *status quo*, and the employer may not implement the contested change in rates of pay, rules, or working conditions." *Id*. at 302-03, 109 S. Ct. at 2480. As such, it is generally recognized that a "major" dispute arises where the parties are negotiating over a new agreement through Section 6 procedures, *see id.,* or where the employer attempts to unilaterally alter the agreement outside of the RLA's collective bargaining procedures. *See International Longshoremen's Association, Local 158 v. Toledo Lakefront Dock Co.,* 1977 WL 1809, at *3 (N.D. Ohio Dec. 16, 1977)(finding a "major" dispute where employer attempted to abrogate the contractual arbitration procedure, because such an action was not a matter of contract interpretation, but an attempt to unilaterally alter the terms of the agreement).

60.     Federal District Courts have the power to enforce the duty to maintain the *status quo* and enjoin either party from engaging in conduct that violates that duty.  *Detroit & T.S.L.R.R.*, 396 U.S. 142, 90 S. Ct. 294.  The RLA's *status quo* requirement is "central to its design.  Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike."  *Id.* at 150.  Because one party may wish to change the *status quo* without undue delay, the power granted in the RLA to the other party "to preserve the *status quo* for a prolonged period" encourages the moving party to compromise and reach agreement without interrupting commerce.  *Id.*  Injunctive relief may issue, even in the absence of a traditional showing of irreparable harm.  *Consolidated Rail Corp*., 491 U.S. at 303, 109 S. Ct. at 2480.

61.     Any unilateral alteration or abrogation of an existing collective bargaining agreement during a "major" dispute is a violation of the *status quo* under the RLA. See, e.g., *International Brotherhood of Teamsters (Airline Division) v. Texas International Airlines, Inc*., 717 F.2d 157, 160-61 (5th Cir. 1983)(holding that illegality of unilaterally amending or modifying

the terms of a collective bargaining agreement during a "major" dispute is an "unquestioned principle").

62.     Under Section 2 (First) of the RLA, 45 U.S.C. § 152 (First), Defendant Southwest Airlines is legally required to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . ."

63.      The Supreme Court has held that this requirement is a legal obligation upon parties covered by the RLA that is judicially enforceable. *Chicago and North Western Railway Co. v. United Transportation Union*, 402 U.S. 570, 91 S. Ct. 1731 (1971).

64.     As compared to the duty to bargain in good faith under the National Labor Relations Act, "Section 2 (First) [of the RLA] imposes a higher standard of negotiation efforts ... *Japan Air Lines Co., Ltd. v. Int'l Ass'n of Machinists and Aerospace Workers*, 389 F. Supp. 27, 34 (S.D.N.Y. 1975), aff'd, 538 F.2d 46 (2d Cir. 1976).

65.     The standard employed in determining what type of conduct constitutes such a violation is "whether the party charged with violation of its duty has merely gone through the motions of compliance with the [RLA's] required procedures without a desire to reach an agreement." *Id*. at 34.

66.     "Whether this standard has been met must be determined by the whole of the party's conduct at the bargaining table." *Id*., *citing Kennedy v. Long Island Rail Road Co.,* 319 F.2d 366 (2d Cir. 1963), cert. denied, 375 U.S. 830, 84 S. Ct. 75 (1963).

67.     A party's unlawful intent not to reach an agreement can be demonstrated where the party was "[e]ngaged in the mere pretense of negotiation, [or] adopted evasive and dilatory tactics that revealed an intent to wait until the union acceded to its demands." *Association of Flight*

*Attendants v. Horizon Air Industries, Inc.*, 976 F.2d 541, 545 (9th Cir. 1992)(internal quotations omitted).

## IV.  CAUSES OF ACTION

### COUNT I

### FAILURE TO MAINTAIN THE STATUS QUO
### DURING THE ONGOING "MAJOR" DISPUTE

68.     SWAPA re-alleges and incorporates the allegations stated in the above Paragraphs 1 through 66 as if fully stated herein.

69.     In light of the negotiations for wages, rates of pay, relocation expenses, bidding, and hours or conditions of employment particularly applicable to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, VPPP program, Flight Crew Training Instructors Program, and mandatory vaccine policy, and the fact that negotiations have not yet led to an agreement, the parties in this case are currently engaged in an ongoing "major" dispute and have been since approximately March 2020.

70.     Defendant Southwest Airlines has violated its duty to maintain the *status quo* during a "major" dispute by ceasing and failing to exert every reasonable effort to make an agreement concerning rates of pay, rules, and working conditions for the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, VPPP program, Flight Crew Training Instructors Program, and mandatory vaccine policy, and by failing to exert every reasonable effort to maintain the agreement as to such conditions of employment and pay.

71.     Defendant Southwest Airlines has also violated its duty to maintain the *status quo* during a "major" dispute by unilaterally changing the terms and conditions of employment and pay and by unilaterally in effect declaring a *force majeure* provision within the parties' contract when there is no such provision.  Defendant has also violated the RLA by failing to maintain the

parties' *status quo* during a major dispute by unilaterally changing the terms and conditions of employment and pay by unilaterally rolling out the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy.

72.     In addition to explicitly violating the RLA, Defendant Southwest Airlines' conduct is in derogation of the policies and principles underlying the RLA, in that the "major" dispute resolution procedures were designed to avoid industrial strife and damage to interstate commerce. Defendant Southwest Airlines' unlawful acts have substantially increased the likelihood of a shortage of Pilot staffing without an ExTO MOU, and an increased endangerment of Pilots, other crew members, and passengers with the airline's incongruent messaging to Pilots without a COVID MOU, both potentially resulting in significant disruption and damage to interstate commerce.

73.     By the foregoing acts and conduct, SWAPA and its members employed by Defendant Southwest Airlines will suffer irreparable harm if injunctive relief is not provided, because there is no other avenue available to resolve this dispute and avoid industrial strife due to Defendant Southwest Airlines' unilateral actions and modifications to the parties' collective bargaining agreement.

## COUNT II

### FAILURE TO EXERT EVERY REASONABLE EFFORT
### TO REACH AGREEMENT

74.     SWAPA re-alleges and incorporates the allegations stated in Paragraphs 1 through 66 as if fully stated herein.

75.     The parties are currently engaged in negotiations over a new overall collective bargaining agreement.  SWAPA seeks to bargain, even as Defendant Southwest Airlines refuses

to bargain, for a first agreement concerning rates of pay, rules and working conditions for the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy.

76.    Pursuant to the RLA, Defendant Southwest Airlines is legally required to "exert every reasonable effort to make" such an agreement.  45 U.S.C. § 152 (First).

77.    It is well settled that whether a party violates this legal obligation depends on "whether the party ... has merely gone through the motions of compliance with the [RLA's] ... procedures without a desire to reach an agreement." *Japan Air Lines Co., Ltd. V. Int'l Ass'n of Machinists and Aerospace Workers*, 389 F. Supp. 27, 34 (S.D.N.Y. 1975); *see also*, *Chicago and North Western Railway Co. v. United Transportation Union*, 402 U.S. 570 (1971)(holding that 45 U.S.C. § 152 (First) imposes a legal duty upon the parties that may be enforced in Federal District Court).

78.    Defendant Southwest Airlines has engaged in the following acts and conduct in violation of its duty to exert every reasonable effort to reach an agreement with SWAPA regarding conditions of employment and pay related to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy: (a) showing general hostility towards and contempt for the negotiation process; (b) delaying and frustrating bargaining by refusing to schedule additional negotiating sessions; (c) refusing to promptly respond to proposals made by SWAPA concerning the ExTO program and COVID quarantines; (d) intentionally and continually making unreasonable bargaining proposals while fully aware that said proposals did not conform to and were outside of existing industry standards; and (e) deliberately rolling out its programs and implementing its programs without collective bargaining.

79.     By the misconduct described herein, Defendant Southwest Airlines has violated its duty under the RLA to make every reasonable effort to reach an agreement with SWAPA regarding the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy, because such misconduct demonstrates Defendant's desire not to make such an agreement and indeed Defendant has unilaterally acted and instituted new working conditions and terms of pay based upon a declared unilateral right to do so.

80.     Defendant's actions throughout the negotiating process with respect to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy evince a clear intent on the part of Defendant Southwest Airlines to unilaterally manufacture and utilize a *force majeure* provision and impose new terms and conditions of work and pay into the parties' Agreement without first resolving the parties' dispute as to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy through negotiations as required by the *status quo* provisions of the RLA.

## V. JURY DEMAND

81.     Plaintiff hereby demands a trial by jury on all claims and defenses in this action.

## VI.  PRAYER FOR RELIEF

WHEREFORE, SWAPA requests that Defendant Southwest Airlines be summoned to appear and answer, and that on final trial, judgment be granted against Southwest Airlines, awarding SWAPA the following:

**As to Count I:**

(A)     Issue injunctive relief enjoining Southwest Airlines from unilaterally abrogating and altering the relevant collective bargaining agreement(s) with respect to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy pending completion of the RLA's "major" dispute resolution procedures, and ordering Defendant Southwest Airlines to immediately revert to the *status quo* under the existing collective bargaining agreement(s) as to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy;

(B)     Issue injunctive relief enjoining Defendant Southwest Airlines from using and/or threatening to an unbargained-for and unilaterally declared *force majeure* clause within the parties' CBA pending completion of the RLA's "major" dispute resolution procedures as to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy, and ordering Defendant to immediately revert to the terms and conditions of the *status quo* under the existing collective bargaining agreements as to the ExTO program, COVID

quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy;

(C)     Issue a declaratory judgment that Defendant Southwest Airlines has violated its duty to maintain the *status quo* during a "major" dispute by ceasing and failing to exert every reasonable effort to make an agreement concerning rates of pay, rules, and working conditions for the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy and failing to exert every reasonable effort to maintain the agreement as to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy;

(D)     Issue a declaratory judgment that Defendant Southwest Airlines has violated its duty to maintain the *status quo* during a "major" dispute by declaring it can unilaterally implement the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy without an agreement with respect to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy.;

(E)     Issue a declaratory judgment that Defendant Southwest Airlines is legally required to make every reasonable effort to reach an agreement with SWAPA regarding the

ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy and that Defendant Southwest Airlines has failed to meet this legal requirement.

**As to Count II:**

(A)     Issue an order requiring Defendant Southwest Airlines to cease and desist engaging in the unlawful conduct of failing to exert every reasonable effort" to reach an agreement as to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy; and

(B)     Issue injunctive relief restraining and enjoining Defendant Southwest Airlines from refusing to "exert every reasonable effort" to reach an agreement as to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy going forward;

(C)     Issue a declaratory judgment that Defendant's actions during negotiations with respect to the ExTO program, COVID quarantine conditions of employment and pay for such quarantine, the VPPP program, the Flight Crew Training Instructors Program, and the mandatory vaccine policy constitute a failure to "exert every reasonable effort" to reach an agreement in violation of Section (First), 45 U.S.C. § 152 (First).

**As to Counts 1 and II:**

(A)    Award SWAPA its reasonable costs and attorney's fees associated with this proceeding; and

(B)    Grant such other and further relief as the Court deems equitable and just.


DATED: October 6, 2021

                                            Respectfully submitted,

                                            By: ___ */s/ Hal K. Gillespie* ___
                                            Hal K. Gillespie
                                            hkg@gillespiesanford.com
                                            Texas State Bar No. 07925500
                                            James D. Sanford
                                            jim@gillespiesanford.com
                                            Texas State Bar No. 24051289
                                            Joseph H. Gillespie
                                            joe@gillespiesanford.com
                                            Texas State Bar No. 24036636
                                            Gillespie Sanford LLP
                                            4803 Gaston Avenue
                                            Dallas, Texas 75246
                                            Phone: (214) 800-5111
                                            Fax: (214) 838-0001

                                            and

                                            K. Helen Yu
                                            hyu@swapa.org
                                            Texas State Bar No. 24071565
                                            Southwest Airlines Pilots Association
                                            1450 Empire Central Drive,
                                            Suite 737
                                            Dallas, TX 75247
                                            Phone: (214) 722-4256
                                            Fax (214) 351-2504

                                            ATTORNEYS FOR PLAINTIFF
                                            SOUTHWEST AIRLINES PILOTS
                                            ASSOCIATION ("SWAPA")

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the forgoing document has been served upon counsel of record for Southwest Airlines by and through the Court's ECF system on October 6, 2021.

By: _____ */s/ Joseph H. Gillespie* _____