IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWEST AIRLINES PILOTS ASSOCIATION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § § | CIVIL ACTION NO. 3:21-cv-2065-M |
| SOUTHWEST AIRLINES CO., | § § § | |
| Defendant. | § § | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION
## FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

I.     STATEMENT OF FACTS ......................................................................................... 2

II.    ARGUMENT ............................................................................................................ 15

       A.     The Standard For Preliminary Injunctive Relief ..................................... 15

       B.     SWAPA Is Likely To Succeed On The Merits As Southwest
              Airlines Has Clearly Violated The RLA's Prohibition Against
              Unilaterally Altering The Parties *Status Quo* ....................................... 17

       C.     Southwest Airlines' Unlawful Actions Are Not Supported By Any
              Contract Term ......................................................................................... 22

       D.     SWAPA Will Suffer Irreparable Harm If The Request For
              Injunctive Relief Is Not Granted ............................................................ 24

III.   CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITES

## <u>CASES</u>

*Bhd. of R.R. Trainmen v. Howard,*
 343 U.S. 768 (1952) ....................................................................................... 16

*Bhd. of Ry, Trainmen v. Central of Georgia Ry.,*
 305 F.2d 605 (5th Cir. 1962) ....................................................................... 15

*BNSF Ry. Co. v. Int'l As'n of Sheet Metal Air, Rail & Transp, Workers-Transp, Div.,*
 973 F.3d 326 (5th Cir. 2020) ....................................................................... 15

*Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n,*
 491 U.S. 299 (1989) ...................................................................... 15, 17, 18, 23

*Detroit & T.S. L.R.R.,*
 396 U.S. 142 (1969) ........................................................................... 18, 22, 24

*Division No. 1, Bhd. of Locomotive Engineers v. Consolidated Rail Corp.,*
 844 F.2d 1218 (6th Cir. 1988) ..................................................................... 16

*Elgin Joliet and Eastern Railway Company v. Burley,*
 325 U.S. 711 (1945) ...................................................................................... 17

*Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
 762 F. 2d 464 (5th Cir. 1985) ....................................................................... 15

*International Brotherhood of Teamsters (Airline Division) v. Tex. International Airlines, Inc.,*
 717 F.2d 157 (5th Cir. 1983) ................................................................... 18-19

*International Longshoremen's Ass'n, Local 158 v. Toledo Lakefront Dock Co.,*
 19977WL 1809 (N.D. Ohio Dec. 16, 1977) ................................................ 18

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*
 600 F.3d 562 (5th Cir. 2010) ....................................................................... 15

*Plains Cotton Co-op. Ass'n v. Goodpasture Comput. Serv., Inc,*
 807 F.2d 1256 (5th Cir. 1987) ..................................................................... 15

*Skywest Pilots ALPA Organizing Committee v. Skywest Airlines, Inc.,*
 2007 WL 1848678 (W.D. Cal. 2007) .......................................................... 16

*United Airlines v. Int'l Ass'n of Machinists,*
    243 F.3d 349 (7th Cir. 2001) ............................................................... 15

*Western Airlines, Inc. v. International Brotherhood of Teamsters,*
    480 U.S. 1301 (1987) ....................................................................... 17

*Wheeling & Lake Erie Ry. Co.,*
    789 F.3d 349 (7th Cir. 2001) ............................................................... 15

## STATUTES

<u>Norris-LaGuardia Act,</u>
    29 U.S.C. § 101 ............................................................................ 16
    29 U.S.C. § 107 ............................................................................ 16

<u>Railway Labor Act</u>
    45 U.S.C § 2 ........................................................................... 17, 23
    45 U.S.C § 6 ....................................................... 2, 12, 17, 18, 22, 23, 25
    45 U.S.C. § 151 ......................................................................... 1, 17
    45 U.S.C. § 156 ........................................................................... 17
    45 U.S.C. § 181 ........................................................................... 17

## RULES

<u>Federal Rules of Civil Procedure</u>
    Rule 65 ..................................................................................... 1

TO THE HONORABLE CHIEF DISTRICT JUDGE BARBARA M. G. LYNN:

Plaintiff Southwest Airlines Pilots Association (hereinafter "SWAPA" or "Plaintiff"), has moved this Court pursuant to Fed. R. Civ. P. 65 for a temporary restraining order and for further preliminary and injunctive relief against Defendant Southwest Airlines Co. ("Southwest Airlines" or "Defendant"). The injunctive relief sought in this action is necessary to stop Defendant from unilaterally issuing new policies and procedures which impact the Pilots' pay, rules, and working conditions without first exerting "every reasonable effort" to not violate the parties' *status quo* under the Railway Labor Act, 45 U.S.C. § 151 *et seq*. ("RLA" or the "Act").

Southwest Airlines has unilaterally implemented an Infectious Disease Control Policy, an Emergency Extended Time Off ("ExTO") Program, a COVID quarantine policy, a Vaccine Participation Pay Program ("VPPP"), a Flight Crew Training Instructors Program, and a mandatory COVID vaccine policy.  Each new policy was unilaterally rolled out by Southwest Airlines without negotiations or bargaining by the Company with SWAPA.  Each new policy violates the parties' *status quo* and is an issue within a major dispute that requires Southwest Airlines to maintain the parties' *status quo* while negotiating with SWAPA.  Instead, Southwest Airlines is acting as if it has a *force majeure* provision within the parties' collective bargaining agreement ("CBA") when it does not.  Because Southwest Airlines keeps taking unilateral actions in violation of the RLA, this motion and the requested injunctions are necessary.

Pursuant to Fed. R. Civ. P. 65, SWAPA hereby moves the Court for a temporary restraining order and for further preliminary injunctive relief against Southwest Airlines. The injunctive relief sought will restrain the Carrier from interfering with the federal, Railway Labor Act-protected rights of its pilots represented by the SWAPA.  Counsel for SWAPA has conferred with counsel for Southwest Airlines in a good-faith attempt to resolve this matter by agreement; however, no

agreement could be made, as Southwest Airlines denies its actions are in violation of the Railway Labor Act-protected rights of its Pilots represented by SWAPA.

## I.  STATEMENT OF FACTS

1.     The parties' CBA covered the period from September 1, 2012 through August 31, 2020.  Sixty days prior to the expiration of the term of the CBA, the Union served notice to Southwest for an early reopener on November 1, 2019, pursuant to CBA Section 28, which provides that "[e]ither party may give written notice of its desire to modify the Agreement at least sixty (60) days prior to March 1 of each year beginning March 1, 2020."  (Murray Declaration, Paragraph 3, Exhibit 1, APP 3 and APP 19-21).

2.     On January 9, 2020, SWAPA met with Management at Southwest's headquarters to begin direct negotiations under Section 6 of the RLA. (Murray Declaration, Paragraph 4, APP 3).

3.     Even early in the negotiation process, Southwest Airlines did not engage in bargaining with SWAPA and, instead, took unilateral action.  Several times, SWAPA had to send written demands to Southwest Airlines for the carrier to cease its unilateral actions to change the CBA while in Section 6 negotiations. (Murray Declaration, Paragraph 5, APP 3).

4.     On January 10, 2020, Captain Murray's predecessor, the prior SWAPA President, Captain Jon Weaks, had to send Southwest Airlines a cease-and-desist demand letter when Southwest Airlines attempted to change and negotiate new working rules and pay changes directly with check airmen under the guise of a "Check Airmen scheduling test."  (Murray Declaration, Paragraph 6, Exhibit 2, APP 3 and APP 17-18).

5.     On January 27, 2020, SWAPA had to object to Southwest Airlines' unilateral change to a delayed implementation of the Pilots' deferral rate change to their 401(k) accounts -- without

bargaining with SWAPA -- and demanded that Defendant Southwest Airlines honor the *status quo*.  (Murray Declaration, Paragraph 7, Exhibit 3, APP 3 and APP 19-21).

6.      On February 27, 2020, SWAPA had to object to Southwest Airlines' change of pharmacy benefits manager, which resulted in the reduction of drug benefits for the Pilots, again without bargaining with SWAPA.  (Murray Declaration, Paragraph 8, Exhibit 4, APP 4 and APP 22-24).

7.      Then, during the rise of the COVID-19 pandemic, Southwest Airlines' Management began to threaten furloughs and sought sizable concessions from SWAPA, along with the other work groups.  (Murray Declaration, Paragraph 9, APP 4).

8.      The parties' CBA does <u>not</u> contain a *force majeure* clause.  Without a *force majeure* clause, Management could <u>not</u> be relieved of its obligation to perform its contractual obligations based on extraordinary, uncontrollable circumstances.  (Murray Declaration, Paragraph 10, Exhibit 14, APP 4 and APP 42-283).

9.      When COVID hit full force in March 2020, Southwest Airlines' pattern of taking without bargaining continued.  In the pandemic, the world became shuttered and air travel plummeted.  (Murray Declaration, Paragraph 11, APP 4).

10.     Under the parties' CBA, Southwest Airlines is obligated to meet pay guarantees for its Pilot group.  (*See* CBA provisions within Section 4 and Section 4 H.  APP 80-101, APP 84)  To reduce costs, Southwest Airlines acted as though it had *force majeure* rights by declaring an emergency and implementing an Emergency Time Off ("ETO") program, and later an Emergency Extended Time Off ("ExTO") program, that offered Pilots the option to not fly and not be paid, in contravention of the terms and conditions of the CBA.  (Murray Declaration, Paragraph 12, APP 4).

11.     SWAPA objected to Management's direct negotiations with the Pilot group on these changes to Pilots' working conditions, rules, and pay.  By a letter dated March 26, 2020, SWAPA objected to these programs as another *status quo* violation and demanded bargaining.  In response to SWAPA's demand, Management did come to the bargaining table and negotiated with SWAPA on the ETO program.  The parties' agreement was memorialized in the ETO MOU (Memorandum of Understanding), fully executed on May 27, 2020.  (Murray Declaration, Paragraph 13, Exhibit 5, APP 4-5 and APP 25-26).

12.     For the subsequently imposed ExTO program, SWAPA also tried to reach an MOU with Southwest Airlines but was unsuccessful because Management took the position that bargaining was not necessary.  Management's anti-union sentiment against SWAPA was high (and continues to be high).  Ultimately, no agreement on the ExTO program was ever reached.   Pilots have not only taken time off on ExTO under this extra-contractual program, but many have already left and been recalled.  Southwest Airlines saw no issue with using the pandemic (despite the absence of a *force majeure* clause) to bargain directly with Pilots for working conditions, rules, and pay that was beyond the scope of the CBA (and despite the RLA's bargaining and non-interference duties).  (Murray Declaration, Paragraph 14, APP 5).

13.     Around the same time, on March 11, 2020, Southwest Airlines further availed itself of *force majeure* rights by issuing an emergency pandemic policy that it is using to improperly and illegally trump the CBA.  As part of its "proactive steps to protect Employees in the workplace in the event of an infectious disease outbreak," Southwest Airlines included information that one would expect in such a company pandemic policy.  It adopted the Center for Disease Control ("CDC") guidelines on how to prevent the spread of infection in the workplace, such as frequent

hand washing and avoiding close contact with people who are sick.   (Murray Declaration, Paragraph 15, Exhibit 6, APP 5 and APP 27-28).

14.     The policy also provided for situations where employees are to be quarantined for both contracting an infectious disease and having been exposed to an infectious disease.   Therein, Southwest Airlines expressly reassured all employees that they "will be paid" for any missed work if they got sick from an infectious disease or if they were directed to quarantine by Management or the CDC. It is this pay reassurance portion of the policy that Management unilaterally changed later to take away Pilot pay, a right that Management does not have vested in the CBA.  (Murray Declaration, Paragraph 16, APP 5-6).

15.     At the time, the pay reassurance was critical to preventing Southwest Airlines' operations from grinding to a complete stop, as tens of thousands of people were dying from the COVID-19 virus and hospitals had to turn away patients because they ran out of hospital beds. Schools, government buildings, and courts closed their facilities to the public and restaurants and numerous other businesses largely shut down.   It was under these conditions that Southwest Airlines needed its front-line employees to continue to report for duty and for its Pilots to keep flying the airline's fleet of 737s to keep the airline operational.  (Murray Declaration, Paragraph 17, APP 6).

16.     The Pilot work group is among the most at-risk work groups immediately after first responders and healthcare employees.  Management employees protected themselves by closing headquarters' offices to work from home and met virtually, but Pilots, along with other front-line workers, did not have that option.  Pilots, especially, were at a heightened risk due to the nature of their work.  (Murray Declaration, Paragraph 18, APP 6).

17.     During flight operations, Pilots are confined to the cockpit for long hours, which makes it impossible for Pilots to maintain safe social distancing under both the CDC Guidelines and Southwest Airlines' Infectious Disease Control Policy.  (Murray Declaration, Paragraph 19, APP 6).

18.     Additionally, while management employees sheltered at home, Pilots were on the road every day, in airport terminals, at hotels with drastically reduced services, and crammed into hotel shuttles to and from their day of work.  (Murray Declaration, Paragraph 20, APP 6).

19.     While management employees with minor children (now no longer in schools) were able to work with their kids at home, Pilots could not, and their families and children were equally put at risk of infection each time the Pilots returned home from a trip.  (Murray Declaration, Paragraph 21, APP 7).

20.     During this time, state and local governments around the country were issuing progressively stricter rules against being in public.  However, because of their role in global transportation, Pilots were deemed an "essential critical infrastructure workforce."  As they flew their trips, Pilots had to carry on their persons a copy of an official letter from CEO Gary Kelly – regarding "Movement of Supplies and Personnel Related to Critical Infrastructure," issued on or about March 23, 2020 – to prove that they were exempt from state and local laws that prohibited individuals from being in public and to avoid arrest if stopped by local law enforcement authorities. (Murray Declaration, Paragraph 22, Exhibit 7, APP 7 and APP 29).

21.      Indeed, conditions were so dangerous for Southwest Pilots that SWAPA had to make a demand on Defendant Southwest Airlines to protect crew health and safety.  In SWAPA's April 20, 2020 letter, SWAPA demanded, among other things, for Southwest Airlines to sanitize the aircraft cockpit daily, to provide Pilots with PPE (which was extremely scarce), and to provide

Pilots with notification when they had been exposed to infected crew or passengers that was consistent across all eleven of Southwest Airlines' domiciles.  SWAPA had received membership complaints that notification by chief pilots varied depending on which domicile the Pilot was based in, and even within the same domicile, notification may have been different from chief pilot to chief pilot or assistant chief pilots.  (Murray Declaration, Paragraph 23, APP 7).

22.    Since March 2020, the COVID pandemic has gone through several surges and peaks. After the first spike in the summer of 2020, America braced itself for a second spike during the fall of 2020.  Vaccination relief did not come until first quarter of 2021, and even then, vaccine supply was extremely limited, on an Emergency Use Approval only, and not available to the general public.  As vaccine supplies increased across the country, the airlines saw increased demand in travel.  (Murray Declaration, Paragraph 24, APP 7-8).

23.    The relief from vaccines, however, was short-lived when the Delta variant of the coronavirus emerged, proving to be far superior in transmission than the original virus, being twice as contagious and able to be transmitted through "fleeting" contact.   (Murray Declaration, Paragraph 25, APP 8).

24.    Today, the number of people infected with the Delta variant is increasing, once again crowding hospitals beyond capacity.  Other mutations of the coronavirus are popping up around the world.  The first case of the Lambda variant in the U.S. has shown up at the Houston Methodist Hospital.  Studies show that Lambda may be resistant to vaccines.  (Murray Declaration, Paragraph 26, APP 8).

25.    Throughout the pandemic, SWAPA's dedicated Pilots have continued to come to work and perform their duty. Many have had close contact with infected individuals while at work.

They have gotten infected.  A few have died.  Many more have not recovered well enough to fly. (Murray Declaration, Paragraph 27, APP 8).

26.     As soon as the pandemic hit, Southwest Airlines began stockpiling cash from all available sources, including the Payroll Support Program ("PSP") for the airline industry as part of the federal CARES Act.  Southwest Airlines went from having a cash balance of $4.1B in 2019 to over $24B during the pandemic.  (Murray Declaration, Paragraph 28, APP 8).

27.     Despite being cash positive, Southwest took advantage of the COVID pandemic. In October 2020, Management demanded concessions from all its labor unions, including SWAPA. Southwest Airlines again made an "enterprise decision" to seek a 10% pay cut from each labor worker.  With the Pilot group, Management sought a 10% pay cut and demanded to add a *force majeure* clause into the CBA, which it did not have.  (Murray Declaration, Paragraph 29, Exhibit APP 8).

28.     In response, SWAPA stood up against Management's demands, pointing out the lack of justification for the concession demands and gave Management alternative concrete solutions to create efficiencies and savings for the airline to weather the pandemic and compete. Management was not receptive to SWAPA's solutions, and on December 3, 2020, sent WARN Act notices to 1,221 Pilots, notifying them that they would be furloughed over the Christmas holidays.  (Murray Declaration, Paragraph 30, APP 9).

29.     As the pandemic dragged on, Southwest Airlines began experiencing staffing issues. These staffing issues were a direct result of the extra-contractual ExTO program rolled out unilaterally by Southwest Airlines.  Once again, SWAPA had anticipated these staffing issues months earlier and offered solutions to Management.  As hundreds of flights are being canceled and Pilots are being overworked on the line and stranded overnight, all the while still at risk of

COVID, and ever more with the Delta and Lambda strains, SWAPA has been vocal in demanding action by Management.  It is an understatement to say that the anti-union sentiment against SWAPA has continued to build throughout the pandemic.  (Murray Declaration, Paragraph 31, APP 9).

30.     Southwest Airlines' attitude toward Pilots is cavalier, indicating that Management thinks it can act unilaterally during this global emergency and hiding behind its "enterprise decision" excuse to refuse to bargain with SWAPA.  However, Southwest Airlines did in fact bargain for and reach agreement with the flight attendants' union over these exact same issues. (Murray Declaration, Paragraph 32, APP 9).

31.     During this same period, other airlines met with their respective labor unions and bargained for new working conditions and rules that were impacted by the pandemic. American Airlines, United Airlines, and Delta Airlines are amongst those airlines with letters of agreement in place to cover the working conditions, rules, and pay related to COVID.  Unlike the case for Southwest Airlines, such codifications at the other airlines have greatly encouraged vaccinations by the pilots of those airlines and the reduction of the chances of COVID-19 transmission in the interstate transportation environment.  (Murray Declaration, Paragraph 33, APP 9-10).

32.     Having negotiated and codified COVID Letters of Agreements with its labor unions back in May 2020, United Airlines reported at the end of September 2021 that 99.5% of its employees have been vaccinated.  (Murray Declaration, Paragraph 34, APP 10).

33.     On the other hand, Southwest Airlines' response to the cost of operating the airline in the pandemic was to shift that cost to its unionized labor.  Despite its reassurances that employees will be paid for the company's operational changes due to COVID, Southwest Airlines targeted Pilots.  (Murray Declaration, Paragraph 35, APP 10).

34.     Even though its Infectious Disease Control Policy was supposed to be an "enterprise decision" applicable to all employees, Southwest Airlines imposed random and unilateral changes to how the policy applied (or not) to Pilots, all without bargaining.  Once again, Pilots were told different things depending on domicile and chief pilots.  SWAPA leadership reached out to its counterparts at the airline to voice objections over Southwest Airlines' failure to bargain and taking of rights.  Each time, SWAPA was rebuffed.  (Murray Declaration, Paragraph 36, APP 10).

35.     By December 2020, Management began directing Pilots into mandatory quarantines and only those Pilots who had crew close contact were paid for the work they missed. The company forced hundreds of pilots into unpaid time off. By June 16, 2021, Management continued directing Pilots into mandatory quarantines, but stopped paying them for missed work.  This all was being done verbally by Management chief pilots.  (Murray Declaration, Paragraph 37, APP 10).

36.     On May 11, 2021, Southwest Airlines revised its Infectious Disease Control Policy. One glaring change was made.  The critical reassurance that employees "will be paid" for COVID-related events was removed.  Instead, it now says "may" be paid - at Management's discretion. (Murray Declaration, Paragraph 38, Exhibit 8, APP 10-11 and APP 30-33).

37.     In light of recent announcements by large corporations, including United Airlines, of their intent to mandate vaccinations, on August 11, 2021, SWAPA's president, Captain Murray, wrote a demand letter to Southwest Airlines, reiterating the need for the parties to come to the table and bargain over the mandates already (unilaterally) imposed by Southwest Airlines, and those which may be imposed, that alter Pilots' working conditions, rules and pay.  He expressly stated that, "a dedicated meeting to address the above is critical," and "SWAPA stands ready to seek relief from the federal court if management takes such unilateral action and refuses to bargain."  (Murray Declaration, Paragraph 39, Exhibit 9, APP 11 and APP 34-35).

38. Southwest Airlines' response of August 21, 2021 disagreed, stating that negotiations were not required, as "current CBA contains broad language granting management the right to unilaterally take action on those issues." (Murray Declaration, Paragraph 40 Exhibit 10, APP 11 and APP 36).

39. After these failed attempts to convince Management to negotiate and reach agreement with SWAPA over Pilots working conditions, rules and pay, SWAPA had no choice but to seek court intervention in upholding the Railway Labor Act. SWAPA filed the instant lawsuit on August 31, 2021. (Murray Declaration, Paragraph 41, APP 11, and Docket No. 1).

40. Instead of coming to the bargaining table, Management doubled down. On September 15, 2021, Southwest Airlines unilaterally implemented another policy that changes Pilots' working conditions, rules, and pay, i.e., its "Vaccine Participation Pay Program" or "VPPP." This new program offered Pilots additional pay to get vaccinated, and also threatened to take away Pilots' pay if they are not vaccinated by a deadline. It was not bargained with the Union. Management gave SWAPA a "heads up" the day before, on September 14, 2021, that Southwest Airlines would implement the new policy but omitted any details. By unilaterally imposing it on the Pilot work group, Southwest Airlines was, in essence, negotiating directly with the Union's membership to change its working conditions, rules, and pay (despite Southwest's duties under the RLA). (Murray Declaration, Paragraph 42, APP 11-12).

41. The unilateral vaccine incentive program was imposed after SWAPA filed the federal *status quo* lawsuit. Since then, the parties met twice virtually to discuss COVID-related issues. In those virtual calls, on September 2 and 7, 2021, SWAPA tried to engage Management in negotiations to reach agreement. SWAPA presented Management with a draft MOU that covers the COVID-related issues that have been festering since March 2020. Southwest Airlines did no

more than hold court to allow SWAPA to present its draft MOU.  It provided no counteroffer, nor did it signal its intent to implement yet another unilateral program, only days later.  (Murray Declaration, Paragraph 43, APP 12).

42.     As soon as SWAPA learned of Management's plan to roll out its unilateral Vaccine Incentive Plan, Captain Murray wrote to Captain Bob Waltz, Southwest Airlines' Vice President of Flight Operations to demand confirmation that the Vaccine Participation Pay Program did not apply to Pilots.  Captain Murray stated to Captain Waltz that, "[t]o roll out a program unilaterally under these circumstances is clear evidence of bad faith bargaining by the Company and de facto negotiating directly with SWAPA's membership, illegal under the RLA as the parties are in Section 6 negotiations."  (Murray Declaration, Paragraph 44, Exhibit 11, APP 12 and APP 37-38).

43.     Captain Waltz responded in writing on September 17, 2021.  In his letter, he described Management's VPPP.  (Murray Declaration, Paragraph 45, Exhibit 12, APP 13 and APP 39).

44.     The following Thursday, on September 23, 2021, SWAPA learned unofficially that Management had plans to start training Pilots to be flight crew training instructors, a job function traditionally performed by non-SWAPA employees and represented by a separate labor union, i.e., the TWU 557 – the Southwest Flight Crew Training Instructors Union.  SWAPA immediately sought clarification from Southwest Airlines, who admitted that Management had indeed solicited SWAPA Pilots to take on this new job function that would change those Pilots' working conditions, rules, and rates of pay.  While SWAPA appreciated Southwest Airlines' need for more instructors to clear up the training logjam it was experiencing from having Pilots return from ExTO (the earlier unilateral program by Management that paid Pilots outside the CBA for an extended leave of absence), SWAPA disagreed with Management once again negotiating directly with its

Pilot group to create a new category of job function without the Union's agreement. (Murray Declaration, Paragraph 46, APP 13).

45.     Southwest Airlines had not engaged SWAPA on this training effort, even though it had been in the works for months. Under SWAPA's insistence and working with a select few at Southwest Airlines, SWAPA proposed an Instructor MOU that the parties agreed to on September 24, 2021, which now awaits ratification by SWAPA Board of Directors as part of the Union's governance process. (Murray Declaration, Paragraph 47, APP 13).

46.     As the Instructor MOU hung in the balance, on Friday afternoon, October 1, 2021, Southwest Airlines gave SWAPA a "heads up" that a vaccine mandate - again unilateral, again without specifics – was imminent. On October 3, 2021, Captain Murray wrote a letter, this time to Gary Kelly, the Chief Executive Officer at Southwest Airlines, to voice the Union's fierce objections to Management's open disregard for its obligation under the RLA to bargain in good faith. SWAPA demanded that Southwest cease and desist from rolling out the vaccine mandate without bargaining and reaching agreement with SWAPA. SWAPA notified Mr. Kelly of the Union's intent to seek injunctive relief against Southwest Airlines to compel Management to stop taking unbargained-for rights. (Murray Declaration, Paragraph 48, Exhibit 13, APP 13-14 and APP 40-41).

47.     On October 4, 2021, Southwest Airlines announced its vaccine mandate, which made vaccination a new condition of employment for Pilots and threatened termination for non-compliance, all of which conflicts with the parties' CBA and has not been negotiated with nor agreed to by SWAPA. Gary Kelly made the announcement at 2:00 p.m. That morning, Southwest Airlines set up a call with SWAPA to "brief" SWAPA of the new vaccine mandate about to be implemented. There was no give and take within the briefing. Instead, Management hurriedly

dumped its plans on the Union.  By this eleventh hour, there was no time nor opportunity for any meaningful dialogue or input, let alone bargaining.  (Murray Declaration, Paragraph 49, APP 14).

48.     That same afternoon, on October 4, 2021, Captain Alan Kasher, Executive Vice President of Daily Operations, joined a SWAPA Board of Directors meeting.  In that meeting, Captain Kasher fielded many questions and concerns by the SWAPA Board members.  It was highlighted that Southwest Airlines' biggest competitors, i.e., United Airlines, Delta Airlines, and American Airlines, all had collectively bargained-for rights.  Specifically, each of the other airlines had reached out to their respective labor unions at the onset of the pandemic and by May 2020 had negotiated COVID-related letter of agreements prior to changing the working conditions, rules, and pay of their unionized work force.  (See Declaration of Mark Myers, Director of Pilot Negotiations and Contract Administration for the Allied Pilots Association ("APA") regarding successfully reaching nine Memorandums of Understanding with American Airlines on behalf of approximately 14,000 pilots, APP 285-87) When asked point blank, Captain Kasher could only admit that Southwest Airlines was wrong in failing to collectively bargain.  (Murray Declaration, Paragraph 50, APP 14-15).

49.     Southwest Airlines' cavalier disregard for the RLA has a significant, consequential, and detrimental impact on SWAPA and its membership.  Southwest Airlines' continued and repeated unilateral actions have wholly upended the *status quo* and effectively destroyed the Union's ability to collectively bargain on behalf of its members in compliance with the RLA. (Murray Declaration, Paragraph 51, APP 15).

50.     With each of these unilateral actions, our phones and emails at SWAPA are being flooded with questions and concerns from membership.  The resulting chaos of these and a multitude of unanswered questions have resulted in a drain on SWAPA's resources and the

Union's ability to represent its membership.  This bargaining structure, or lack thereof, cannot be what was envisioned by the drafters of the RLA.  (Murray Declaration, Paragraph 52, APP 15).

## II.   ARGUMENT

### A.   The Standard for Preliminary Injunctive Relief

Under the law of this Circuit, preliminary injunctive relief is appropriate if (1) there is a substantial likelihood that the moving party will prevail on the merits, (2) there is a substantial threat of irreparable injury, (3) the balance of harms tips in the movant's favor, and (4) the public interest supports an injunction. *See, e.g., BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers-Transp. Div.*, 973 F.3d 326, 333 fn. 5 (5th Cir. 2020); *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 568-69 (5th Cir. 2010); *Plains Cotton Co-op. Ass'n v. Goodpasture Comput. Serv., Inc.*, 807 F.2d 1256, 1259 (5th Cir. 1987); *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir. 1985).

However, in cases where a party has alleged violations of the RLA, the court need not make a finding of irreparable harm or injury and may issue a preliminary injunction to put an end to the non-moving party's actions. *See, e.g., Bhd. of Ry. Trainmen v. Central of Georgia Ry.*, 305 F.2d 605, 609 (5th Cir.1962)(holding that if rail carrier's motivation is to destroy the representative through the imposition of improper discipline, "the public interest, if nothing else, would make injunctive relief appropriate if not compelled."); *see also Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 303 (1989)(holding that violations of the statutory requirements of the RLA may be enjoined without the customary showing of irreparable injury); *Wheeling & Lake Erie Ry. Co.*, 789 F.3d 681, 691 (6th Cir. 2015)(same); *United Airlines v. Int'l. Ass'n of Machinists*, 243 F.3d 349, 362 (7th Cir. 2001)(affirming a preliminary injunction without a finding

of irreparable harm); *Division No. 1, Bhd. of Locomotive Engineers v. Consolidated Rail Corp.*, 844 F.2d 1218, 1220 (6th Cir. 1988)(same).

Moreover, the Norris-LaGuardia Act, 29 U.S.C. § 101, *et seq.*, does not deprive this Court of jurisdiction to issue the requested injunctive relief. *See Bhd. of R.R. Trainmen v. Howard*, 343 U.S. 768, 774 (1952). Norris-LaGuardia states that before issuing a preliminary injunction in any case involving a labor dispute, the district court must hear testimony of witnesses in open court and must make findings to the effect:

> (a) that unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained. . . .;
>
> (b) That substantial and irreparable injury to complainant's property will follow;
>
> (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;
>
> (d) That complainant has no adequate remedy at law; and
>
> (e) That the public officers charged with the duty to protect complainant's property are unable to unwilling to furnish adequate protection.

29 U.S.C. § 107. But the requirements of Norris-LaGuardia do not substantially change the court's preliminary injunction analysis; to grant the moving party's motion, "the Court must find that Plaintiffs have shown a substantial likelihood that they can prevail on their RLA claims and must also find that without a preliminary injunction Plaintiffs will suffer irreparable harm which outweighs any harm caused," to the defendant. *Skywest Pilots ALPA Organizing Committee v. Skywest Airlines, Inc.*, 2007 WL 1848678, * 5 (W.D. Cal. 2007).

**B.    SWAPA Is Likely To Succeed On The Merits As Southwest Airlines Has Clearly Violated The RLA's Prohibition Against Unilaterally Altering The Parties'** *Status Quo*

The instant labor dispute is governed by the provisions of the RLA, which defines two types of disputes that may arise between covered employers and the labor organizations representing their employees. 45 U.S.C. § 151 (a)(4) and (a)(5). Disputes falling under Section 151 (a)(4) ("concerning rates of pay, rules, or working conditions") have been coined by the United States Supreme Court as "major" disputes.  *Elgin, Joliet and Eastern Railway Company v. Burley,* 325 U.S. 711, 723, 65 S. Ct. 1282, 1289-90 (1945).  A "major" dispute concerns contract formation or the amendment of a collective bargaining agreement, and the resolution of such disputes is governed by § 6 of the RLA, 45 U.S.C. §§ 156, 181*; Western Airlines, Inc. v. International Brotherhood of Teamsters*, 480 U.S. 1301, 1302 (1987). The RLA establishes "major" dispute resolution procedures, including, but not limited to, negotiation between the parties, mediation before the NMB, and voluntary interest arbitration. *Consolidated Rail Corporation v. Railway Labor Executives' Association,* 491 U.S. 299, 109 S. Ct. 2477 (1989).  Where an employer asserts a contractual right to take contested action, the ensuing dispute is "minor," under Railway Labor Act, if the action is arguably justified by terms of parties' collective bargaining agreement.  In contrast, if the employer's claims are frivolous or obviously insubstantial, the dispute is "major." *Id.* at 306.  The Supreme Court has ruled: "In a situation in which a party asserting a contractual basis for its claim is 'insincere' in so doing, or its 'position [is] founded upon insubstantial grounds,' the result of honoring that party's characterization would be to undercut 'the prohibitions of § 2, Seventh, and § 6 of the Act' against unilateral imposition of new contractual terms." *Id.*

While parties are engaging in the RLA's "major" dispute resolution procedures, they "are obligated to maintain the *status quo*, and the employer may not implement the contested change

in rates of pay, rules, or working conditions." *Id.* at 302-03.  As such, it is generally recognized that a "major" dispute arises where the parties are negotiating over a new agreement through Section 6 procedures, *see id.,* or where the employer attempts to unilaterally alter the agreement outside of the RLA's collective bargaining procedures. *See International Longshoremen's Association, Local 158 v. Toledo Lakefront Dock Co.,* 1977 WL 1809, at *3 (N.D. Ohio Dec. 16, 1977)(finding a "major" dispute where employer attempted to abrogate the contractual arbitration procedure, because such an action was not a matter of contract interpretation, but an attempt to unilaterally alter the terms of the agreement).

Federal District Courts have the power to enforce the duty to maintain the *status quo* and enjoin either party from engaging in conduct that violates that duty.  *Detroit & T.S.L.R.R.*, 396 U.S. 142 (1969).  The RLA's *status quo* requirement is "central to its design.  Its immediate effect is to prevent the Union from striking and management from doing anything that would justify a strike."  *Id.* at 150.  Pursuant to Section 6 of the RLA, the section of immediate concern in this case, provides that "rates of pay, rules, or working conditions shall not be altered" during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board.  *Id.*  Because one party may wish to change the *status quo* without undue delay, the power granted in the RLA to the other party "to preserve the *status quo* for a prolonged period" encourages the moving party to compromise and reach agreement without interrupting commerce.  *Id.*  Injunctive relief may issue, even in the absence of a traditional showing of irreparable harm.  *Consolidated Rail Corp.*, 491 U.S. at 303.

Any unilateral alteration or abrogation of an existing collective bargaining agreement during a "major" dispute is a violation of the *status quo* under the RLA. See, e.g., *International Brotherhood of Teamsters (Airline Division) v. Texas International Airlines, Inc.*, 717 F.2d 157,

160-61 (5th Cir. 1983)(holding that illegality of unilaterally amending or modifying the terms of a collective bargaining agreement during a "major" dispute is an "unquestioned principle").

In this case, Southwest Airlines has repeatedly violated the RLA's requirement that Defendant maintain the parties' *status quo*. Southwest Airlines has continuously failed to uphold its duty to bargain and negotiate regarding: (1) the unilaterally implemented an Infectious Disease Control Policy, (2) the Emergency Extended Time Off ("ExTO") Program, (3) COVID quarantine policies, (4) the Vaccine Participation Pay Program ("VPPP"), (5) the Flight Crew Training Instructors Program, and (6) the mandatory COVID vaccine policy. Each of these new unilaterally developed and established policies was rolled out by Southwest Airlines without negotiations or bargaining. Each new policy violates the parties' *status quo* and is an issue within a major dispute that requires Southwest Airlines to maintain the parties' *status quo* while negotiating with SWAPA. Instead, Southwest Airlines is acting as if it has a *force majeure* provision within the parties' collective bargaining agreement ("CBA") when it does not. Without court intervention, Defendant Southwest will continue to violate the RLA.

The unilaterally implemented Infectious Disease Control Policy impacts the parties' *status quo* by altering the Pilots' pay, rules, or working conditions. Specifically, this new policy instituted quarantine and pay changes (APP 28) which required Pilots to quarantine under certain circumstances and it also impacted Pilot's pay as it issued a new pay policy for time spent in quarantine. This new unilateral policy was not bargained upon by Defendant Southwest Airlines before it was issued. SWAPA did not push back on this policy at the time because the pay language within the policy indicated that no pay would be lost due to the quarantine.

The unilaterally implemented ExTO Program impacts the parties' *status quo* by altering the Pilots' pay, rules, or working conditions. This new program directly offered Pilots the option

to not fly and not be paid in contravention of the terms and conditions of the CBA.  Pilots are paid for their flying and are guaranteed contractual minimum pay if flying is taken away from them. (*See* CBA provisions within Section 4 and Section 4 H.  APP 80-101, APP 84)  Southwest Airlines' unilateral offer – directly to Pilots - of this extended "time off" with reduced pay program, was not bargained upon by Defendant and Defendant would not agree to reach an Memorandum of understanding regarding this policy.

The unilaterally implemented COVID quarantine policies impacts the parties' *status quo* by altering the Pilots' pay, rules, or working conditions.  The Company's unilaterally created policy for quarantines and pay during quarantines was unilaterally altered by the Company in June of 2021 by Defendant removing language within the policy which placed an affirmative duty to pay employees for time spent in quarantine (see APP 28) to wholly discretionary language stating that the Company "may" pay the employee for quarantines imposed by the Company (see APP 31).  Again, Pilots are paid for their flying and guaranteed contractual minimum pay if flying is taken away from them.  There is no contractual right vested in the Company to create a policy that reduces Pilot guaranteed pay. (*See* CBA provisions within Section 4 and Section 4 H.  APP 80-101, APP 84). This unilateral shift by the Company does not comport with the parties' CBA and it violates' the parties *status quo*.

The unilaterally implemented VPPP policy impacts the parties' *status quo* by altering the Pilots' pay, rules, or working conditions.  Specifically, this policy which was unilaterally implemented by Defendant *after* this lawsuit was filed by SWAPA, directly changes the pay of Pilots by offering them 16 hours or 13 trip pulls (a unit of Pilot pay), if they undertake certain vaccine-related actions.  It also takes away Pilot pay for those Pilots who chose to not participate in this program, whether or not they are in fact vaccinated.  The unilateral changing of the Pilots'

pay clearly violates the parties' *status quo* and Southwest Airlines' refusal to reach a memorandum of understanding demonstrates its cavalier attitude in which it believe that it does not need to negotiate with the Union.

The unilaterally implemented Flight Crew Training Instructors Program impacted the parties' *status quo* by altering the Pilots' pay, rules, or working conditions.  With this program, Southwest Airlines unilaterally rolled out a new program to train pilots to be Flight Crew Training Instructors (APP 13).  This newly created program literally took work from one union (TWU 557) and assigned it to pilots within SWAPA.  (APP 13)  Defendant solicited Pilots to work in this new category of Pilots, offering them different work and pay.  After unilaterally rolling this policy out, Southwest Airlines admitted that this new job function would change the pay, rules, and working conditions of the Pilots selected for this position.  This action again violated the parties' *status quo*.  This Instructor Program was implemented without negotiations with SWAPA.  *After* the Instructor Program was rolled out, SWAPA was able to negotiate a tentative agreement with the Company that is, at the time of this writing, pending approval by the SWAPA Board of Directors pursuant to the Union's governance process.

Finally, not only does the newly implemented unilateral mandatory COVID vaccine policy impact the parties' *status quo* by altering the Pilots' pay, rules, or working conditions, it also is a work rule mandate that requires decision and effects negotiations under the RLA.  This new policy announced by Southwest Airlines on October 4, 2021, purports to require all Pilots to be vaccinated by certain dates, submit proof of vaccination by certain dates, *or be terminated*.  This radical new policy is in stark contrast with the progressive discipline and termination policies within the parties' CBA and it radically violates the parties' *status quo*.

### C.  Southwest Airlines' Unlawful Actions Are Not Supported By Any Contract Term

It is anticipated that Southwest Airlines will attempt to argue that this is a "minor" dispute rather than a major dispute.  Such argument is not supportable because there is no contractual term that provides Southwest Airlines the right to unilaterally alter "rates of pay, rules, or working conditions" during the parties' Section 6 negotiations.   "The [RLA's] *status quo* requirement is central to its design." *Detroit & T. S. L. R. Co. v. United Transp. Union*, 396 U.S. 142, 150 (1969). The *status quo* of, "the actual, objective working conditions out of which the dispute arose, irrespective of whether these conditions are covered in an existing collective agreement," must be maintained by Southwest Airlines.  *Id*. at 143.  Southwest Airlines cannot unilaterally alter the rates of pay, rules, or working conditions and doing so is a major dispute because the *status quo* has been breached.

Southwest Airlines may attempt to argue that COVID has created a situation that requires it to take unilateral actions to ensure the safety and health of its employees and passengers.  The primary problem with this argument is that Southwest Airlines does not have a *force majeure* clause within the Parties' CBA and it cannot unilaterally create one.  Indeed, Southwest has attempted to obtain a *force majeure* provision in past negotiations, and it has not succeeded and there is no such term in the parties' CBA.  Additionally, Southwest Airlines cannot establish that it took every reasonable effort to attempt to negotiate regarding the "rates of pay, rules, or working conditions" before it unilaterally made the changes complained of in this litigation.  Southwest Airlines also cannot establish, at all, that bargaining with the Union, as required by the RLA, would have negatively impacted public safety.  Indeed, the unilaterally rolled out ExTO program is similar to the ETO program, and the Company *was* able to negotiate with and reach a Memorandum of Understanding with SWAPA regarding the ETO program.  There is simply no

reason, other than anti-Union animus and Defendant's "might makes right" attitude which have prevented Southwest Airlines from complying with the requirements of the RLA.

Southwest Airlines may argue that the CBA's "management right's" provision (APP 63) gives it the right to do what it has done (and what is complained about by SWAPA in this litigation). Such an argument would fail. The management rights provision of the parties contract does not support Defendant's actions. This clause of the parties' CBA states:

> The right to **manage and direct** the work force, **subject to the provisions of this Agreement**, is vested in the Company. Employees covered by this Agreement shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company **which are not in conflict with the terms and conditions of this Agreement** and which have been made available to the affected employees and the Association prior to becoming effective.

(APP 63, emphasis added). Creating new programs and policies, such as the mandatory vaccine policy, which includes a new non-just cause standard for termination of pilots, is clearly in conflict with the terms and conditions of the parties CBA. As held by the Supreme Court, "In a situation in which a party asserting a contractual basis for its claim is 'insincere' in so doing, or its 'position [is] founded upon insubstantial grounds,' the result of honoring that party's characterization would be to undercut 'the prohibitions of § 2, Seventh, and § 6 of the Act' against **unilateral imposition of new contractual terms.**" *Consolidated Rail Corporation v. Railway Labor Executives' Association,* 491 U.S. 299, 306 (1989)(emphasis added). Here, it would be insincere and frivolous for Southwest Airlines to argue that it has Management Rights to alter the rates of pay, rules, and working conditions of SWAPA Pilots as it has done in the past several months. While COVID is a serious issue, COVID does not obviate Defendant's RLA imposed obligations to negotiate with SWAPA and to maintain the parties' *status quo* during the negotiations.

Furthermore, even if Southwest Airlines argues that its actions are within its management's rights because its actions *arguendo* do not conflict with the terms and conditions of the CBA, the

Supreme Court has long held that, "that what must be preserved as the *status quo* are the actual, objective working conditions out of which the dispute arose, irrespective of whether these conditions are covered in an existing collective agreement. *Detroit & T. S. L. R. Co. v. United Transp. Union*, 396 U.S. 142, 143 (1969). Southwest simply cannot do as it pleases without involving SWAPA in the process and negotiating with SWAPA regarding any change that impacts the Pilots' rates of pay, rules, or working conditions. Here, this major dispute has reached a point wherein Defendant has repeatedly, and with increasing frequency, violated the parties' *status quo* and therefore an injunction is necessary and proper.

### D. SWAPA Will Suffer Irreparable Harm If The Request For Injunctive Relief Is Not Granted

The element of irreparable harm need not be shown in the context of a court injunction to enforce the statutory requirements of the RLA. Even though SWAPA need not establish irreparable harm, without an injunction the Union and its members will be irreparably harmed to be sure.

What is happening in this case is very simple. Southwest Airlines is in year two of direct contract negotiations with SWAPA and Southwest Airlines is engaged in bad faith negotiations in an effort to damage the strength of the Union and weaken the Union's bargaining position. Each time that the Company unilaterally rolls out a new program or policy that impacts the parties' *status quo*, SWAPA is in a fire drill response mode because of the Company's violations of the RLA. SWAPA must send a cease and desist letter which the Company promptly ignores and then SWAPA must answer a flood of questions and worry by its members who have a CBA that is being unilaterally altered and ignored by the Company. Each time this happens, turmoil and labor strife increases. Each time this happens, the Company is flexing its muscle in violation of the RLA in an effort to damage the Union. And the Union is being damaged. The Union is having to use

internal resources to respond and put out this fire each time it happens.  Discord among Union members and employees grows each time this happens.  The drafters of the RLA were attempting to prevent this labor strife, but Southwest Airlines acts as if it is above the RLA.

Worth noting, this is not happening at other airlines and Southwest Airlines is an outlier within the domestic industry.  A direct comparison can be made to American Airlines, and its 14,000 pilots represented by the Allied Pilots Association ("APA").  (Myers Declaration ¶1, APP 285)  The APA has successfully negotiated and bargained with American Airlines regarding pilot working conditions, work rules, pay, and benefits during COVID while the parties have been in Section 6 negotiations.  (Myers Declaration ¶3-5, APP 286)  APA has entered into *nine* separate MOUs regarding COVID related programs that would have altered the parties' *status quo* if American Airlines had not negotiated with and reached agreement with APA as required under the RLA.  (Myers Declaration ¶5-6, APP 286-7). The MOUs reached by American Airlines and APA are also similar in nature to those at issue in this case.  (*See* APA and American Airlines letters of understanding, Exhibit A to Myers Declaration, APP 288-346)

## III.    CONCLUSION

For the reasons stated above, the Court should issue temporary, preliminary, and permanent injunctive relief enjoining Southwest Airlines as set forth in Plaintiff's Motion.

DATED: October 8, 2021

Respectfully submitted,

By:    /s/ Hal K. Gillespie
Hal K. Gillespie
hkg@gillespiesanford.com
Texas State Bar No. 07925500
James D. Sanford
jim@gillespiesanford.com
Texas State Bar No. 24051289
Joseph H. Gillespie
joe@gillespiesanford.com
Texas State Bar No. 24036636
Gillespie Sanford LLP
4803 Gaston Avenue
Dallas, Texas 75246
Phone: (214) 800-5111
Fax: (214) 838-0001

and

K. Helen Yu
hyu@swapa.org
Texas State Bar No. 24071565
Southwest Airlines Pilots Association
1450 Empire Central Drive,
Suite 737
Dallas, TX 75247
Phone: (214) 722-4256
Fax (214) 351-2504

ATTORNEYS FOR PLAINTIFF
SOUTHWEST AIRLINES PILOTS
ASSOCIATION ("SWAPA")

## **CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that counsel for SWAPA, Hal K. Gillespie, has conferred with counsel for Southwest Airlines, Jonathan C. Fritts, on October 8, 2021 regarding the above and foregoing.  The relief sought by SWAPA within this brief and its related motion is <u>opposed</u> by Southwest Airlines.

By:   */s/ Joseph H. Gillespie*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the forgoing document has been served upon counsel of record for Southwest Airlines by and through the Court's ECF system on October 6, 2021.

By:   */s/ Joseph H. Gillespie*