Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWEST AIRLINES PILOTS ASSOCIATION, | § | |
| Plaintiff, | § | |
| vs. | § | CIVIL ACTION NO. 3:21-cv-2065 |
| SOUTHWEST AIRLINES CO., | § | |
| Defendant. | § | |

**DECLARATION OF CASEY MURRAY**

I make the following declaration, in accordance with 28 U.S.C. § 1746, subject to the penalties for perjury:

1. I am currently a Dallas-based Captain with Southwest Airlines Co. ("Southwest" or "Management") with a seniority date of August 15, 2007. My duties as a Captain include transporting airline passengers on Southwest Airlines flights.

2. I am also the President and Chairman of the Board for Southwest Airlines Pilots Association ("SWAPA" or "Union"), a position I have held since January 1, 2021. Before being elected President of the Union, I was the Chair of the Negotiating Committee for SWAPA from November 2015 to December 2020. In that role, I led the Union's negotiating team toward a new Collective Bargaining Agreement ("CBA"), which is the current CBA, and served as one of the Union's chief spokespersons. Prior to that, I was a member of SWAPA's Negotiating Committee from March 2008 to April 2013, during which time I participated in the negotiation of several side letters that amended our CBA.

3. The CBA covered the period from September 1, 2012 through August 31, 2020. Sixty days prior to the expiration of the term of the CBA, the Union served our notice to Southwest for an early reopener on November 1, 2019, pursuant to CBA Section 28, which provides that "[e]ither party may give written notice of its desire to modify the Agreement at least sixty (60) days prior to March 1 of each year beginning March 1, 2020." A true and correct copy of the Section 6 reopener letter, dated November 1, 2019, is attached as Exhibit 1.

4. On January 9, 2020, we met with Management at Southwest's headquarters to begin direct negotiations under Section 6 of the RLA.

5. Even early in the negotiation process, Southwest Airlines did not engage in bargaining with SWAPA and, instead, took unilateral action. Several times, SWAPA had to send written demands to Southwest Airlines for the carrier to cease its unilateral actions to change the CBA while in Section 6 negotiations.

6. On January 10, 2020, my predecessor, the prior SWAPA President, Captain Jon Weaks, had to send Southwest Airlines a cease-and-desist demand letter when Southwest Airlines attempted to change and negotiate new working rules and pay changes directly with check airmen under the guise of a "Check Airmen scheduling test." A true and correct copy of the Check Airmen demand letter, dated January 10, 2020, is attached as Exhibit 2.

7. Then on January 27, 2020, SWAPA had to object to Southwest Airlines' unilateral change to a delayed implementation of the Pilots' deferral rate change to their 401(k) accounts -- without bargaining with SWAPA -- and demanded that Defendant Southwest Airlines honor the *status quo*. A true and correct copy of the 401(k) demand letter, dated January 27, 2020, is attached as Exhibit 3.

8. Next, on February 27, 2020, SWAPA had to object to Southwest Airlines' change of pharmacy benefits manager, which resulted in the reduction of drug benefits for the Pilots, again without bargaining with SWAPA. A true and correct copy of the pharmacy benefits demand letter, dated February 27, 2020, is attached as Exhibit 4.

9. Then, during the rise of the COVID-19 pandemic, Management began to threaten furloughs and sought sizable concessions from SWAPA, along with the other work groups.

10. Our CBA does not contain a *force majeure* clause. Without a *force majeure* clause, Management could not be relieved of its obligation to perform its contractual obligations based on extraordinary, uncontrollable circumstances.

11. When COVID hit full force in March 2020, Southwest Airlines' pattern of taking without bargaining continued. In the pandemic, the world became shuttered and air travel plummeted.

12. Under our CBA, Southwest Airlines is obligated to meet pay guarantees for its Pilot group. To reduce costs, Southwest Airlines acted as though it had *force majeure* rights by declaring an emergency and implementing an Emergency Time Off ("ETO") program, and later an Emergency Extended Time Off ("ExTO") program, that offered Pilots the option to not fly and not be paid, in contravention of the terms and conditions of the CBA.

13. SWAPA objected to Management's direct negotiations with the Pilot group on these changes to Pilots' working conditions, rules, and pay. By a letter dated March 26, 2020, SWAPA objected to these programs as another *status quo* violation and demanded bargaining. In response to SWAPA's demand, Management did come to the bargaining table and negotiated with SWAPA on the ETO program. The parties' agreement was memorialized in the ETO MOU (Memorandum

of Understanding), fully executed on May 27, 2020. A true and correct copy of the ETO demand letter, dated March 26, 2020, is attached as Exhibit 5.

14. For the subsequently imposed ExTO program, SWAPA also tried to reach an MOU with Southwest Airlines but was unsuccessful because Management took the position that bargaining was not necessary. Management's anti-union sentiment against SWAPA was high (and continues to be high). Ultimately, no agreement on the ExTO program was ever reached. Pilots have not only taken time off on ExTO under this extra-contractual program, but many have already left and been recalled. Southwest Airlines saw no issue with using the pandemic (despite the absence of a *force majeure* clause) to bargain directly with Pilots for working conditions, rules, and pay that was beyond the scope of the CBA (and despite the RLA's bargaining and non-interference duties).

15. Around the same time, on March 11, 2020, Southwest Airlines further availed itself of *force majeure* rights by issuing an emergency pandemic policy that it is using to improperly and illegally trump the CBA. As part of its "proactive steps to protect Employees in the workplace in the event of an infectious disease outbreak," Southwest Airlines included information that one would expect in such a company pandemic policy. It adopted the Center for Disease Control ("CDC") guidelines on how to prevent the spread of infection in the workplace, such as frequent hand washing and avoiding close contact with people who are sick. A true and correct copy of the Southwest Airlines Infectious Disease Control Policy, dated March 11, 2020, is attached as Exhibit 6.

16. The policy also provided for situations where employees are to be quarantined for both contracting an infectious disease and having been exposed to an infectious disease. Therein, Southwest Airlines expressly reassured all employees that they "will be paid" for any missed work

if they got sick from an infectious disease or if they were directed to quarantine by Management or the CDC. It is this pay reassurance portion of the policy that Management unilaterally changed later to take away Pilot pay, a right that Management does not have vested in the CBA.

17. At the time, the pay reassurance was critical to preventing Southwest Airlines' operations from grinding to a complete stop, as tens of thousands of people were dying from the COVID-19 virus and hospitals had to turn away patients because they ran out of hospital beds. Schools, government buildings, and courts closed their facilities to the public and restaurants and numerous other businesses largely shut down. It was under these conditions that Southwest Airlines needed its front-line employees to continue to report for duty and for its Pilots to keep flying the airline's fleet of 737s to keep the airline operational.

18. The Pilot work group is among the most at-risk work groups immediately after first responders and healthcare employees. Management employees protected themselves by closing headquarters' offices to work from home and met virtually, but Pilots, along with other front-line workers, did not have that option. Pilots, especially, were at a heightened risk due to the nature of their work.

19. During flight operations, Pilots are confined to the cockpit for long hours, which makes it impossible for Pilots to maintain safe social distancing under both the CDC Guidelines and Southwest Airlines' Infectious Disease Control Policy.

20. Additionally, while management employees sheltered at home, Pilots were on the road every day, in airport terminals, at hotels with drastically reduced services, and crammed into hotel shuttles to and from their day of work.

21. While management employees with minor children (now no longer in schools) were able to work with their kids at home, Pilots could not, and their families and children were equally put at risk of infection each time the Pilots returned home from a trip.

22. During this time, state and local governments around the country were issuing progressively stricter rules against being in public. However, because of their role in global transportation, Pilots were deemed an "essential critical infrastructure workforce." As they flew their trips, Pilots had to carry on their persons a copy of an official letter from CEO Gary Kelly – regarding "Movement of Supplies and Personnel Related to Critical Infrastructure," issued on or about March 23, 2020 – to prove that they were exempt from state and local laws that prohibited individuals from being in public and to avoid arrest if stopped by local law enforcement authorities. A true and correct copy of the Emergency Movement Letter, dated March 23, 2021, is attached as Exhibit 7.

23. Indeed, conditions were so dangerous for Southwest Pilots that SWAPA had to make a demand on Defendant Southwest Airlines to protect crew health and safety. In our April 20, 2020 letter, SWAPA demanded, among other things, for Southwest Airlines to sanitize the aircraft cockpit daily, to provide Pilots with PPE (which was extremely scarce), and to provide Pilots with notification when they had been exposed to infected crew or passengers that was consistent across all eleven of Southwest Airlines' domiciles. SWAPA had received membership complaints that notification by chief pilots varied depending on which domicile the Pilot was based in, and even within the same domicile, notification may have been different from chief pilot to chief pilot or assistant chief pilots.

24. Since March 2020, the COVID pandemic has gone through several surges and peaks. After the first spike in the summer of 2020, America braced itself for a second spike during the

fall of 2020. Vaccination relief did not come until first quarter of 2021, and even then, vaccine supply was extremely limited, on an Emergency Use Approval only, and not available to the general public. As vaccine supplies increased across the country, the airlines saw increased demand in travel.

25. The relief from vaccines, however, was short-lived when the Delta variant of the coronavirus emerged, proving to be far superior in transmission than the original virus, being twice as contagious and able to be transmitted through "fleeting" contact.

26. Today, the number of people infected with the Delta variant is increasing, once again crowding hospitals beyond capacity. Other mutations of the coronavirus are popping up around the world. The first case of the Lambda variant in the U.S. has shown up at the Houston Methodist Hospital. Studies show that Lambda may be resistant to vaccines.

27. Throughout the pandemic, our dedicated Pilots have continued to come to work and perform their duty. Many have had close contact with infected individuals while at work. They have gotten infected. A few have died. Many more have not recovered well enough to fly.

28. As soon as the pandemic hit, Southwest Airlines began stockpiling cash from all available sources, including the Payroll Support Program ("PSP") for the airline industry as part of the federal CARES Act. Southwest Airlines went from having a cash balance of $4.1B in 2019 to over $24B during the pandemic.

29. Despite being cash positive, Southwest took advantage of the COVID pandemic. In October 2020, Management demanded concessions from all its labor unions, including SWAPA. Southwest Airlines again made an "enterprise decision" to seek a 10% pay cut from each labor worker. With the Pilot group, Management sought a 10% pay cut and demanded to add a *force majeure* clause into the CBA, which it did not have.

30. In response, SWAPA stood up against Management's demands, pointing out the lack of justification for the concession demands and gave Management alternative concrete solutions to create efficiencies and savings for the airline to weather the pandemic and compete. Management was not receptive to SWAPA's solutions, and on December 3, 2020, sent WARN Act notices to 1,221 Pilots, notifying them that they would be furloughed over the Christmas holidays.

31. As the pandemic dragged on, Southwest Airlines began experiencing staffing issues. These staffing issues were a direct result of the extra-contractual ExTO program rolled out unilaterally by Southwest Airlines. Once again, SWAPA had anticipated these staffing issues months earlier and offered solutions to Management. As hundreds of flights are being canceled and Pilots are being overworked on the line and stranded overnight, all the while still at risk of COVID, and ever more with the Delta and Lambda strains, SWAPA has been vocal in demanding action by Management. It is an understatement to say that the anti-union sentiment against SWAPA has continued to build throughout the pandemic.

32. Southwest Airlines' attitude toward Pilots is cavalier, indicating that Management thinks it can act unilaterally during this global emergency and hiding behind its "enterprise decision" excuse to refuse to bargain with SWAPA. However, Southwest Airlines did in fact bargain for and reach agreement with the flight attendants' union over these exact same issues.

33. During this same period, other airlines met with their respective labor unions and bargained for new working conditions and rules that were impacted by the pandemic. American Airlines, United Airlines, and Delta Airlines are amongst those airlines with letters of agreement in place to cover the working conditions, rules, and pay related to COVID. Unlike the case for Southwest Airlines, such codifications at the other airlines have greatly encouraged vaccinations

by the pilots of those airlines and the reduction of the chances of COVID-19 transmission in the interstate transportation environment.

34. Having negotiated and codified COVID Letters of Agreements with its labor unions back in May 2020, United Airlines reported at the end of September 2021 that 99.5% of its employees have been vaccinated.

35. On the other hand, Southwest Airlines' response to the cost of operating the airline in the pandemic was to shift that cost to its unionized labor. Despite its reassurances that employees will be paid for the company's operational changes due to COVID, Southwest Airlines targeted Pilots.

36. Even though its Infectious Disease Control Policy was supposed to be an "enterprise decision" applicable to all employees, Southwest Airlines imposed random and unilateral changes to how the policy applied (or not) to Pilots, all without bargaining. Once again, Pilots were told different things depending on domicile and chief pilots. SWAPA leadership reached out to our counterparts at the airline to voice objections over Southwest Airlines' failure to bargain and taking of rights. Each time, we were rebuffed.

37. By December 2020, Management began directing Pilots into mandatory quarantines and only those Pilots who had crew close contact were paid for the work they missed. The company forced hundreds of pilots into unpaid time off. By June 16, 2021, Management continued directing Pilots into mandatory quarantines, but stopped paying them for missed work. This all was being done verbally by Management chief pilots.

38. On May 11, 2021, Southwest Airlines revised its Infectious Disease Control Policy. One glaring change was made. The critical reassurance that employees "will be paid" for COVID-related events was removed. Instead, it now says "may" be paid - at Management's discretion. A

true and correct copy of the amended Southwest Airlines Infectious Disease Control Policy, dated May 11, 2021, is attached as Exhibit 8.

39. In light of recent announcements by large corporations, including United Airlines, of their intent to mandate vaccinations, on August 11, 2021, I wrote a demand letter to Southwest Airlines, reiterating the need for the parties to come to the table and bargain over the mandates already (unilaterally) imposed by Southwest Airlines, and those which may be imposed, that alter Pilots' working conditions, rules and pay. I expressly stated that, "a dedicated meeting to address the above is critical," and "SWAPA stands ready to seek relief from the federal court if management takes such unilateral action and refuses to bargain." A true and correct copy of the COVID demand letter, dated August 11, 2021, is attached as Exhibit 9.

40. Southwest Airlines' response of August 21, 2021 disagreed, stating that negotiations were not required, as "current CBA contains broad language granting management the right to unilaterally take action on those issues." A true and correct copy of Southwest Airlines' response letter, dated August 21, 2021, is attached as Exhibit 10.

41. After these failed attempts to convince Management to negotiate and reach agreement with SWAPA over Pilots working conditions, rules and pay, SWAPA had no choice but to seek court intervention and aid in upholding the Railway Labor Act. SWAPA filed the instant lawsuit on August 31, 2021.

42. Instead of coming to the bargaining table, Management doubled down. On September 15, 2021, Southwest Airlines unilaterally implemented another policy that changes Pilots' working conditions, rules, and pay, i.e., its "Vaccine Participation Pay Program" or "VPPP." This new program offered Pilots additional pay to get vaccinated, and also threatened to take away Pilots' pay if they are not vaccinated by a deadline. It was not bargained with the Union.

Management gave SWAPA a "heads up" the day before, on September 14, 2021, that Southwest Airlines would implement the new policy but omitted any details. By unilaterally imposing it on the Pilot work group, Southwest Airlines was, in essence, negotiating directly with the Union's membership to change its working conditions, rules, and pay (despite Southwest's duties under the RLA).

43. This unilateral vaccine incentive program was imposed after SWAPA filed the federal *status quo* lawsuit. Since then, the parties met twice virtually to discuss COVID-related issues. In those virtual calls, on September 2 and 7, 2021, SWAPA tried to engage Management in negotiations to reach agreement. We presented Management with a draft MOU that covers the COVID-related issues that have been festering since March 2020. Southwest Airlines did no more than hold court to allow SWAPA to present our draft MOU. It provided no counteroffer, nor did it signal its intent to implement yet another unilateral program, only days later.

44. As soon as SWAPA learned of Management's plan to roll out its unilateral Vaccine Incentive Plan, I wrote to Captain Bob Waltz, Southwest Airlines' Vice President of Flight Operations to demand confirmation that the Vaccine Participation Pay Program did not apply to Pilots. I stated to Captain Waltz that, "[t]o roll out a program unilaterally under these circumstances is clear evidence of bad faith bargaining by the Company and de facto negotiating directly with SWAPA's membership, illegal under the RLA as the parties are in Section 6 negotiations." I informed Captain Waltz that without that written confirmation, SWAPA would be forced to seek punitive damages in our federal *status quo* lawsuit. A true and correct copy of the Vaccine Incentive Program MOU demand letter, dated September 14, 2021, is attached as Exhibit 11.

45. Captain Waltz responded in writing on September 17, 2021. In his letter, he described Management's VPPP. A true and correct copy of Bob Waltz's September 17, 2021 letter is attached as Exhibit 12.

46. The following Thursday, on September 23, 2021, SWAPA learned unofficially that Management had plans to start training Pilots to be flight crew training instructors, a job function traditionally performed by non-SWAPA employees and represented by a separate labor union, i.e., the TWU 557 – the Southwest Flight Crew Training Instructors Union. SWAPA immediately sought clarification from Southwest Airlines, who admitted that Management had indeed solicited SWAPA Pilots to take on this new job function that would change those Pilots' working conditions, rules, and rates of pay. While we appreciated Southwest Airlines' need for more instructors to clear up the training logjam it was experiencing from having Pilots return from ExTO (the earlier unilateral program by Management that paid Pilots outside the CBA for an extended leave of absence), we disagreed with Management once again negotiating directly with our Pilot group to create a new category of job function without the Union's agreement.

47. Southwest Airlines had not engaged SWAPA on this training effort, even though it had been in the works for months. Under SWAPA's insistence and working with a select few at Southwest Airlines, we proposed an Instructor MOU that the parties agreed to on September 24, 2021, which now awaits ratification by SWAPA Board of Directors as part of the Union's governance process. Unfortunately, the fact that this Flight Crew Training Instructors program was another unilateral imposition by Management in a long string of unilateral action is jeopardizing the likelihood of the Instructor MOU being approved through union governance.

48. As the Instructor MOU hung in the balance, on Friday afternoon, October 1, 2021, Southwest Airlines gave SWAPA a "heads up" that a vaccine mandate - again unilateral, again

without specifics – was imminent. On October 3, 2021, I wrote a letter, this time to Gary Kelly, the Chief Executive Officer at Southwest Airlines, to voice the Union's fierce objections to Management's open disregard for its obligation under the RLA to bargain in good faith. I demanded that Southwest cease and desist from rolling out the vaccine mandate without bargaining and reaching agreement with SWAPA. I notified Mr. Kelly of the Union's intent to seek injunctive relief against Southwest Airlines to compel Management to stop taking unbargained-for rights. A true and correct copy of my October 3, 2021 letter to Gary Kelly is attached as Exhibit 13.

49. On October 4, 2021, Southwest Airlines announced its vaccine mandate, which made vaccination a new condition of employment for Pilots and threatened termination for non-compliance, all of which conflicts with the parties' CBA and has not been negotiated with nor agreed to by SWAPA. Gary Kelly made the announcement at 2:00 p.m. That morning, Southwest Airlines set up a call with SWAPA to "brief" us of the new vaccine mandate about to be implemented. There was no give and take within the briefing. Instead, Management hurriedly dumped its plans on the Union. By this eleventh hour, there was no time nor opportunity for any meaningful dialogue or input, let alone bargaining.

50. That same afternoon, on October 4, 2021, Captain Alan Kasher, Executive Vice President of Daily Operations, joined a SWAPA Board of Directors meeting. In that meeting, Captain Kasher fielded many questions and concerns by the SWAPA Board members. It was highlighted that our biggest competitors, i.e., United Airlines, Delta Airlines, and American Airlines, all had collectively bargained-for rights. Specifically, each of the other airlines had reached out to their respective labor unions at the onset of the pandemic and by May 2020 had negotiated COVID-related letter of agreements prior to changing the working conditions, rules,

and pay of their unionized work force. When asked point blank, Captain Kasher could only admit that Southwest Airlines was wrong in failing to collectively bargain.

51. Southwest Airlines' cavalier disregard for the RLA has a significant, consequential, and detrimental impact on SWAPA and its membership. Southwest Airlines' continued and repeated unilateral actions have wholly upended the *status quo* and effectively destroyed the Union's ability to collectively bargain on behalf of its members in compliance with the RLA.

52. With each of these unilateral actions, our phones and emails at SWAPA are being flooded with questions and concerns from membership. The resulting chaos of these and a multitude of unanswered questions have resulted in a drain on SWAPA's resources and the Union's ability to represent its membership. This bargaining structure, or lack thereof, cannot be what was envisioned by the drafters of the RLA.

53. I believe the only way to remedy this situation and protect the integrity of good faith bargaining is for this Court to order Southwest to stop its unilateral action and to bargain with SWAPA as the RLA requires.

54. Attached hereto as Exhibit 14 is a true and correct copy of the parties' collective bargaining agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: October 6, 2021

Captain Casey A. Murray
President
Southwest Airlines Pilots Association