**SWAPA**
SOUTHWEST AIRLINES PILOTS ASSOCIATION

November 4, 2019

Russell McCrady
Vice President Labor Relations
Southwest Airlines Company
2702 Love Field Drive
Dallas, TX 75235

Dear Mr. McCrady,

This serves as written notice by the Southwest Airlines Pilots Association, pursuant to Section 28 of our Collective Bargaining Agreement, to begin direct Section 6 negotiations in advance of the amendable date of our current Agreement. As stated in Section 28, "[e]ither party may give written notice of its desire to modify the Agreement at least sixty (60) days prior to March 1 of each year beginning March 1, 2020."

I'm certain that you have been following SWAPA's two-and-a-half-year Survey-Education-Poll (SEP) process that was designed to build a Pilot-commanded contract that satisfies the Company's needs — both now and in the future — and rewards our Pilots for their industry-leading productivity. The result is a fully formed contract proposal that addresses the many shortcomings of our current language; language that has led to dozens of unresolved grievances and resulted in needless expenses and a substantial loss of goodwill.

Based on the Company's pattern of prolonging negotiations with many of its large unionized workgroups, I'm sure you can understand our Pilots' collective concern over the possibility of an unnecessarily drawn-out Section 6. In order to facilitate a better process, I am requesting that our teams meet at the beginning of January to discuss our efforts so far. At that meeting, we plan to provide you with the completed product of our SEP process, which we believe will help springboard our negotiations. This will give your team approximately eight weeks to become familiar with our future-focused language and new data-driven concepts before we begin formal meetings.

In order for our Negotiating Committee to properly prepare for the early January meeting, I ask that you respond to this letter as soon as practical, but no later than November 11, 2019. Regardless of your decision to meet in January, we look forward to commencing formal negotiations on March 1, 2020.

Regards,

*Casey A. Murray*

Captain Casey Murray
SWAPA Negotiating Committee Chair



**VIA EMAIL**

January 10, 2020

Captain Alan Kasher
Senior Vice President
Southwest Airlines Co.
2702 Love Field Drive
Dallas, TX 75235

      Re:    **Demand to Cease and Desist – CKAM Scheduling Testing**

Dear Alan:

I hope you had a restful year end with loved ones. As we dive into collective bargaining, I believe it is of utmost importance that each side abides by the rules of engagement as set forth in the Railway Labor Act. Unfortunately, the Association has already learned of an infraction, that management is implementing a purported "Check Airman scheduling Test," whereby the Company is unilaterally changing work rules and rates of pay for and negotiating directly with individual union members. Such is not allowed under the RLA. The Association hereby demands that the Company immediately cease and desist from its "testing."

The RLA provisions serve to "prevent the union from striking and management from doing anything that would justify a strike." *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 150 (1969). The Act expressly states that "[n]o carrier, its officers, or agents shall change the rates of pay, rules or working conditions of its employees, as a class, as embodied in agreements . . . ." 45 U.S.C. § 152 (2012). It also provides that carriers have the duty to bargain only with the union and not directly with employees. Id. The RLA strictly prohibits the carrier, by making unilateral changes in working conditions or interfering with the union's representation of its members, to gain an unbargained-for advantage against its counterpart union.

The Company's CKAM scheduling test "requires" participation from a minimum number of Check Airmen from each region and those "volunteers" are required to

Brookview Plaza | 1450 Empire Central Dr., Suite 737 | Dallas, TX 75247
Phone: 214-350-9237 | Tollfree: 800-969-7972 | Fax: 214-350-0647 | www.swapa.org

APP 17

agree to several changes in their working conditions, including forfeiture of pay and departure from bidding seniority based on the Master Seniority List. By function of the "test," not only those who volunteer will be impacted, but all Check Airmen will have their bidding seniority impacted and suffer the potential of pay loss. Moreover, due to the lack of transparency afforded by the Company in this process, it will be difficult, if not impossible, for individual Check Airman and the Association to protect their contractual rights. This is exactly what the law does not allow.

Upon learning of the Company's "test," the Association's Check Airman Committee attempted to engage with its counterpart several times to no avail. Such collaboration should not be new for management. As you know, the Company and the Association have agreed to other testing that impacts our members' working conditions, most recently the TGDOs, through negotiated MOUs.

Again, the Association respectfully demands that management immediately stop its CKAM scheduling testing. If the Company refuses, the Association will be forced to pursue legal remedies, including but not limited to immediate protection from the courts and monetary damages. Ironically, the Association is in full agreement with the Company's efforts to correct the long-standing failures of Training Scheduling. We remain open to collaborating with you on improvements.

Please provide me with the Company's position. I look forward to resolving this with you.

Very truly yours,

Captain Jon Weaks
President


cc: Lee Kinnebrew, Sr. Dir. Training & Standards
Carl Kuwitzky, Sr. Dir. Labor Relations
Juan Suarez, Managing Director and Deputy General Counsel
Captain Casey Murray, Negotiating Committee Chair
Captain Patrick Thomas, Check Airman Committee Chair
Captain Seth Kornblum, Contract Administration Chair
K. Helen Yu, SWAPA General Counsel

Brookview Plaza | 1450 Empire Central Dr., Suite 737 | Dallas, TX 75247
Phone: 214-350-9237 | Tollfree: 800-969-7972 | Fax: 214-350-0647 | www.swapa.org

APP 18



**VIA EMAIL**

January 27, 2020

Captain Alan Kasher
Senior Vice President
Southwest Airlines Co.
2702 Love Field Drive
Dallas, TX 75235

    Re:    **Intentional Delay of Deferral Rate Changes to 401(k) Plan Trust**

Dear Alan:

I bring to your attention another issue that came to light after the fact. In administering employee payroll contributions into the Southwest Airlines Pilots Retirement Savings Plan (the "401(k) Plan"), the Company willfully and intentionally delayed implementation of the employee's deferral rate changes. The Company made this unilateral change without advance notice to the Pilots and the Association. There was no coordination with Schwab and no updates of written materials to Pilots, including in the Enrollment Packet. This is inappropriate under the 401(k) Plan, constitutes an unfair labor practice, and must be remedied to satisfy the Employee Retirement Income Security Act ("ERISA").

For at least the past fifteen (15) years, Pilots who elected a deferral rate change by the 24th of the month saw the change implemented by the first paycheck (5th) of the next month. Timely deferral rate elections made between December 10 – 24, 2019, however, were not implemented by the January 5th paycheck. Pilots had no idea their 401(k) deferral instructions were not going to be followed. They were surprised and dismayed to find their January 5th paychecks to have incorrect pay and incorrect 401(k) contribution amounts. The Company's delay in making the deferral rate changes affected Pilots' expected take-home pay, the amounts being contributed to the Pilots' individual accounts, the amount of overall 401(k) Plan

Brookview Plaza | 1450 Empire Central Dr., Suite 737 | Dallas, TX 75247
Phone: 214-350-9237 | Tollfree: 800-969-7972 | Fax: 214-350-0647 | www.swapa.org

APP 19

assets, and resulting tax effects. When asked, the Company stated that the delay was allowed because deferral changes could be implemented as "administratively possible" with no notice to the Pilots or to the Association. The Company is wrong.

Section 4.2(g) of the 401(k) Plan states that "the Employer and the Administrator will adopt a procedure necessary to implement the salary reduction elections...." The Company, on its own, is not at liberty to change that procedure without notice to and agreement by the Association.

The Company's unilateral change is also in violation of ERISA, wherein the Company is obligated to follow the 401(k) Plan documents. See ERISA Section 404(a)(1)(D), 29 U.S.C. 1104(a)(1)(D). The Company has a fiduciary duty to act in the best interest of participants and beneficiaries by developing and following an agreed-upon salary reduction election procedure, and to ensure participants understand that procedure. The Company failed to do so here.

This is reinforced in our CBA, which provides for Pilot retirement benefits in Section 19. Before making any changes to the timeframe of the payroll deductions, which directly impacts the funding of the 401(k) Plan, the Company has a statutory duty under the Railway Labor Act to bargain with the Association over such changes. To have done so unilaterally demonstrates the Company's unfair labor practices.

In this case, the timing of the Company's unilateral changes was especially damaging to the Pilot Participants and to the Plan funds. It is reasonable to expect Participants to make changes to their 401(k) Plan deferral elections at the end of the year.

The Company is responsible for contributing the Participants' deferrals to the Plan trust. Department of Labor rules require the employer to deposit the deferrals to the trust as soon as possible. In our case, "administratively possible" has long been set, through over fifteen years of past practice, to be made no later than the following paycheck (i.e. if requested by the 24th to be effective on the 5th of the next month). To delay Participant deferral changes to a later paycheck (20th) for Company convenience clearly fails the "administratively possible" requirement. As such, the Company must make the appropriate corrections set out by law, including determining which deposits were late, calculating lost earnings, depositing any missed elective referrals, together with lost earnings, into the trust, and correcting the procedures that led to the late deposits.

For the January 5th paycheck, there were at least 625 Pilots affected by the Company's failure to timely fund the 401(k) Plan with the Pilots' changed deferral rates. We ask that the Company conduct an immediate audit to verify the Pilots

Brookview Plaza | 1450 Empire Central Dr., Suite 737 | Dallas, TX 75247
Phone: 214-350-9237 | Tollfree: 800-969-7972 | Fax: 214-350-0647 | www.swapa.org

APP 20

impacted and to coordinate with the Association to make sure all corrections to the Participants and the 401(k) Plan are made promptly and as required by law.

Please let me know if the Company concurs. We are ready to sit down with you and your team to help the Company remedy this situation.

Very truly yours,

Captain Jon Weaks
President


cc:  Bob Jordan, EVP Corporate Services
     Julie Weber, VP and Chief People Officer
     Gregg Thorsen, Sr. Dir. People
     Carl Kuwitzky, Sr. Dir. Labor Relations
     Juan Suarez, Managing Director and Deputy General Counsel
     Captain Casey Murray, Negotiating Committee Chair
     Captain Damian Jennette, Negotiating Committee Member
     Captain Andrew Payne, 401(k) Committee Chair
     Captain Seth Kornblum, Contract Administration Chair
     Michael Haynes, Director of Pilot Retirement
     K. Helen Yu, SWAPA General Counsel

Brookview Plaza | 1450 Empire Central Dr., Suite 737 | Dallas, TX 75247
Phone: 214-350-9237 | Tollfree: 800-969-7972 | Fax: 214-350-0647 | www.swapa.org

APP 21



**VIA EMAIL**

February 27, 2020

Members of the Board of Trustees and
Members of the Advisory Board to the Board of Trustees
  Southwest Airlines Co. Health and Welfare Plans
c/o Southwest Airlines Co.
2702 Love Field Drive
Dallas, TX 75235

    Re:    **Health and Welfare Plan – Notice of Breach and Meeting Request**

Dear Board Members:

The Association hereby raises a grave matter that deserves your immediate attention. Southwest Airlines switched its pharmacy benefits manager (PBM) from OptumRx to CVS/caremark, effective January 1, 2020. In doing so, the Company has either intentionally or inadvertently breached its collective bargaining agreement (CBA) with the Association. We are concerned that the breach necessarily exposes the Plan to legal liability and calls into question possible fiduciary duty breaches by the Board of Trustees and its Advisory Board. We would not want additional legal exposure to follow if it is determined that internal controls are not being observed or liabilities are not being timely made in the Company's financial reporting.

Specifically, the Company's change of PBM resulted in a reduction of drug benefits for our Pilot membership. It appears that approximately 300 drugs previously covered in the PDL (Plan Drug List) have been removed. Pilots and their dependents can either no longer obtain those drugs or must pay out-of-pocket for them. In addition, it may be the case that CVS/caremark is applying benefits coverage contrary to Plan design, another reduction to benefits. This needs to be further reviewed.

Brookview Plaza | 1450 Empire Central Dr., Suite 737 | Dallas, TX 75247
Phone: 214-350-9237 | Tollfree: 800-969-7972 | Fax: 214-350-0647 | www.swapa.org

APP 22

These changes are in direct contradiction to our CBA. Section 14 (Insurance and Loss of License) provides in pertinent part:

> "A comprehensive group medical and dental plan (Regular Plan) for Southwest employees covered by this Agreement and their eligible dependents as is in effect on the effective date of this Agreement. During the term of this Agreement, the Company will continue the benefits of the Regular Plan and **will not reduce the benefits** provided by the Regular Plan to persons covered by this Agreement and their eligible dependents." (emphasis added)

The Board of Trustees should have been advised of the Company's CBA obligations and ensured that the PBM change and the successor PBM's applications of benefits are not in violation of those contractual responsibilities.

At this time, the Association is willing to meet with you and the Company to review this matter and hopefully correct course before pursuing legal recourse on behalf of our membership. In advance of the meeting, we ask that you share with us all notices provided to Participants in connection with the change to CVS/caremark.

Please let us know your willingness to meet with the Association. I look forward to your response.

Very truly yours,

Captain Jon Weaks
President


cc:   Board of Trustees
      Katie Coldwell
      Chris Johnson
      Captain Alan Kasher
      Chris Monroe
      Julie Weber

      Advisory Board
      Judy Berger
      Chad Mead, Esq.

Brookview Plaza | 1450 Empire Central Dr., Suite 737 | Dallas, TX 75247
Phone: 214-350-9237 | Tollfree: 800-969-7972 | Fax: 214-350-0647 | www.swapa.org

APP 23

Plan Board of Trustees
 and Its Advisory Board
Page 3

    Shari Conaway
    Gregg Thorsen, Esq.
    Ruth Daniel

    Captain Bob Waltz
    Captain Damian Jennette
    Captain Casey Murray
    K. Helen Yu, Esq.

Brookview Plaza | 1450 Empire Central Dr., Suite 737 | Dallas, TX 75247
Phone: 214-350-9237 | Tollfree: 800-969-7972 | Fax: 214-350-0647 | www.swapa.org

APP 24



**VIA EMAIL**

March 26, 2020

Captain Alan Kasher
Senior Vice President
Southwest Airlines Co.
2702 Love Field Drive
Dallas, TX 75235

      Re:    ETO Program - Agreement

Dear Alan,

First and foremost, on behalf of all Pilots who serve Southwest Airlines, I want to thank you and Bob for trying to find solutions for our Company and our Pilots. As you know, the Company offered an Emergency Time Off Program (ETO) yesterday, and not a Leave of Absence Program (LOA). I have no doubt it was named that for very specific reasons.

For the ETO (or even an LOA) to meet its intended purpose, and to clarify all of the issues that a program like this creates and for everyone's protection, there must be agreement between Southwest and SWAPA. The intended ETO language has caused numerous questions and concerns. We ask that our respective subject matter experts meet with the Company to try to reach agreement. We also need financial projections and information to do our own modeling and forecasting to aid in these discussions.

Only an ETO agreed to by both parties has a chance to succeed. The Railway Labor Act (RLA) provides that "[n]o carrier, its officers, or agents shall change the rates of pay, rules or working conditions of its employees, as a class, as embodied in agreements . . . ." 45 U.S.C. § 152 (2012). It also provides that carriers have the duty to bargain only with the union and not directly with employees. Id. The RLA strictly prohibits the carrier, by making unilateral changes in working conditions or interfering with the union's representation of its members, to gain an unbargained-for advantage against its counterpart union.

Brookview Plaza | 1450 Empire Central Dr., Suite 737 | Dallas, TX 75247
Phone: 214-350-9237 | Tollfree: 800-969-7972 | Fax: 214-350-0647 | www.swapa.org

APP 25

Captain Alan Kasher
March 26, 2020
Page 2

The ETO impacts Pilot work rules and conditions and cannot be a unilateral offering. Although well intended, the Company's actions constitute unfair labor practices and a clear violation of the parties' mutual obligation to maintain *status quo* during direct negotiations.

SWAPA stands ready to enforce its legal rights under the RLA and hereby reserves all rights to do so. The Association has reviewed the ETO and has grave concerns about its likelihood of success. We are ready to share our data studies with your subject matter experts in order to arrive at an ETO that would generate the necessary interest by the Pilot group to deliver the desired scheduling and manning relief. Working together will also answer the many questions our membership already has regarding the Company information published yesterday. The Company unilaterally launching a lackluster ETO will set Southwest back when it can ill afford it and put the Company in legal jeopardy.

I look forward to our meeting this afternoon with the Southwest management and labor leaders. A dedicated meeting with the Association, however, to solve the Pilot ETO is critical. Please let me know if that can be scheduled for tomorrow.

Sincerely,

Captain Jon Weaks
President


cc:   Captain Robert Waltz, Vice President
      Mark Sutcliffe, Director FO Crew Planning & Analytics
      Carl Kuwitzky, Sr. Dir. Labor Relations
      Juan Suarez, Managing Director and Deputy General Counsel
      Captain Michael Santoro, Vice President
      Captain Casey Murray, Negotiating Committee Chair
      Captain Scott Plyer, Scheduling Research Committee
      Captain Seth Kornblum, Contract Administration Chair
      K. Helen Yu, SWAPA General Counsel

Brookview Plaza | 1450 Empire Central Dr., Suite 737 | Dallas, TX 75247
Phone: 214-350-9237 | Tollfree: 800-969-9972 | Fax: 214-350-0647 | www.swapa.org

APP 26

## 5.7 Infectious Disease Control Policy
**Revised: 03/11/2020**

Southwest Airlines will take proactive steps to protect Employees in the workplace in the event of an infectious disease outbreak. The purpose of this policy is to address Employee expectations in the event of an increase or an outbreak of non-common infectious diseases such as but not limited to COVID-19 (Coronavirus), SARS, tuberculosis, and avian flu. The Southwest Airlines Disaster Response Plan outlines the Teams and associated tasks to respond to an event ranging in severity from an outbreak to pandemic. In consultation with Senior Leadership, the Emergency Director will determine the activation of the Pandemic Emergency Response Plan and this policy. When activated, the Emergency Director will provide specific direction with respect to each measure below as well as the timeframe all of which are subject to change.

Southwest Airlines' goal during an infectious disease outbreak is to ensure the Safety of our Employees as we strive to operate effectively; therefore Employee attendance/work continuation is expected. Unless otherwise notified, Southwest Airlines' normal attendance and leave policies will remain in place. In the event of closures (all or partial) to the HDQ campus including remote non-operational offices such as People Department offices and Governmental Affairs, Southwest Airlines will use the codes described in 11.5 Noncontract Attendance Policy Relating to Headquarters and Other Non-operational Facilities Closures. Information containing code levels yellow, orange and red will be communicated to Employees via Company email. In some instances, text messages may be sent through the automated notification system (to Employees who populate their cell phone numbers in SWALife). In the event of closures or partial closures of airports or other facilities such as Centers, Employees will be notified by their Leadership via the common communication method.

### Preventing the Spread of Infection in the Workplace

Southwest Airlines asks all Employees to cooperate in taking steps to reduce the transmission of infectious disease in the workplace. The Center for Disease Control (CDC) recommends everyday preventive actions to help limit the spread of infectious diseases, including:

- Avoid close contact with people who are sick.
- Avoid touching your eyes, nose, and mouth.
- Stay home when you are sick.
- Cover your cough or sneeze with a tissue, then throw the tissue in the trash.
- Clean and disinfect frequently touched objects and surfaces using a regular household cleaning spray or wipe.
- Follow the CDC's recommendations for using personal protection equipment such as face masks and gloves.
- Wash your hands often with soap and water for at least 20 seconds, especially after going to the bathroom; before eating; and after blowing your nose, coughing, or sneezing.

### Limiting Business and Leisure Travel

Southwest Airlines will generally follow the CDC's Travel Notices with respect to travel within and outside of the United States. In accordance with the Travel Notices, the Company may ban or limit nonessential business travel. At times, guidelines that are stricter than the CDC Travel Notices may be instituted. Employees who travel as an essential part of their job should consult frequently with their Leader on appropriate actions. Employees are expected to also follow CDC Travel Notices and Company direction when traveling for leisure.

### Staying Home When Ill

Many times, with the best of intentions, Employees report to work even though they are presenting signs and symptoms of illness. Under the Time Off Program and collective bargaining agreements, Southwest Airlines provides Sick Pay, Paid Time Off, and other benefits to compensate Employees who are unable to work due to illness. Refer to 11.4.1 Illness and 11.6 Time Off Program. Especially during an infectious disease outbreak, it is critical that Employees not report to work while they are ill and/or experiencing symptoms of the outbreak, such as fever, cough, and shortness of breath, sore throat, runny or stuffy nose, body aches, headache, chills and fatigue. Employees are encouraged to call their healthcare provider if they suspect that they are ill with an infectious disease. Unless instructed otherwise by the Emergency Director or the Department Head, Employees who are ill and/or experiencing symptoms must comply with attendance reporting and documentation requirements in their respective departments.

Currently, the CDC provides recommendations regarding how long individuals with infectious diseases should remain quarantined. If you have flu-like symptoms during an outbreak of non-common infectious diseases, it is important to speak to your healthcare provider. Leaders have the authority to send an Employee home who is ill and/or exhibiting symptoms.

In order to prevent the spread of the infectious disease during any period in which this Infectious Disease Control Policy has activated, if an Employee has complied with Emergency Director's instructions under this policy and has a medically confirmed diagnosis of the infectious disease and is considered contagious according to the CDC, Southwest Airlines will continue to pay the Employee for scheduled hours/shifts/trips missed without reducing the Employee's Sick Pay Hours, Paid Time Off or 2016 Paid Sick Hour balances and without the Employee incurring any infraction under attendance control policies. Such regular pay will be considered eligible compensation for purposes of ProfitSharing and Company 401(k) contributions per the terms of the Plan Documents. Should the Employee's illness extend beyond the contagious period or is complicated by other conditions, Southwest Airlines' leave policies and collective bargaining agreements will apply. Absences due to illness will run concurrently with leave under the Family and Medical Leave Act of 1993 (FMLA), and state/local family leave laws of a similar nature, if the Employee is eligible and qualifies for FMLA or state/local family leaves.

### Quarantine and Pay

Based on potential exposure to an infectious disease, Employees may be required to quarantine after travel or potential exposure based on CDC recommendations or guidance.

Quarantine during an outbreak of non-common infectious diseases may be required under the following conditions:

1. Employees have traveled during the quarantine period (for example, in the last 14 days) to regions listed on the CDC's Travel Index for the disease;
2. Employees have been informed by public health officials or health care providers that they are suspected of or confirmed to have the disease;
3. Employees have been in close contact with an individual who has traveled during the quarantine period to regions on the CDC's Travel list for the disease; or
4. Employees have been in close contact with an individual who has been informed by public health officials or health care providers that they are suspected of or confirmed to have the disease.

If an Employee has complied with the Emergency Director's instructions issued under this policy, but must quarantine at CDC direction or Southwest Airlines direction, the Company will continue to pay the Employee for scheduled hours/shifts/trips missed during quarantine and all regular pay during quarantine will be considered eligible compensation for purposes of ProfitSharing and Company 401(k) contributions per the terms of the Plan Documents. This time missed under required quarantine will not be considered infractions under attendance control policies. For those employees eligible for Perfect Attendance the time missed during quarantine will be considered qualifying hours for the purposes of Perfect Attendance. Additionally, for those Employees eligible, the time missed during quarantine will count toward the accrual of Paid Time Off. Employees covered by a collective bargaining agreement may have other coverage provided and they should consult with their Leader.

Unless otherwise required by state or local law, Employees who elect self-quarantine and/or isolation outside of the Emergency Director's instruction will not be paid and must work with their Leader and follow department or collective bargaining agreement requirements for shift or trip coverage, requesting vacation or Paid Time Off or working from home if eligible based on the Employee's specific job. Attendance control policies will apply.

### Additional Measures

The Emergency Director may implement additional measures to minimize the spread of disease in the workplace.

### Failure to Comply

Employees who are found in violation of this policy including instructions issued by the Emergency Director will be subject to disciplinary action, up to and including termination of employment.

**Southwest Airlines Co.**
Gary C. Kelly
Chairman and Chief Executive Officer
2702 Love Field Drive
Dallas, TX 75235



## Movement of Supplies and Personnel
## Related to Critical Infrastructure

To Whom It May Concern:

Southwest Airlines provides essential support to the nation's infrastructure and is therefore exempt from any shelter-in-place orders under federal law. As an airline, Southwest is also exempted by the explicit terms of many such orders. The person carrying this letter performs work for Southwest, a business that provides support and/or supplies critical products or services necessary in maintaining the "critical infrastructure" of our nation.

Presidential Policy Directive 21 (PPD-21) designates airlines as a critical infrastructure sector whose assets, systems, and networks are considered so vital that their incapacitation or destruction would have a debilitating effect on security, national economic security, national public health, or safety.

The President's Coronavirus Guidance published on March 16, 2020, instructs employees of critical infrastructure industries, such as the airline industry, to maintain as near-normal as possible work patterns during the global coronavirus outbreak.

<u>This document certifies that this individual is necessary for airline operations within a sector that has been designated as critical infrastructure.</u>

Accordingly, in light of the President's Coronavirus Guidance, it is appropriate to allow this individual to proceed to and from work in the interests of protecting the nation's infrastructure.

Best regards,

*Gary C Kelly*

Gary C. Kelly
Chairman and CEO
Southwest Airlines