

# AGREEMENT

By and Between

# SOUTHWEST AIRLINES CO.

And The

# SOUTHWEST AIRLINES PILOTS ASSOCIATION

## For the Period

## September 1, 2012 Through AUGUST 31, 2020

Exhibit 4
MEV #3
Updated July 9, 2019

# Table of Contents

**SECTION 1: PURPOSE OF AGREEMENT** ........................................................................ 1-1

A.   SCOPE ........................................................................................................... 1-1

B.   RECOGNITION ............................................................................................. 1-1

C.   MERGERS AND FRAGMENTATION ......................................................... 1-2

D.   PURCHASE OR ACQUISITION OF ANOTHER COMPANY ............................. 1-3

E.   SUBCONTRACTED FLYING ....................................................................... 1-4

F.   AIRLINE PARTNERSHIP .............................................................................. 1-4

G.   CABOTAGE ................................................................................................... 1-9

H.   FOREIGN DOMICILES ................................................................................ 1-9

I.   EXPEDITED BOARD OF ADJUSTMENT PROCEDURES ................................. 1-10

J.   INFORMATION SHARING ......................................................................... 1-10

K.   HOLD HARMLESS ...................................................................................... 1-10

L.   AMENDMENTS TO AGREEMENT ........................................................... 1-10

M.   RE-OPENER ................................................................................................. 1-11

N.   SEPARABILITY ........................................................................................... 1-11

O.   MANAGEMENT RIGHTS ........................................................................... 1-12

P.   ADMINISTRATION OF THE CONTRACT ............................................... 1-12

**SECTION 2: GENERAL** ................................................................................................. 2-1

A.   UNIFORM ...................................................................................................... 2-1

B.   COMPANY RELATIONS .............................................................................. 2-1

C.   REMOVAL FROM FLYING ......................................................................... 2-2

D.   PRISONER OF WAR, HOSTAGE, INTERNMENT .................................... 2-2

E.   PERSONNEL AND TRAINING FILE .......................................................... 2-3

F.   JURY DUTY/WITNESS ................................................................................. 2-3

G.   TEAM MEETINGS ........................................................................................ 2-4

H.   REQUIRED COMPANY MEETINGS .......................................................... 2-5

I.   PAYMENT FOR EQUIPMENT/TRAINING ................................................ 2-6

J.   DAMAGE TO EQUIPMENT ........................................................................ 2-6

K.   EMPLOYEE TRAVEL POLICY ................................................................... 2-6

L.   JUMPSEAT ..................................................................................................... 2-6

i

M.   COPIES OF AGREEMENT ............................................................................ 2-6
N.   PASSPORTS, VISAS, INOCULATIONS AND RESTRICTED RADIO
TELEPHONE OPERATOR PERMIT (RR) ......................................................... 2-7
O.   NON-DISCRIMINATION ............................................................................ 2-9
P.   ASSOCIATION MEETINGS WITH NEW HIRE PILOTS .................................... 2-9
Q.   PILOT INFORMATION PROVIDED TO ASSOCIATION .................................. 2-9
R.   ASSOCIATION REPRESENTATION ............................................................... 2-9
S.   PILOT DEATH ............................................................................................ 2-9
T.   PILOT PROTECTION/DEFENSE DEVICES .................................................... 10
U.   AIRPORT SECURITY IDENTIFICATION BADGES ......................................... 2-10
V.   BENEFITS ENTITLEMENT ......................................................................... 2-10
W.   INTERNATIONAL SECURITY ..................................................................... 2-11
X.   CREW MEALS .......................................................................................... 2-11

**SECTION 3: SENIORITY ............................................................................... 3-1**
A.   SENIORITY LIST ......................................................................................... 3-1
B.   ESTABLISHMENT, USE AND RETENTION OF SENIORITY ........................... 3-1
C.   PROBATION ............................................................................................... 3-2

**SECTION 4: COMPENSATION ...................................................................... 4-1**
A.   PILOT LONGEVITY ..................................................................................... 4-1
B.   CAPTAIN PAY ............................................................................................. 4-1
C.   EQUIPMENT LONGEVITY PAY ................................................................... 4-1
D.   FIRST OFFICER PAY .................................................................................... 4-2
E.   TRIP PAY .................................................................................................... 4-3
F.   STANDARD / NON-STANDARD TRIP .......................................................... 4-4
G.   OVER-SCHEDULE/OVER-FLY ..................................................................... 4-4
H.   SCHEDULE LINE GUARANTEES ................................................................. 4-5
I.   RIGS .......................................................................................................... 4-5
J.   LANCE CAPTAIN ........................................................................................ 4-7
K.   TRAINING PAY ........................................................................................... 4-7
L.   DEADHEADING ......................................................................................... 4-12
M.   RESERVE PAY ........................................................................................... 4-12
N.   PREMIUM PAY .......................................................................................... 4-13
O.   DOUBLE TIME PAY ................................................................................... 4-14
P.   GOLDEN DAY OFF (GDO) PAY .................................................................. 4-15

Q.    JURY DUTY/WITNESS/MEETING..........................................................................4-15

R.    ON-LINE SCHEDULE PAY ...................................................................................4-15

S.    SCHEDULING ERRORS .......................................................................................4-15

T.    PER DIEM................................................................................................................4-16

U.    BUSINESS EXPENSES – CHARTER AND NON-REVENUE FLYING............4-17

V.    CHARTER PAY.......................................................................................................4-17

W.    SCHEDULED SUB SERVICE ...............................................................................4-18

X.    PAY CHECKS ..........................................................................................................4-18

Y.    DRUG/ALCOHOL TESTING.................................................................................4-18

Z.    PAY FOR ACCRUED VACATIONS .....................................................................4-18

AA.   VACATION PAY .....................................................................................................4-18

BB.   ENGINE TEST RUNS/REPOSITIONS .................................................................4-19

CC.   GROUND TRANSPORTATION .............................................................................4-20

DD.   CHECK FLIGHTS ...................................................................................................4-20

EE.   HOLIDAY PAY ........................................................................................................4-21

FF.   OVERRIDES.............................................................................................................4-22

GG.   FATIGUE PAY .........................................................................................................4-22

**SECTION 5: PILOT SCHEDULING AND WORK RULES............................................5-1**

A.    BIDDING MONTHLY LINE FLYING....................................................................5-1

B.    BIDDING BLANK LINE FLYING...........................................................................5-2

C.    TIME LINE OF SCHEDULING EVENTS ..............................................................5-2

D.    RULES GOVERNING FLOWS, DUTY TIME, CREW REST, AND LINES OF
TIME ............................................................................................................................5-5

E.    BID LINE PARAMETERS......................................................................................5-11

F.    BLANK LINES .........................................................................................................5-14

G.    SCHEDULE QUALITY...........................................................................................5-14

H.    SCHEDULING COMMITTEE AND DATA ACCESS .........................................5-15

I.    MONTHLY OVERLAP CORRECTION ................................................................5-15

J.    OPEN TIME PRIORITY (OTP) .............................................................................5-18

K.    MONTHLY OVERLAP RE-AWARDS ..................................................................5-19

L.    DOUBLE COVERED PAIRINGS...........................................................................5-19

M.    LIMITATIONS .........................................................................................................5-20

N.    CREW LEGALITY...................................................................................................5-20

O.    REPORTING TIME ................................................................................................5-20

APP 46

P.    COMMUTER RULES ............................................................................................ 5-21
Q.    SCHEDULING RECORDS .................................................................................... 5-22
R.    CREW ACCOMMODATIONS BOARD ................................................................ 5-23
S.    DEADHEADING ................................................................................................... 5-23
T.    ASSOCIATION PAIRING PULL/DROP................................................................ 5-24
U.    TELEPHONE ACCESS ......................................................................................... 5-24
V.    RED EYE FLYING................................................................................................. 5-24
SECTION 6: ADDITIONAL FLYING.................................................................................. 6-1
A.    ............................................................................................................................. 6-1
B.    VOLUNTARY ADDITIONAL FLYING.................................................................. 6-1
C.    NON-VOLUNTARY FLYING................................................................................ 6-17
SECTION 7: EXCHANGE OF FLYING .............................................................................. 7-1
A.    TRIP TRADES AND GIVEAWAYS (TT/GA).......................................................... 7-1
B.    ENHANCED LINE IMPROVEMENT TRIP TRADE (ELITT) .............................. 7-2
SECTION 8: RESERVE ...................................................................................................... 8-1
A.    RESERVE LINES .................................................................................................. 8-1
B.    BLOCK AND FLIGHT DUTY HOUR LIABILITY................................................ 8-2
C.    ADDITIONAL AND EXCHANGE OF FLYING.................................................... 8-2
D.    ASSIGNMENTS .................................................................................................... 8-4
E.    RESERVE REST, AVAILABILITY AND DUTY .................................................... 8-8
F.    ............................................................................................................................. 8-10
G.    CONTACT AND REPORTING .............................................................................. 8-10
H.    APPLICATION OF EMBEDDED RESERVES........................................................ 8-11
SECTION 9: VACANCIES .................................................................................................. 9-1
A.    GENERAL.............................................................................................................. 9-1
B.    INVOLUNTARY DISPLACEMENT PROVISIONS .............................................. 9-2
C.    DOMICILE RIGHT OF RETURN (DRR) PROVISIONS ...................................... 9-2
D.    VOLUNTARY VACANCY CHANGE FROM CAPTAIN TO FIRST OFFICER.. 9-3
E.    VACANCY LOCKS ............................................................................................... 9-4
SECTION 10: MOVING EXPENSES ................................................................................. 10-1
A.    ............................................................................................................................. 10-1
B.    ............................................................................................................................. 10-1
C.    ............................................................................................................................. 10-1
D.    ............................................................................................................................. 10-2

iv

E.    ................................................................................................................ 10-2
**SECTION 11: VACATIONS** ............................................................................................ **11-1**
A.    GENERAL.............................................................................................................. 11-1
B.    VACATION ACCRUAL ........................................................................................ 11-2
C.    VACATION NOTICE, BIDDING AND AWARDS.............................................. 11-3
D.    FLOATING VACATION ....................................................................................... 11-4
E.    VACATION CHANGES (TRADES, SHIFTS, ADJUSTMENTS) ...................... 11-5
**SECTION 12: LEAVES OF ABSENCE**............................................................................ **12-1**
A.    EMERGENCY LEAVE ......................................................................................... 12-1
B.    SICK LEAVE ......................................................................................................... 12-1
C.    MEDICAL LEAVE OF ABSENCE (MLOA) ....................................................... 12-5
D.    PERSONAL LEAVE OF ABSENCE .................................................................... 12-6
E.    MATERNITY LEAVE............................................................................................ 12-6
F.    MILITARY LEAVE OF ABSENCE (MILOA) ..................................................... 12-7
G.    CRITICAL INCIDENT LEAVE OF ABSENCE .................................................. 12-8
H.    FMLA LEAVE ....................................................................................................... 12-8
**SECTION 13: ON THE JOB INJURIES** ........................................................................ **13-1**
A.    GENERAL.............................................................................................................. 13-1
B.    ACCRUAL ............................................................................................................. 13-1
C.    USAGE ................................................................................................................... 13-2
**SECTION 14: INSURANCE AND LOSS OF LICENSE** ............................................... **14-1**
A.    INSURANCE .......................................................................................................... 14-1
B.    LOSS OF LICENSE............................................................................................... 14-5
C.    INTERNATIONAL MEDICAL SERVICES.......................................................... 14-6
**SECTION 15: INVESTIGATION AND DISCIPLINE** ................................................... **15-1**
A.    PRELIMINARY MATTERS .................................................................................. 15-1
B.    DOCUMENTATION ............................................................................................. 15-1
C.    CONSIDERATION OF PRIOR DISCIPLINARY ACTION ................................. 15-2
D.    INVESTIGATION PROCESS................................................................................ 15-2
E.    ADMINISTRATION OF DISCIPLINE................................................................. 15-3
**SECTION 16: GRIEVANCE PROCEDURE** .................................................................. **16-1**
A.    GRIEVANCES ....................................................................................................... 16-1
B.    FILING OF GRIEVANCES................................................................................... 16-1
C.    DISCOVERY ......................................................................................................... 16-2

v

D.    HEARING WITH VICE PRESIDENT ...................................................................... 16-3

E.    APPEAL OF DECISION .......................................................................................... 16-3

F.    GENERAL................................................................................................................. 16-3

**SECTION 17: MEDIATION AND SYSTEM BOARD OF ADJUSTMENT ................ 17-1**

A.    MEDIATION.............................................................................................................. 17-1

B.    SYSTEM BOARD OF ADJUSTMENT ................................................................... 17-2

C.    JURISDICTION ........................................................................................................ 17-3

D.    SUBMISSION OF DISPUTES ................................................................................. 17-3

E.    REPRESENTATION ................................................................................................. 17-4

F.    DISCOVERY ............................................................................................................. 17-4

G.    BOARD PROCEEDINGS......................................................................................... 17-4

H.    MAJORITY DECISION IS FINAL .......................................................................... 17-5

I.    DEADLOCK .............................................................................................................. 17-5

J.    RECORDS.................................................................................................................. 17-5

K.    EXPENSES ................................................................................................................ 17-6

L.    FREEDOM TO DISCHARGE DUTIES................................................................... 17-6

**SECTION 18: STANDARDIZATION.............................................................................. 18-1**

A.    CHECK AIRMEN...................................................................................................... 18-1

B.    PROCEDURES .......................................................................................................... 18-1

**SECTION 19: RETIREMENT ......................................................................................... 19-1**

A.    SOUTHWEST AIRLINES PROFIT SHARING PLAN.......................................... 19-1

B.    SWAPA PILOT 401(K) PLAN ................................................................................. 19-2

C.    TOP HAT PLAN ....................................................................................................... 19-4

D.    415 Excess Plan ........................................................................................................ 19-4

E.    401(a)(17) Plan .......................................................................................................... 19-4

**SECTION 20: PHYSICAL EXAMINATION ................................................................. 20-1**

A.    STANDARDS ............................................................................................................ 20-1

B.    FITNESS FOR DUTY............................................................................................... 20-2

**SECTION 21: TRANSFER TO SUPERVISORY DUTY .............................................. 21-1**

A.    TRANSFER................................................................................................................ 21-1

B.    PROCEDURES .......................................................................................................... 21-1

**SECTION 22: REDUCTION IN FORCE, FURLOUGH AND RECALL ..................... 22-1**

A.    FURLOUGH .............................................................................................................. 22-1

B.    RECALL..................................................................................................................... 22-2

vi

C.    INCENTIVE PLAN ................................................................ 22-3

D.    NON-FLYING EMPLOYMENT OPPORTUNITIES ........................... 22-4

E.    FURLOUGH PAY ................................................................. 22-4

**SECTION 23: TRAINING AND UPGRADE .................................................. 23-1**

A.    COMMUNICATION ............................................................... 23-1

B.    TRAINING PHILOSOPHY ....................................................... 23-1

C.    REVIEW ........................................................................... 23-1

D.    TRAINING SCHEDULING ....................................................... 23-2

E.    ..................................................................................... 23-2

F.    ..................................................................................... 23-2

G.    GENERAL.......................................................................... 23-2

H.    DISTANCE LEARNING .......................................................... 23-3

I.    TRANSPORTATION AND HOTEL ACCOMMODATIONS .................... 23-5

J.    SCHEDULING..................................................................... 23-6

K.    TRAINING PREFERENCES...................................................... 23-9

L.    UPGRADE ....................................................................... 23-11

M.    LANCE CAPTAIN................................................................ 23-12

N.    CREW POSITION FOR TRAINING ........................................... 23-14

O.    ETOPS and NEAR INTERNATIONAL TRAINING/CURRENCY................ 23-15

P.    CAPTAIN UPGRADE CURRENCY ............................................ 23-15

**SECTION 24: SAFETY PROGRAMS AND ................................................... 24-1**

**AIRCRAFT DATA COLLECTION SYSTEMS ............................................... 24-1**

A.    SAFETY PROGRAMS ............................................................ 24-1

B.    AIRCRAFT DATA COLLECTION SYSTEMS ................................... 24-2

C.    USE OF AIRCRAFT DATA COLLECTION SYSTEMS AND ELECTRONIC
      INFORMATION.................................................................... 24-3

D.    UTILIZATION OF NEW AIRCRAFT DATA COLLECTION SYSTEMS.......... 24-4

E.    EMERGENCY PREPAREDNESS PLAN.......................................... 24-5

F.    OTHER SAFETY RELATED INVESTIGATIONS ............................... 24-5

G.    SAFETY INVESTIGATIONS ..................................................... 24-5

**SECTION 25: DUES, CHECK-OFF, AND UNION SECURITY .............................. 25-1**

A.    UNION SECURITY ............................................................... 25-1

B.    CHECK-OFF ...................................................................... 25-1

C.    DELINQUENCY................................................................... 25-2

APP 50

MEV #3
Updated July 9, 2019

D.   PAYMENTS.............................................................................................................. 25-3

**SECTION 26: HOTEL STANDARDS...................................................................................... 26-1**

A.   CREW ACCOMMODATIONS BOARD ................................................................. 26-1

**SECTION 27: DEFINITIONS.............................................................................................. 27-1**

**SECTION 28:  TERM OF AGREEMENT ......................................................................... 28-1**

APP 51

## SECTION 1: PURPOSE OF AGREEMENT

A. SCOPE

This collective bargaining agreement ("Agreement") is made and entered into between Southwest Airlines Co. (hereinafter known as the "Company" or "SWA") and the Southwest Airlines Pilots' Association (hereinafter known as the "Association"). This Agreement covers all revenue and miscellaneous flying, performed with aircraft owned or leased by the Company, or which displays Company markings, including all flying in and for the service of the Company and its affiliates. All flying covered by this Agreement shall be performed by pilots whose names appear on the Southwest Airlines Master Pilot Seniority List ("SWA pilots"), except as otherwise provided for in this Agreement.

The purpose of this Agreement, in the mutual interest of the Company and the Association, is to provide for the operation of the Company under methods which will further, to the fullest extent possible, the safety of air transportation, the efficiency of operation and the continuation of employment of all pilots under safe and reasonable working conditions and proper compensation. It is recognized to be the duty of the Company, the Association and the employees to cooperate fully, reasonably, and in good faith for the attainment of these purposes.

B. RECOGNITION

Pursuant to the certification by the National Mediation Board in Case No. R-7403, dated September 30, 2014, the Company hereby recognizes the Association as the sole collective bargaining representative of the Airline Pilots of the Company. For purposes of this Agreement, and in accordance with the Railway Labor Act, "Company" and "SWA" will include Southwest Airlines Co., and any affiliate, subsidiary company, and any wholly owned, or partially owned and controlled company engaged in transporting passengers and/or cargo by air.

This Agreement will be binding upon the parties hereto, their successors, administrators, executors, transferees and assigns. It is agreed that if the Company transfers the control, operation or management of all or substantially all of the assets of its business, in either a single transaction or series of transactions, to another person, entity, company, corporation, or firm, the Company will require such transferee to assume the obligations of this Agreement by specific provision in the agreement of transfer and to offer full-time regular employment to all SWA pilots employed within the bargaining unit at the time of such transfer. The Company will give written notice of the existence of this Agreement to any proposed successor, with copy of such notice to the Association, before the Successor executes an agreement with respect to the transaction.

APP 52

## C. MERGERS AND FRAGMENTATION

1. Mergers

In the event of a transaction or series of transactions with an air carrier or any person or entity that owns or controls or is owned or controlled by an air carrier, which may result in an operational merger, the Company will require, as an irrevocable condition of such transaction or series of transactions, that the transferee will offer full-time regular employment to all SWA pilots employed within the bargaining unit on the date of the transaction, provide such SWA pilots with the seniority integration procedures established under Sections 3 and 13 of the "Allegheny-Mohawk Labor Protection Provisions", 59 CAB 22 (1972),  (including accepting the pilot seniority list obtained through that process as the pilot seniority list of the merged carrier), and maintain the statutory status quo of rates of pay, rules and working conditions established under this Agreement pending such operational merger.  Pending any period of separate operation prior to operational merger and integration of collective bargaining agreements and pilot seniority lists, which shall be no longer than twenty-four (24) months, unless mutually agreed upon by the Company and the Association, the successor shall keep separate the flight operations of the carriers and will not transfer or interchange crews, equipment and/or routes between the carriers unless otherwise negotiated and agreed to by the Association, and shall ensure that all Company aircraft on hand or on order at the time of the transaction are operated only by SWA pilots on the Southwest Airlines' Master Pilot Seniority List.  The successor shall meet promptly with the Association to negotiate implementation of these requirements and any other "Merger Transition Agreement" to be effective in the period prior to an operational merger.  Before seniority lists are integrated in accordance with this Section, no pilot on the SWA Master Pilot Seniority List will be furloughed.

2. Fragmentation

In the event of a transaction with an air carrier, or any person or entity that owns or controls or is owned or controlled by an air carrier, by which the Company disposes of and/or transfers directly or indirectly, either in a single transaction or a series of transactions, either (a) twenty five (25) or more aircraft, or (b) assets owned by the Company which results in a reduction in the Company's daily scheduled block hours of five hundred (500) hours or more, the Company will require, as an irrevocable condition of such transaction, that the transferee: offer employment at the closing of the acquisition to that number of pilots covered by this Agreement whose identity shall be determined in accordance with their seniority, (the number of pilot positions affected shall be the average monthly pilot staffing actually utilized in the operation of the transferred assets over the twelve (12) months prior to the employment offers); negotiate and arbitrate under Allegheny-Mohawk Section 13, 59 CAB 22 (1972), any dispute, regarding the identity or number of transferring SWA pilots, that may arise with the transferee carrier; and integrate the two groups of pilots in accordance with

Sections 3 and 13 of the Allegheny-Mohawk Labor Protection Provisions, 59 CAB 22 (1972), when the acquiring air carrier decides to integrate the pre-merger operations.

3.  General

The Company shall not directly or through an affiliate establish any new airline or subsidiary or acquire a Controlling Interest in any air carrier unless the operations of such carrier are performed by pilots on the Southwest Airlines Master Pilot Seniority List, in accordance with the terms of this Agreement, to the same extent as if the operations were performed in and for the service of the Company; and in the instances of transactions subject to Section 1.C.1., in accordance with the requirements of that Section.

The Association will be provided with reasonable advance notice of any successorship transaction followed by disclosure of the details of any material agreements related to such transaction in a timely manner, provided that no financial or other confidential business information needs to be disclosed unless suitable arrangements for confidentiality are established. Subject to Association representatives signing confidentiality and non-disclosure agreements required by the Company, such notice will be given at least ten (10) days prior to the announcement date.

D.  PURCHASE OR ACQUISITION OF ANOTHER COMPANY

In the event of a purchase or acquisition by the Company of another air carrier or entity that owns or controls or is owned or controlled by an air carrier, or a substantial portion of the assets of that company or entity, the Association and the Company will meet to discuss the impact of the purchase or acquisition, if any, upon SWA pilots. The Company will provide the Association with reasonable advance notice of a proposed purchase or acquisition followed by disclosure of the details of any material agreements related to such transactions in a timely manner to allow the Association to prepare for those discussions; provided that no financial or other confidential business information need be disclosed unless suitable arrangements for confidentiality are developed. Subject to Association representatives signing confidentiality and non-disclosure agreements required by the Company, such notice will be given at least ten (10) days prior to the announcement date.

1.  The rates of pay, rules, and working conditions contained in this Collective Bargaining Agreement will not be open for collective bargaining in the event of a purchase or acquisition of another company, nor will the Association or the Company have any obligation to bargain upon changes thereto, except as provided explicitly in Section 1.M: Re-Opener of this Agreement.

2.  In the event the Company chooses to hire the pilots of the company which it is acquiring, those pilots will be placed on the Southwest Airlines' Master Pilot Seniority List by agreement of the Association and the Company or as may otherwise

be required by federal law. The Company will accept the Master Pilot Seniority List established under this Section as the pilot seniority list of the Company.

E. SUBCONTRACTED FLYING

1. "Subcontracted Revenue Flying" as used in this Agreement shall refer to transactions in which the Company contracts for another carrier and its pilots to perform flying (e.g., a wet lease) covered by this Agreement.

2. The Company will not engage in Subcontracted Revenue Flying nor contract for flying to be performed by another carrier except as provided in Section 1.F., Airline Partnerships, of this Agreement.

F. AIRLINE PARTNERSHIP

Flying by or for the Company pursuant to an Airline Partnership is prohibited except as expressly permitted in this Section. The Association must agree to any exception to the provisions of this Section in advance of any action being taken by the Company.

1. General

The Company and the Association recognize the primary goal of an Airline Partnership Agreement is the continued growth of SWA and the SWA Master Pilot Seniority List by providing passenger feed to Company flights and to establish, maintain, and/or enhance the Company's overall market presence.

a. Flag of Convenience (FOC) or State Owned Enterprise (SOE) Carriers: The Company shall not enter into any Airline Partnership with any FOC carriers or SOE carriers, or any affiliates thereof, except as agreed upon by the Association.

b. Mergers and Acquisitions: The Company must discontinue any existing Airline Partnership Agreements of an acquired carrier that do not conform to the requirements of Section 1.F. of this Agreement at the conclusion of the published schedule or within nine (9) months from the transaction closing date, whichever occurs first.  The Company may not maintain or enter into any new Airline Partnership Agreement on behalf of an acquired carrier or the new entity unless agreed to by the Association.

c. Revenue Guarantee: The Company shall not enter into any Airline Partnership Agreement that provides a revenue guarantee to the other carrier, including but not limited to guarantees of block space, fixed fee per departure or cost plus arrangements.

d. Investment: Investment in an Airline Partnership by the Company shall not be used to establish a de facto subsidiary or alter ego carrier in circumvention of the

intent and purpose of the Scope and Recognition provisions in Section 1.A. and 1.B.

e. Assistance: Financial assistance, goods and/or services to be provided to another carrier pursuant to an Airline Partnership shall be at no less than the prevailing market/industry rates.

f. Furlough: There will be no furlough of any SWA pilots as a result of any Airline Partnership. As a commitment to this, there will be no new agreements as long as there is one pilot on furlough and all existing agreements will expire at the term of their published schedule

2. Interline Agreements

The Company may enter into Interline Agreements with other carriers to provide service limited to the following:

a. Irregular Operations: To provide passenger recovery in the event either the Company or the Interline partner experiences irregular operations, i.e., flight service disruption along a passenger's original itinerary.

b. Cargo: To provide for the transport and transfer of cargo by and between air carriers and Southwest Airlines.

c. Near International: To provide connecting service between the Company and a foreign carrier on Near International itineraries within the regions of North America, Central America, and South America under the following conditions:

   i. The Company must operate all domestic and all U.S. trans-border segments of that Near International itinerary.

   ii. Unless the Company serves the destination, it will not initiate interline service to any Near International foreign destination for which the average of the total Passengers Daily Each Way (PDEW) between the United States and the foreign destination over the previous twelve (12) months is equal to or greater than nine hundred (900). The Company may only initiate interline service to a Near International foreign destination with a monthly average PDEW below nine hundred (900) for the previous twelve (12) months, provided it does not serve that destination as of the date of this Agreement.

   iii. Following the start of interline service to a foreign destination permitted under this subsection c. the Company may continue interline service to that foreign destination for which the daily average of the SWA interline PDEW between the United States and the foreign destination over the previous six (6) months is less than or equal to seventy-five (75). In the event said daily average is above seventy-five (75), the Company must:

Section 1: Purpose of Agreement
Page 1-5

a) Within twelve (12) months, begin service to or add additional capacity to that foreign destination to offset the PDEW overage and continue interlining to that destination; or

b) Within twelve (12) months, reduce the volume of interlining below the PDEW threshold and/or reduce the number of interline partners to get below the PDEW threshold; or

c) Within sixty (60) days, obtain the Association's agreement to continue interlining to that foreign destination.

d. Far International Interline: To provide connecting service with the Company and a foreign carrier on international itineraries beyond the regions of North America, Central America and South America under the following conditions:

   i. The Far International itinerary must include at least one segment on Southwest Airlines.

   ii. The Company must operate all domestic and all Near International United States trans-border segments of that Far International itinerary.

   iii. The Company will not initiate interline service with foreign carriers to the Far International Atlantic Region if the total Far International SWA PDEW among all SWA Airline Partners to that region over the previous twelve (12) months exceeds three hundred seventy-five (375). The Company will not initiate interline service with foreign carriers to a Far International destination in the Pacific Region if the total Far International SWA PDEW among all SWA Airline Partners to that region over the previous twelve (12) months exceeds eight hundred seventy-five (875).

   iv. Following the start of interline service above, the lookbacks will revert to six (6) months to account for seasonality.

   v. In the event the total Far International SWA PDEW among all SWA Airline Partners to the Atlantic Region exceeds three hundred seventy-five (375) or Pacific Region exceeds eight hundred seventy-five (875) over the previous six (6) months, the Company shall:

      a) Serve that Region with SWA aircraft after reaching an agreement with the Association in accordance with Section 1.M., and continue interlining to that Region; or

APP 57

Exhibit 9
MEV #3
Updated July 9, 2019

    b) Within twelve (12) months, reduce the volume of Interline partners below the region PDEW threshold and/or reduce interlining to that region with the Airline Partner to get below the region PDEW threshold; or

    c) Within twelve (12) months, discontinue interlining to that Region for no less than twelve (12) months; or

    d) Within sixty (60) days, obtain the Association's agreement, as required by its governing documents, to continue interlining to that Region. Should the Company reach an agreement with the Association in accordance with Section 1.M. to serve the Far International region the limitations described in b) above will not apply.

3. Codeshare Agreements

The Company may enter into Codeshare Agreements with foreign carriers where flight service connections are provided limited to the following:

    a. Far International: To provide connecting service with the Company and a foreign carrier on international itineraries beyond the regions of North America, Central America and South America

        i. The Far International itinerary must include at least one segment on Southwest Airlines.

        ii. The Company must operate all domestic and all Near International United States trans-border segments of that Far International itinerary.

        iii. The Company will not initiate codeshare service with foreign carriers to the Far International Atlantic Region if the total Far International SWA PDEW among all SWA Airline Partners to that region over the previous twelve (12) months exceeds three hundred seventy-five (375). The Company will not initiate codeshare service with foreign carriers to the Far International Pacific Region if the total Far International SWA PDEW among all SWA Airline Partners to that region over the previous twelve (12) months exceeds eight hundred seventy-five (875).

        iv. Following the start of codeshare service above, the lookbacks will revert to six (6) months to account for seasonality.

        v. In the event the total Far International SWA PDEW among all SWA Airline Partners to the Atlantic Region exceeds three hundred seventy-five (375) or Pacific Region exceeds eight hundred seventy-five (875) over the previous six (6) months, the Company shall:

a) Serve that Region with SWA aircraft after reaching an agreement with the Association in accordance with Section 1.M., and continue codesharing to that Region; or

b) Within twelve (12) months, reduce the volume of codeshare partners below the region PDEW threshold and/or reduce codesharing to that region with the Airline Partner to get below the region PDEW threshold; or

c) Within twelve (12) months, discontinue codesharing to that Region for no less than twelve (12) months; or

d) Within sixty (60) days, obtain the Association's agreement, as required by its governing documents, to continue codesharing to that region. Should the Company reach an agreement with the Association in accordance with Section 1.M. to serve the Far International destination, the limitations described in b) above will not apply.

b. Other: The Company may enter into Codeshare and/or Interline Agreements with foreign carriers to provide inter-island service within the Caribbean Islands. The Company may also enter into Codeshare and/or Interline Agreements with other carriers, including Domestic carriers, to provide intra-state service within the State of Alaska and inter-island service within the Hawaiian Islands.

4. Distribution Agreements

The Company may distribute other airlines' flights on www.southwest.com or through Southwest Marketing Department limited to the following:

a. Flights to and from Hawaii and international destinations (including any domestic legs of that itinerary) pursuant to the Southwest Airlines Rapid Rewards program, provided the Company does not offer connecting service on those routes and makes clear such flights are flown by the other airline and not the Company.

b. Itineraries that contain a Southwest segment pursuant to Codeshare and/or Interline agreements authorized by Section 1. F.

5. Communication

a. Prior to entering into, modifying, implementing or terminating any Airline Partnership under Section 1.F., the Company will meet and confer with the Association reasonably in advance of the effective date of such event. The Company will demonstrate to the Association and ensure that any Airline Partnership or modification thereof, is not being used as a substitute for the Company aircraft growth. The Company will also provide the Association with a final and unredacted draft of any Airline Partnership Agreement or amendment

thereof, at least thirty (30) days prior to signing and will, upon request, meet and confer with the Association regarding the same.

b. The Company agrees to provide monthly compliance data and meet and confer with the Association at least monthly to evaluate the feasibility and viability of existing and future Airline Partnerships. The compliance data available to the Company will be provided and shall include but is not limited to the following:

    i. De-identified ticket lift data for the given month containing selling carrier or agency, point of origin, origin destination, first connecting point, second connecting point, fare and Southwest portion of the fare for each interline/codeshare passenger;

    ii. Planned schedules for flights that would be impacted by Southwest or OA code and/or interline. Flights impacted will be appropriately marked; and

    iii. Estimated projection of impact of interline/codeshare in terms of additional passenger and revenue by route.

c. The parties shall enter into a non-disclosure agreement to protect the confidentiality of these discussions and any disclosure of confidential materials.

G. CABOTAGE

The Company shall not allow its code to be used on flights of foreign carriers carrying local revenue passengers or cargo traffic between airports within the United States or its territories.

H. FOREIGN DOMICILES

Prior to the Company establishing any pilot domicile outside of the United States, it shall meet and confer with the Association upon its request and bargain with the Association regarding bidding, relocation expenses, and conditions of employment applicable to the specific situation at least ninety (90) days prior to any bid establishing such domicile. If a pilot domicile is established outside the United States, pilots assigned to such domicile shall be covered by this Agreement and shall enjoy all rights of the Railway Labor Act in the same manner as if the pilots were domiciled within the United States. Disputes concerning SWA pilots based at a foreign domicile shall be heard by the System Board of Adjustment, as set forth in this Agreement, and the decision of the System Board of Adjustment in such cases shall be enforceable in any court of competent jurisdiction in the United States to the same extent and in the same manner as other cases arising out of interpretation and application of this Agreement. In any proceeding related to the enforcement of the obligations of this paragraph, the Company will not raise non-applicability of the Railway Labor Act as a defense.

APP 60

I.  EXPEDITED BOARD OF ADJUSTMENT PROCEDURES

The Company and Association agree to arbitrate any claim made by either party, alleging a violation of this Section 1 directly before the System Board of Adjustment, sitting with a neutral arbitrator mutually acceptable to both parties. If a mutually agreed upon arbitrator cannot be selected within ten (10) days of the request for arbitration, an arbitrator will be selected pursuant to Section 17.B.3. of this Agreement.  The dispute shall be heard no later than thirty (30) days following the submission of the dispute to the system board (subject to the availability of the arbitrator), and shall be decided no later than thirty (30) days following submission, unless the parties agree otherwise in writing.

J.  INFORMATION SHARING

The Company agrees to provide the Association, upon request, with relevant information necessary for enforcement of this Section, subject to the Association's agreement to comply with reasonable restrictions and rules established by the Company for confidential or proprietary information.  The Company shall produce such information within two (2) weeks of the request, unless the parties agree that additional time is necessary.

K.  HOLD HARMLESS

The Company will indemnify, defend and hold harmless each of the FAA licensed pilots in the employ of the Company, and the personal estates of such pilot personnel, from and against any and all liabilities, losses, damages, claims, suits, judgments and all expenses (including reasonable attorneys' fees) arising therefrom or related thereto for personal injury or death, or damage to property of any person whomsoever, resulting from or arising out of any act or omission of such pilot personnel in the course or scope of such pilot's employment. The pilot will cooperate fully with the Company, its insurers and any attorneys retained to represent any of them in the defense of any claims covered hereby.

L.  AMENDMENTS TO AGREEMENT

Either party hereto may, at any time, propose in writing to the other party any amendment which it may desire to make to this Agreement, and if such amendment is agreed to by both parties hereto, such amendment will be stated in writing, signed by both parties, and will then be deemed incorporated in, and will become part of, this Agreement. No amendment hereto will be valid unless in writing and duly and properly executed by both parties.  These amendments will be referred to as Side Letters to the Agreement.

In an effort to keep pilots informed and contract language easily accessible and understandable, this Agreement will be maintained in an electronic format agreeable to both parties.  That electronic contract will be called the Contract Master Electronic Version.  It will be amended when a Side Letter is executed and will become the updated version and labeled as such.  It will also be used to correct any grammatical or typographical errors. The first version agreed upon at the signing of this new contract will

be Version 1. Each subsequent change agreed upon will be dated and named Version 2, Version 3, etc. Side Letters will be executed in the same historical manner, numbered and documented as such, but will immediately be integrated into the Contract Master Electronic Version. That integration will be part of the Side Letter process.

## M. RE-OPENER

In the event that the Company, during the duration of this Agreement, should:

1. Acquire for its use any aircraft other than a 737 aircraft which can be flown under the same common 737 type rating; or

2. Establish any new classification of employees employed within the bargaining unit and not in existence on the date of this Agreement; or

3. Conduct flying limited to cargo only; or

4. Begin flying international routes, other than Near International routes; or

5. Create any subset of flying not specifically delineated in Section 5 of this Agreement; or

6. Acquire or configure any aircraft with more than one hundred seventy-five (175) passenger seats will trigger a re-opener on rates of pay.

This Agreement will be reopened for the sole purpose of negotiating wages, rates of pay, relocation expenses, bidding, and hours or conditions of employment particularly applicable to the specific situation. If the FAA, or the Company, or other competent authority restricts any flying beyond those aircraft listed above, this paragraph shall apply. If the reopener is triggered pursuant to paragraphs M.1 through M.6, the Company shall not place such aircraft in revenue service, or implement as applicable until the above provisions are negotiated and agreed to by the Association.

## N. SEPARABILITY

Should any part of this Agreement be rendered invalid by reason of any existing or subsequently enacted legislation, act of government agency or decree of court having jurisdiction, such invalidation of a part of this Agreement will not invalidate the remaining parts thereof, which will remain in full force and effect. If any part of this Agreement is invalidated, either party may, upon thirty (30) days written notice to the other, request negotiations for an amendment specifically drafted to account for the invalidated part of this Agreement.

Should any provision in this Agreement be declared illegal by any court of competent jurisdiction, such provision will immediately become null and void, leaving the

remainder of the Agreement in full force and effect, and the parties will thereupon seek to negotiate substitute provisions which are in conformity with applicable law.

O.  MANAGEMENT RIGHTS

The right to manage and direct the work force, subject to the provisions of this Agreement, is vested in the Company.  Employees covered by this Agreement shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement and which have been made available to the affected employees and the Association prior to becoming effective. The Association shall be advised of any changes to rules, regulations, or orders governing pilots at least fourteen (14) calendar days before such rules, regulations, or orders become effective, unless the parties mutually agree to a shorter advance notification period. This fourteen (14) calendar day requirement will not apply when the Company is required by law to make immediate changes or in the event of an emergency circumstance that reasonably requires immediate change.

P.  ADMINISTRATION OF THE CONTRACT

1.  The Company and the Association both recognize the importance of a Collective Bargaining Agreement that promotes a safe and efficient operation. The Company will provide the Association with the ability to run all Crew Management System (CMS) transactions.

2.  Contract Implementation

The Company and the Association will each designate representatives to facilitate the implementation of this Agreement.

3.  Contract Dispute Resolution

The Company and the Association will each designate representatives to expeditiously resolve any dispute arising during the implementation of this CBA and any misunderstandings about the intent or language contained herein.

## SECTION 2: GENERAL

A. UNIFORM

   1. Pilots will wear the uniform prescribed by the Company in accordance with the manner prescribed by the Company. The expense of the initial uniform, including its maintenance, will be borne by each pilot. Expenses due to changes in design or other requirements will be borne by the Company. The Company will provide, free of charge, such insignia that are to be worn as part of the prescribed uniform. Such insignia will remain the property of the Company, and each pilot will be responsible for same if lost.

   2. The Association may designate a uniform committee which, if formed, will be consulted by the Company regarding any contemplated change to the uniform, uniform accessories or policies concerning the wear of the pilot uniform.

   3. Any contemplated change in the vendor(s) who supply the uniform and uniform accessories, and manner in which the uniforms are procured will also be discussed with the committee. The Company will give careful consideration to the recommendations of such committee. Three (3) months notice will be given of any uniform change that renders any portion of the uniform purchased by pilots obsolete.

   4. All Company required uniforms and uniform accessories that are purchased through a Company authorized vendor or through Southwest Airlines Administrative Purchasing will be available through payroll deduction. The individual accounts will be paid back at the rate of thirty dollars ($30) per pay period. If the account balance for a non-probationary pilot exceeds five hundred dollars ($500), the Company may increase the deduction amount to fifty dollars ($50) per pay period. The Company may allow optional items to be purchased from authorized vendors or Southwest Airlines Administrative Purchasing, and may set a dollar limit and repayment schedule concerning such purchases. Any balance owed to the Company from any purchases made on a payroll deduction basis will be deducted from an employee's final paycheck upon termination of employment.

B. COMPANY RELATIONS

   1. The Association or its representatives will meet with officials designated by the Company as necessary every calendar year to discuss safety, employee problems and other items of mutual interest.

   2. During the time a pilot who maintains currency as a Southwest Airlines pilot is on flight pay loss for Association business, the Company will provide the pilot with the same benefits he or she would normally receive or accrue.

MEV #3
Updated July 9, 2019

   3. Authorized representatives of the Association will be provided with a reasonable number of must ride passes upon request for the purpose of travel related to the transaction of business with Southwest Airlines.

## C. REMOVAL FROM FLYING

Any pilot removed from duty for a possible offense, questionable occurrence, or fitness for duty will have his pairing(s) coded Company Convenience (CC with Pay). The specific reason for a pilot's removal from duty will be explained to him at the time of removal. A written explanation detailing the specific reason for his removal will be provided to him with a copy to the Association as soon as is practicable, but definitely no later than three (3) business days from the time of removal. A pilot will continue in a paid status until such time that just cause for removal is clearly demonstrated.

## D. PRISONER OF WAR, HOSTAGE, INTERNMENT

1. A pilot who in the course and scope of Company business is kidnapped, hijacked, taken prisoner, interned or is missing as a result of war, rebellion, insurrection, terrorist act or action of a foreign government, shall continue to accrue seniority and longevity.

2. The Company shall provide such pilot with the following compensation and benefits until the pilot is released or the official date of death:

   a. Compensation based on average monthly bid line total per the pilot's Domicile and seat position.

   b. Applicable insurance benefits and other benefits attendant to his status as an active employee.

   c. Accruals and contributions normally made by the pilot and/or the Company.

   d. Continuation of insurance benefits for spouse and/or eligible dependents of the pilot.

3. Compensation and other benefits payable under this Section shall be provided to the beneficiaries indicated by the pilot in his Beneficiary Designation Form. In the absence of a completed Beneficiary Designation Form, the Company shall deposit all applicable benefits in trust for the pilot until his status has been legally determined. The trustee shall invest such funds in accordance with applicable fiduciary responsibilities.

4.  Should a pilot's spouse and/or eligible dependents wish to continue health coverage beyond the end of the appropriate benefit continuation period provided in Section 14 of this Agreement, they may do so under the provisions of COBRA. A pilot and his spouse and/or eligible dependents needing more information regarding COBRA (including time limits) should refer to Section 14 of this Agreement.

5.  The Company shall provide each pilot with a Beneficiary Designation Form in the following manner. Each pilot shall submit such designation form to the designated Company official within ninety (90) days of the effective date of this Agreement, or, in the case of new hires, within sixty (60) days of the pilot's date of hire.

E.  PERSONNEL AND TRAINING FILE

1.  An official Flight Operations Domicile Personnel File will be maintained by the Company in the Chief Pilot's office at the pilot's Domicile.

2.  For information related to a pilot's access to his file, refer to Section 15.B. of this Agreement.

3.  An official training file, containing all records relating to a pilot's training and flight checks will be maintained at the Training Center.

4.  A pilot may examine his personal files (Domicile or training) on any business day during normal business hours with adequate notice to his Chief Pilot or Training Department personnel, as appropriate. A pilot will be given a copy of any document in his personnel file upon request.

F.  JURY DUTY/WITNESS

1.  General

    A pilot who is required to serve on a jury will not suffer a loss in pay from his schedule at the time jury duty notice is received as a result of such service. A pilot who receives notice of jury duty should inform his Chief Pilot or designee as soon as possible, but certainly no later than three (3) business days after receiving the jury duty summons, to ensure timely communication for required schedule changes. When warranted by operational need, the Company may request the appropriate authorities to defer or establish alternative date(s) for a pilot's jury duty.

2.  Pairings Obtained (Assigned or Awarded) Prior to Receipt of Jury Duty Notice

    The Company will pull the leg(s) that conflict with the known jury duty.  If the pilot lives in domicile, the pilot will be returned to the domicile in time for adequate rest and travel to the jury duty assignment. If pulled at an outstation, the duty period will end thirty (30) minutes after block-in of the last flight.  If the pilot is a commuter, he

will be removed from the pairing to allow him to commute home with adequate rest prior to the jury assignment.  The pilot will be scheduled on must ride deadhead(s) back to domicile or the commuter's SWA commuter city.  Deadheads will not be paid unless they are part of a bid pairing. A pilot with a pairing that conflicts with jury duty is permitted to use TT/GA and ELITT to adjust his schedule as to not conflict with the jury duty. Crew Scheduling will pull the pairing no sooner than three (3) days prior to the jury duty. For pay purposes only, DHR will be applied to the duty period until the pilot is released in domicile, released in his SWA commuter city, or returned to the pairing after completion of jury duty.

A pilot may elect to call his Chief Pilot regarding alternate trip pull solutions.

3.  Pairings Obtained (Assigned or Awarded) After Receipt of Jury Duty Notice

Upon receipt of a jury duty notice, a pilot is expected to refrain from acquiring pairings that would conflict with the jury duty. Pairings acquired after receipt of a jury duty notice that conflict with the jury duty will be pulled at no pay. The affected pilot and the Company must mutually agree to return the pilot to a portion of the pairing upon the completion of jury duty service. Deadhead(s) added to rejoin the pairing will not be paid, unless part of a bid pairing.

A pilot is not restricted from acquiring pairings which commence after the expected completion of jury duty. Such pairings must allow for adequate time to commute to the pairing. Pairings acquired prior to jury duty must allow for adequate time to commute after the completion of the pairing. However, pairings acquired after the pilot receives a jury duty notice that conflict with an extension of jury service will be removed at no pay.

4.  Pilot as Witness

If a pilot is required to testify in a court of law on behalf of the Company, otherwise perform at Company request any service needed to defend the Company or himself, or is subpoenaed as a witness in any legal proceeding based on performance of job duties within the scope of his employment, the pilot will be paid Duty Period Minimum (DPM) or actual TFP lost, whichever is greater.

## G.  TEAM MEETINGS

1.  A pilot, when notified, is encouraged to attend interdepartmental meetings to resolve conflicts which have occurred. These interdepartmental meetings are normally not mandatory and are called only after review by senior departmental management.

2.  If a pilot is notified that the meeting is mandatory and is required by the Company to attend a Team Building Meeting on a day off, he will be paid DPM and travel will be kept at an absolute minimum.

3.  The meeting date/time will normally be mutually agreed upon. Disciplinary action is not a function of the team meeting; however, a pilot may request a SWAPA representative to be present. The Company will promptly inform SWAPA of any negative results of any Team Building Meeting involving a pilot within seven (7) days.

## H. REQUIRED COMPANY MEETINGS

1.  Meetings on a Scheduled Day Off

    In the event a pilot is given a "Notification of Meeting Requirement" form by the Company (or a representative of the Company) that requires him to attend a meeting on a scheduled day off, the pilot will be paid 2.5 TFP unless the result of the meeting or investigation leads to discipline or a Letter of Reprimand. If discipline or a Letter of Reprimand is administered, the pilot will be paid one (1.0) TFP for the time spent in the office. If the sole purpose of the trip to the domicile is for the required meeting, the pilot will be provided a must ride deadhead from/to the pilot's commuter city/domicile. Flight reservations will be handled in the manner described in Section 23.I.1. Duty time will be reflected in the Crew Management System to account for time spent in the meeting. For meetings that require an additional night in the domicile over and above the pilot's normal commute required domicile nights, the Company will provide a paid hotel room. If the pilot has been pulled CC during the course of the investigation, the pilot will be paid the greater of the pay required by this Section or the CC pull pay.

2.  Meetings during a Flight Duty Period (FDP)

    a.  If the meeting is prior to any FDP, the pilot's FDP will start at the scheduled meeting time. DHR and THR will apply. The meeting will be scheduled so as not to conflict with an FAR or contractual legality.

    b.  If the meeting is after any FDP, the pilot's duty day/period shall continue until the conclusion of the meeting. DHR and THR will apply. The meeting will be scheduled so as not to conflict with an FAR or contractual legality.

3.  Meetings during non-FDPs

    If the meeting is in conjunction with any duty other than an FDP, time spent at the meeting will not be counted as FDP, but will be included in duty day/period calculations. Duty day/period will begin at the scheduled meeting time for meetings prior to the originally scheduled duty day/period and continue until the conclusion of the meeting for meetings scheduled after the originally scheduled duty day/period.

I.  PAYMENT FOR EQUIPMENT/TRAINING

A pilot shall not be required to pay for the use of any equipment and/or supplies used in operations and training. The cost of any pilot training required by the Company shall be borne by the Company.

J.  DAMAGE TO EQUIPMENT

A pilot shall not be required to pay for damages resulting from his operation of equipment in the service of the Company unless such damage results from willful misconduct.

K.  EMPLOYEE TRAVEL POLICY

1.  Each pilot will be afforded travel benefits no less than those extended to other employee groups as established by Company policy.

2.  Each pilot listed on the Southwest Airlines Master Pilot Seniority List will be allowed to carry "two plus one" bags in the performance of duties, as permitted by TSA regulations.

L.  JUMPSEAT

The Company shall provide each pilot with cockpit jumpseat privileges on Company aircraft, unless otherwise prohibited by regulation or statute. The Company will participate in the Cockpit Access Security System (CASS) (or its equivalent) for both domestic and international jumpseat access when available at no expense to the pilot.  A pilot who is traveling on a space available basis shall have priority on the jumpseat over any other Company or non-Company personnel traveling on a space available basis. Pilots who have signed up for the jumpseat will be allowed to pre-board.

M.  COPIES OF AGREEMENT

Each pilot, upon request, shall be provided with a copy of the new Agreement within a reasonable time after its signing. Each new pilot will be provided a copy during initial training. The Company will maintain an updated copy of the Agreement on the Electronic Flight Bag (EFB).

APP 69

N.  PASSPORTS, VISAS, INOCULATIONS AND RESTRICTED RADIO TELEPHONE
    OPERATOR PERMIT (RR)

   1.  Pilots may be required to obtain and maintain a current passport.  First Officers and
       Check Airmen are required to obtain and possess a Restricted Radio Telephone
       Operator Permit (RR). Each pilot may be required to carry his passports (and visas if
       required) while on duty as defined in the Flight Operations Manual. First Officers and
       Check Airmen are required to carry their RR while on duty.

   2.  The Company may, at its discretion, contract with a third party vendor to manage the
       passport and visa processes. Should the Company contract with a third party vendor
       for these processes, pilots who are required to carry a passport or visa must obtain and
       maintain passports and visas through the vendor, and the costs will be borne by the
       Company unless described otherwise below.

       Should a third party vendor not be contracted, the Company shall reimburse each
       pilot for the cost of new passports, passport renewals and photos, visas, if required.
       Charges for expediting passport service, when required, and required
       inoculations/medications will be reimbursed by the Company. Reimbursement for
       pilot initiated third party vendor fees requires Chief Pilot's approval prior to the
       transaction. Passport fee reimbursement will be limited to the application fee,
       expedition fee, photos, and any other governmental fees that may apply. The
       Company, or a third party vendor, shall obtain visas for pilots whenever practicable,
       and each pilot shall cooperate and assist in the process. Current First Officers and
       Check Airmen who do not have a Restricted Radio Telephone Operator Permit (RR)
       will be reimbursed by the Company for the cost of obtaining one. Reimbursement is
       subject to submittal of proper receipts. Each pilot will be required to submit
       government-required information to the Company (i.e. information the Company is
       required to share with the TSA or Border Patrol, etc.).

   3.  PASSPORT/VISA/RR REQUIRED FLYING

       a.  A pilot awarded a hard line or blank line (including Reserve) or an assignment via
           the open time system, ELITT, Trip Trade/Giveaway, etc. that includes flying
           to/from a destination(s) where a passport/visa/RR is required must possess a
           passport/visa/RR valid for travel to/from that destination for the entire bid period
           or trip, and carry-out period. A pilot who does not have a valid passport/visa/RR
           should notify Crew Scheduling twenty-four (24) hours prior to the report time of a
           pairing with flying that requires a passport/visa/RR.  The pilot will be removed
           from the pairing at no pay. The pilot will have the option to pick up flying
           through the Open Time or Trip Trade/Giveaway (TT/GA) systems.  The pairing
           acquired cannot contain flying that requires a passport/visa/RR.

APP 70

b. A pilot who is unable to obtain or hold the required travel documentation will be awarded lines through the normal award process. Any International pairings which he cannot fly will be removed as an overlap adjustment and will be handled in accordance with Open Time Priority procedures, as delineated in Section 5.J.

c. If the pilot is reassigned or pulled without pay, corrective action may be administered in accordance with the Passport/Visa/ Restricted Radio Telephone Operator Permit (RR) Policy.

4. EXPIRED/LOST/STOLEN PASSPORTS

a. A pilot whose passport is lost or stolen while working must report the loss promptly to the U.S. Embassy or Consulate and Southwest Airlines Crew Scheduling.

b. The Company will not be responsible for the costs associated with replacing lost passports, passport photos, visas and RR, except and unless they are lost or stolen while on duty or on an overnight. If a passport or visa is lost or stolen while on duty or on an overnight, reimbursement will be done in accordance with Section 2.N.2. Reimbursement is subject to submittal of proper receipts.

c. A pilot removed from flying in a near international station because of a lost or stolen passport/visa/RR is subject to reassignment and will be covered by daily reassignment pay rules through the end of the pairing. If the Company cannot return the pilot to his domicile inside the original pairing footprint, the days outside the pairing will not be paid. If the pilot's return to his domicile is outside of the original footprint of the pairing, he will be given unpaid deadheads back to domicile and will receive per diem until he returns to domicile.

d. A pilot who is on-line or notifies Crew Scheduling four (4) hours or less from report that he does not have a valid passport/visa/RR, when required, is subject to reassignment. The pilot will be reassigned, if possible, or the pairing(s) or a portion of the pairing(s) will be pulled without pay. The reassigned flying will become the new original pairing for pay calculation purposes for any subsequent reassignment. Should the remainder of the pairing be pulled, the pilot will have the option to pick up from the Open Time or TT/GA systems. The pairing acquired cannot contain flying that requires a passport/visa/RR.

e. All Reserves may be required to carry a valid passport/visa. First Officers and Check Airmen Reserves are also required to carry a RR. Reserves who fail to carry the required documentation for a reserve assignment may be assigned a different reserve assignment if available. Should no other flying be available at the time Crew Scheduling is notified that the Reserve does not have a passport/visa/RR, the Company will continue the pilot on the Reserve Availability Period (RAP). Reserve assignments to accommodate passport, visa and RR issues may be made out of RCO and RAP order.



APP 71

O. NON-DISCRIMINATION

    1. No employee covered by this Agreement will be interfered with, restrained, coerced or discriminated against by the Company or the Association because of membership in the Association. All employees shall be free to engage in lawful Association activities.

    2. No employee covered by this Agreement shall be discriminated against because of race, color, religion, national origin, age, gender identity, sexual orientation, pregnancy, marital status, disability or veteran status.

P. ASSOCIATION MEETINGS WITH NEW HIRE PILOTS

    The Company will allow the Association to meet with new hire pilots. Such meetings shall be scheduled at the conclusion of a training day at a time convenient to the Company.

Q. PILOT INFORMATION PROVIDED TO ASSOCIATION

    The Company shall provide the Association with a list containing each pilot's name, mailing address, phone number and e-mail address as last provided to the Company by the pilot. The Association shall treat the information as confidential, shall not post such information on any general membership or pilot bulletin board or website, and shall not disclose such information to any other person or party except as may be required by law.

R. ASSOCIATION REPRESENTATION

    1. The Association will install a suitable bulletin board at each domicile for the posting of Association meetings, elections, seniority lists, and official notices. The bulletin board will not contain any editorialized material and will be lockable.

    2. With reasonable notification, the Company agrees to admit to its property the officially designated representatives of the Association to transact such business as is necessary for the administration of this Agreement.

    3. Any pilot covered by this Agreement and required to be present at Company direction shall be entitled to Association representation if he so requests.

S. PILOT DEATH

    In the event of a pilot's death, the Company shall notify the Association immediately.

APP 72

## T. PILOT PROTECTION/DEFENSE DEVICES

In the event the Company or any regulatory agency requires a pilot to become trained in the use of any protective or defense device that the Company decides to use (e.g., mace, stun gun, taser or firearm) as a part of flight and/or aircraft security, the Company shall provide written notice to the Association of such requirement. Pay for such training shall be as per Section 4.K. of this Agreement. The Company and the Association shall meet for the purpose of reviewing training requirement(s) and liability associated with such device(s). Failure of a pilot to qualify on such device(s) shall not result in any disciplinary action. The Company will make every reasonable effort to train a pilot to proficiency.

## U. AIRPORT SECURITY IDENTIFICATION BADGES

1. When a specific local airport security Identification (ID) badge is authorized at a pilot's Domicile or required at other specific airports, the Company shall provide guidance and authorization, to the extent allowed by local regulations and policies, to obtain a local airport security ID badge.

2. Any cost involved with this process, with the exception of lost badge replacement, shall be borne exclusively by the Company.

3. It is the requesting pilot's responsibility to ensure adherence to all required security currency requirements/updates and any validation/revalidation processes that the federal and/or local airport authority may require.

4. Where provided at the local airport, the Company will offer an alternate means of screening.

## V. BENEFITS ENTITLEMENT

1. Except as otherwise provided for herein, each pilot shall be entitled to no less than the same benefits, privileges and policies as are available to other Company employees pursuant to policies and practices by the Company.

2. No pilot will be deprived of any existing insurance, profit sharing, or other benefits presently enjoyed by pilots covered by this Agreement merely by virtue of the fact that such benefits are not specifically mentioned herein.

W. INTERNATIONAL SECURITY

The Company will, at its own expense, provide appropriate security for pilot transportation to and from the airport, and at Crew Hotels. Additionally, all appropriate security measures will be employed in situations involving travel warnings by agencies such as the U.S. Department of State, up to and including, evacuation from and/or suspension of operations to, such international destinations.

X. CREW MEALS

Unless the Association agrees to an alternative solution, crew meals will be provided to non RON crews at international stations where food is inaccessible due to policies or local regulations or at any location that would require a crew member to clear customs in the foreign city. Crew meals will be time appropriate and nutritiously balanced.