**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

———————————————————————
:
SOUTHWEST AIRLINES PILOTS                    :
ASSOCIATION                                  :
                                             :
       Plaintiff,                            :
                                             :
        vs.                                :     CASE NO. 3:21-cv-02065-M
                                             :
SOUTHWEST AIRLINES CO.                       :
                                             :
       Defendant.                            :
———————————————————————:


**DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF**

Robert E. Sheeder, attorney-in-charge
Texas Bar No. 18174300
robert.sheeder@morganlewis.com
Clayton M. Davis
Texas Bar No. 24092323
clayton.davis@morganlewis.com
1717 Main Street, Suite 3200
Dallas, Texas 75201
Telephone: (214) 466-4000
Facsimile: (214) 466-4001

Jonathan C. Fritts *(admitted pro hac vice)*
D.C. Bar No. 464011
Jonathan.fritts@morganlewis.com
David R. Broderdorf II
D.C. Bar No. 984847
dbroderdorf@morganlewis.com
Geoffrey J. Rosenthal*
D.C. Bar No. 198404
geoffrey.rosenthal@morganlewis.com
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  202-739-3000
Facsimile:  202-739-3001

Shannon L.C. Ammon*
PA Bar No. 318939
1701 Market Street
Philadelphia, PA 19103
shannon.ammon@morganlewis.com
Telephone:  215-963-4690
Facsimile:  215-963-5001

*pro hac vice application forthcoming

Attorneys for Defendant Southwest Airlines Co.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. FACTS ............................................................................................................... 4

    A.  The Parties' Collective Bargaining Agreement ..................................... 4

    B.  The Infectious Disease Control Policy and Its Application to Pilots..................... 6

    C.  Southwest's Extended Time Off Program and Its Application to Pilots .............. 6

    D.  The Flight Crew Training Instructor Program ....................................... 8

    E.  The President's Executive Order .......................................................... 8

III. ARGUMENT..................................................................................................... 10

    A.  The Court Should Reject SWAPA's Motion for Emergency Injunctive Relief Because the Court Lacks Subject Matter Jurisdiction over This Minor Dispute .................................................................................... 10

    B.  SWAPA Has Failed to Satisfy the Standard for Preliminary Injunctive Relief......................................................................................... 14

        1.  SWAPA Is Not Likely to Succeed on the Merits of Its Claims............... 15

            a. SWA Has Acted in Accordance with the CBA and Dealt with SWAPA in Good Faith ............................................................ 15

            b. SWA Is Not Required to Bargain over Its Status as a Federal Government Contractor or Compliance with the Executive Order. ........ 16

            c. Some of SWAPA's Claims Are Time-Barred. ................................... 17

        2.  SWAPA Has Failed to Demonstrate Irreparable Harm ......................... 18

        3.  The Balance of Harms Weighs Against an Injunction............................. 21

        4.  The Public Interest Weighs Against an Injunction ................................. 22

    C.  SWAPA Has Failed to Meet the "Clean Hands" Requirement of the Norris-LaGuardia Act ........................................................................ 24

IV. CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addington v. US Airline Pilots Ass'n*,
  588 F. Supp. 2d 1051 (D. Ariz. 2008) ...................................................................13

*Air Line Pilots Ass'n, Int'l v. Guildford Transp. Indus., Inc.*,
  399 F.3d 89 (1st Cir. 2005)........................................................................... 19-20

*Airline Prof'ls Ass'n, Teamsters Local Union 1224 v. ABX Air, Inc.*,
  No. 07-820, 2007 WL 4460619 (S.D. Ohio Dec. 14, 2007)..................................13

*Allen v. Am. Airlines, Inc.*,
  No. 3:98-CV-2990, 2000 WL 4257 (N.D. Tex. Jan. 3, 2000) , *aff'd*, 247 F.3d
  241 (5th Cir. 2001).............................................................................................17

*Beckerich v. St. Elizabeth Med. Ctr.*,
  No. CIV 21-105-DLB-EBA, 2021 WL 4398027 (E.D. Ky. Sept. 24, 2021)..........................21

*Bhd. of Maint. of Way Emps. Div. of Int'l Bhd. of Teamsters v. Union Pac. R. R.
  Co.*,
  475 F. Supp. 2d 819 (N.D. Iowa 2007)..................................................................13

*Bhd. of R.R. Trainmen v. Akron & B.B.R. Co.*,
  385 F.2d 581 .......................................................................................................24

*Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*,
  394 U.S. 368 (1969).............................................................................................24

*Bhd. of R.R. Trainmen v. Toledo, Peoria & W.R.R.*,
  321 U.S. 50 (1944)..........................................................................................24, 25

*BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers*,
  973 F.3d 326 (5th Cir. 2020) ......................................................................11, 12, 24

*Boire v. Pilot Freight Carriers, Inc.*,
  515 F.2d 1185 (5th Cir. 1975) .............................................................................18

*Brotherhood of Railroad Trainmen v. Central of Ga. Railway Co.*,
  305 F.2d 605 (5th Cir. 1962) ................................................................................18

*Brown v. DFW Gateway Oaks Apartments LLC*,
  No. 3:19-CV-1928-B-BH, 2020 WL 1942139 (N.D. Tex. Apr. 6, 2020) ...............................21

*Cherokee Pump & Equip., Inc. v. Aurora Pump*,
    38 F.3d 246 (5th Cir. 1994) ..................................................................................14

*Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*,
    491 U.S. 299 (1989) ("*Conrail*") ...........................................................11, 12, 19

*Daniels Health Sciens., L.L.C. v. Vascular Health Sciens.*,
    *L.L.C.*, 710 F.3d 579 (5th Cir. 2013) .....................................................................15

*David Sambrano, et al. v. United Airlines, Inc.*,
    No. 4:21-cv-1074-P, Doc. 66 at *2 (N.D. Tex. Oct. 12, 2021)..............................20

*Detroit, Toledo & St. Louis R.C. v. UTU*,
    396 U.S. 142 (1969).......................................................................................2, 11, 22

*DFW Metro Line Servs. v. Sw. Bell Tel. Co.*,
    901 F.2d 1267 (5th Cir. 1990) (per curiam), *cert denied*, 498 U.S. 985 (1990)......................21

*Easwarankudyil v. Hazuda*,
    No. 3:13-CV-4166-P, 2014 WL 11498059 (N.D. Tex. May 19, 2014), *aff'd*,
    600 F. App'x 254 (5th Cir. 2015) ..........................................................................10

*First Nat'l Maint. Corp. v. NLRB*,
    452 U.S. 666 (1981)...............................................................................................16

*Harris v. Univ. of Massachusetts, Lowell*,
    No. 21-CV-11244-DJC, 2021 WL 3848012 (D. Mass. Aug. 27, 2021)..................23

*Harsman et al. v. Cincinnati Children's Hosp. Med. Ctr. et al.*,
    No. 1:21-CV-597, 2021 WL 4504245 (S.D. Ohio Sept. 30, 2021) ........................23

*Hill v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, IAMAW*,
    828 F. App'x 216 (5th Cir. 2020) ..........................................................................17

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Alaska Airlines, Inc.*,
    813 F.2d 1038, 1040 (9th Cir. 1987), ....................................................................18

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Aloha Airlines, Inc.*,
    790 F.2d 727 (9th Cir. 1986) .................................................................................17

*Int'l Bhd. of Teamsters v. Sw. Airlines*,
    875 F.2d 1129 (5th Cir. 1989) (en banc) ...............................................................12

*Jacksonville Mar. Ass'n v. Int'l Longshoremen's Ass'n*,
    571 F.2d 319 (5th Cir. 1978) .................................................................................14

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.*,
    328 F.3d 192 (5th Cir. 2003) .................................................................................14

*Local Union No. 733 of Int'l Bhd. of Elec. Workers v. Ingalls Shipbuilding Div.,*
*Litton Sys., Inc.,*
    906 F.2d 149 (5th Cir. 1990) ........................................................................14

*Local 553, TWU v. E. Air Lines,*
    695 F.2d 668 (2d Cir. 1982).........................................................................24

*Marable v. Dep't of Commerce,*
    No. 3:17-CV-3030-D, 2018 WL 3900903 (N.D. Tex. June 15, 2018)...................10

*Pittsburgh & Lake Erie Railroad Co. v. Railway Labor Executives' Ass'n,*
    491 U.S. 490 (1989).....................................................................................17

*Ry. Lab. Execs.' Ass'n v. S. Ry. Co.,*
    860 F.2d 1038 (11th Cir. 1988) ....................................................................17

*Sampson v. Murray,*
    415 U.S. 61 (1974)......................................................................................21

*TWU Local 555 v. Southwest Airlines Co.,*
    No. 3:14-CV-103-M, 2014 WL 200700, at *5 (N.D. Tex. Jan. 17, 2014) ............12

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)........................................................................................22

*Wireless Agents, L.L.C. v. T–Mobile USA, Inc.,*
    No. 3:05-CV-0094-D, 2006 WL 1540587 (N.D. Tex. June 6, 2006)....................18

**Statutes**

29 U.S.C. § 107.................................................................................................14

29 U.S.C. § 108.................................................................................................24

**Other Authorities**

E.O. 14042, https://www.whitehouse.gov/briefing-room/presidential-
    actions/2021/09/09/executive-order-on-ensuring-adequate-covid-safety-
    protocols-for-federal-contractors/ ..................................................................8, 9, 23

## I.     __INTRODUCTION__

Plaintiff Southwest Airlines Pilots' Association ("SWAPA") complains about various programs and policies that Defendant Southwest Airlines Co. ("Southwest" or "SWA") has implemented in response to the COVID-19 pandemic.  Some of these policies and programs were implemented as long as 18 months ago, at the beginning of the pandemic.  As SWAPA acknowledges, this included an Infectious Disease Control Policy, which took "proactive steps to protect Employees in the workplace" and "included information that one would expect in such a company pandemic policy."  Pl. Br. ¶ 13.  SWAPA's belated claims as to that policy and other policies are far too stale to justify seeking emergency injunctive relief.

The precipitating event for Plaintiff's motion is SWA's effort to comply with President Biden's Executive Order 14042, which mandates that employees of federal contractors be fully vaccinated for COVID-19 by December 8, 2021.  SWA is a federal contractor, and the federal government is its largest single customer.  To comply with the Executive Order, SWA's employees (including pilots represented by SWAPA) must receive a single-dose vaccine or a second dose of a two-dose vaccine by November 24, 2021.

The injunction that SWAPA seeks is extraordinary.  It would prevent SWA from complying with the Executive Order and the federal government's efforts to contain the COVID-19 virus.  The injunction also would force SWA to roll back the Infectious Disease Control Policy, which implements Center for Disease Control ("CDC") guidance to prevent the spread of the COVID-19 virus in the workplace.  SWAPA claims that the various measures that SWA has taken to deal with the COVID-19 virus are a deviation from the "status quo" under the Railway Labor Act ("RLA").  SWAPA's position is that SWA should revert to the "status quo" that existed before the pandemic, retract any of the policies that have been implemented since March 2020, and refrain from implementing any new policies—including compliance with the vaccine mandate

pursuant to the Executive Order—unless and until SWAPA agrees with those polices or the parties have exhausted the lengthy "major dispute" process of negotiation and mediation under the RLA. The major dispute process often takes years to complete; the Supreme Court has characterized it as "almost interminable." *Detroit, Toledo & St. Louis R.C. v. UTU*, 396 U.S. 142, 149 (1969). Therefore, the injunction that Plaintiff seeks could freeze SWA's ability to comply with the Executive Order and respond to the ever-changing conditions of the pandemic for months or even years.

There are multiple reasons why the Court should reject Plaintiff's extraordinary request for injunctive relief.  Most importantly, the Court does not have jurisdiction over Plaintiff's claims because they involve a "minor dispute" under the RLA—a dispute over the interpretation of the parties' existing collective bargaining agreement ("CBA").  Such "minor disputes" (i.e., contract interpretation disputes) are subject to final and binding arbitration under the RLA.  Because the Court does not have subject matter jurisdiction over such a dispute, the Court need not and should not reach the question of whether Plaintiff's motion should be granted.

Even if this Court had subject matter jurisdiction, SWAPA fails to sustain its burden to satisfy the traditional requirements for injunctive relief or the requirements of the Norris-LaGuardia Act ("NLGA").  First, SWAPA is not likely to succeed on the merits because (a) SWA has engaged in good faith discussions with SWAPA about the vaccine mandate and the other policies and programs at issue in this case (in some cases, those discussions have resulted in an agreement with SWAPA); (b) to the extent SWAPA is asserting that SWA must negotiate over compliance with the Executive Order or whether SWA should continue to be a federal government contractor subject to the Executive Order, those are not issues over which SWA is required to bargain under the RLA; and (c) the Infectious Disease Control Policy and some of the other

policies that SWAPA complains about were implemented more than six months ago and therefore Plaintiff's claims are time-barred with respect to those policies.

Second, SWAPA cannot show irreparable harm. While SWAPA argues that it need not prove such harm, its claims about loss of employment are exaggerated and premature. SWA has already announced that there will be procedures for pilots to request religious or medical accommodations from the vaccine mandate, and SWA is in ongoing discussions with SWAPA about those accommodation procedures. If SWA and SWAPA are unable to reach agreement about the accommodation procedures, SWAPA will still have a remedy—final and binding arbitration pursuant to the RLA's mandatory procedure for resolving "minor disputes."

Third, the balance of the harms weighs heavily against an injunction. The injunction that SWAPA seeks would block SWA's ability to comply with the Executive Order or to maintain the other policies that SWA has implemented to meet the changing regulatory and safety landscape of the COVID-19 pandemic. Such an injunction would put SWA's business, employees, and customers at risk because SWA would be forced to retract policies that implement basic CDC guidance and quarantine protocols. Such an injunction also would cause severe harm to SWA's business. If SWA is unable to comply with the Executive Order, that will jeopardize its federal government contracts. Because the federal government is SWA's largest customer, cancellation of its government contracts would cause substantial harm to SWA and all of its employees, including the pilots represented by SWAPA. None of the many other unions that represent SWA's employees have taken the extreme position that SWAPA is taking here—that SWA should risk cancellation of its government contracts rather than comply with the Executive Order.

Fourth, it is quite obvious that the public interest does not support an injunction that would halt SWA's efforts to issue policies that implement CDC guidance, encourage vaccination, or

comply with the Executive Order and the federal government's broader efforts to combat the spread of the deadly COVID-19 virus.

Finally, SWAPA has unclean hands for failing to make "every reasonable effort" to settle this dispute, either through ongoing discussions with SWA or final and binding arbitration under the CBA. Because SWAPA has failed to make every reasonable effort to resolve this dispute, the Norris-LaGuardia Act prohibits Plaintiff's extraordinary request for emergency injunctive relief.

For all of these reasons, which are explained more fully below, the Court should deny SWAPA's motion in its entirety.

## II.   FACTS

### A.   The Parties' Collective Bargaining Agreement.

The current CBA between SWA and SWAPA has an effective date of September 1, 2012 through August 31, 2020. Carl Kuwitzky ("CK") Decl. at D. App. 2, ¶5. The parties are currently engaged in negotiations to amend the CBA, but the existing CBA remains in effect while the parties are engaged in those negotiations. CK Decl. at D. App. 2, ¶5. That includes the CBA's Management Rights clause, which specifically grants SWA authority to take unilateral action in situations like this.

The Management Rights provision, located at Section 1.O., makes clear that the Company has the right to promulgate "rules, regulations and orders" that do not conflict with the terms of the CBA:

> The right to manage and direct the work force, subject to the provisions of this Agreement, is vested in the Company. **Employees covered by this Agreement shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement** and which have been made available to the affected employees and the Association prior to becoming effective….

CK Decl. at D. App. 2-3, ¶7 (emphasis added).

-4-

This Management Rights provision, which is part of the status quo under the existing CBA, exists because SWA must have the ability to implement—without months or years of negotiations—rules and regulations necessary to meet changing business, regulatory, and safety conditions.  CK Decl. at D. App. 2-3, ¶7.  The provision requires 14 days' notice to SWAPA before such rules or regulations become effective, but even that time frame does not apply when "immediate changes" are "required by law" or in an "emergency circumstance":

> The Association shall be advised of any changes to rules, regulations, or orders governing pilots at least fourteen (14) calendar days before such rules, regulations, or orders become effective, unless the parties mutually agree to a shorter advance notification period.  **This fourteen (14) calendar day requirement will not apply when the Company is required by law to make immediate changes or in the event of an emergency circumstance that reasonably requires immediate change**.

CK Decl. at D. App. 3, ¶7 (emphases added).

The first section of the CBA, termed "Scope," recognizes the parties' mutual goal of promoting safety and efficiency of operations:

> The purpose of this Agreement, in the mutual interest of the Company and the Association, is to provide for the operation of the Company under methods which will further, to the fullest extent possible, **the safety of air transportation, the efficiency of operation and the continuation of employment of all pilots under safe and reasonable working conditions and proper compensation**.  It is recognized to be the duty of the Company, the Association and the employees to cooperate fully, reasonably, and in good faith for the attainment of these purposes.

CK Decl. at D. App. 2, ¶6 (emphasis added).

To the extent SWAPA believes that the policies which SWA has implemented, pursuant to its Management Rights, do not sufficiently address this mutual goal, SWAPA can file a grievance under the CBA's procedure for resolving "minor disputes" under the RLA.  In fact, SWAPA filed such a grievance on April 15, 2020—a year and a half ago—but SWAPA has declined to submit it to final and binding arbitration under the CBA.  CK Decl. at D. App. 10-11, ¶34.

**B.      The Infectious Disease Control Policy and Its Application to Pilots.**

SWA promulgated the Infectious Disease Control Policy on March 11, 2020, at the outset of the COVID-19 pandemic.  CK Decl. at D. App. 5-6, ¶17.  At the time, SWAPA did not object to the Company's right to promulgate this Policy.  CK Decl. at D. App. 5-6, ¶17.  SWA has revised the Policy several times since it was first promulgated, including most recently on May 11, 2021.  CK Decl. at D. App. 6, ¶18.  The Policy, as revised, establishes safety procedures for preventing the spread of infectious diseases, including quarantine for work-related close-contact or COVID-positive events.  CK Decl. at D. App. 5-6, ¶17.  It also provides pay for quarantined employees.  CK Decl. at D. App. 5-6, ¶17.  SWAPA did not contest the Company's right to revise the Infectious Disease Control Policy to provide quarantine pay for employees, including pilots.  CK Decl. at D. App. 5-6, ¶17.

On June 1, 2021, with the COVID-19 pandemic seemingly in decline after vaccines became widely available, SWA informed SWAPA that it would be discontinuing pay for employees under quarantine, effective June 16, 2021.  CK Decl. at D. App. 6, ¶19.  On September 2, 2021, however, due to the rise in Delta variant COVID-19 cases, SWA reinstated pay for its employees for COVID-related quarantine.  CK Decl. at D. App. 6, ¶19.  The change was retroactive to June 16, 2021 and any prior sick time used during quarantine time was restored.  CK Decl. at D. App. 6, ¶19.

**C.      SWA's Extended Time Off Program and Its Application to Pilots.**

COVID-19 caused a dramatic reduction in SWA's level of business during the spring and summer of 2020.  CK Decl. at D. App. 4, ¶11.  To help address this, the Company developed an Extended Emergency Time Off ("ExTO") Program.  CK Decl. at D. App. 4, ¶11.  The ExTO program is voluntary, and employees who elect to participate receive partial pay and full benefits in exchange for at least six months free from work duties.  CK Decl. at D. App. 4, ¶11.  SWA

-6-

believed it could implement the ExTO program unilaterally under the CBA, but nonetheless the Company engaged SWAPA in a good faith effort to reach agreement on the ExTO program and its application to pilots.  CK Decl. at D. App. 4, ¶11.  Those efforts nearly resulted in agreement (the parties did reach agreement on an earlier Emergency Time Off ("ETO") program), but an agreement was not reached on the ExTO program.  CK Decl. at D. App. 4, ¶11; Pl. Br. ¶¶ 11-12.

Ultimately, the Company implemented the ExTO Program pursuant to the existing terms of the CBA.  CK Decl. at D. App. 4, ¶11.  Pilots bid on an initial ExTO round during June and July 2020, and those awarded ExTO began their leave in September 2020.  CK Decl. at D. App. 4-5, ¶12.  Although no agreement was reached with SWAPA, SWA incorporated several of SWAPA's requests, including certain "Frequently Asked Questions" for its pilots (the "FAQs").  CK Decl. at D. App. 4-5, ¶12.  The Company issued several revisions of these FAQs, which included changes based on SWAPA's feedback.  CK Decl. at D. App. 4-5, ¶12.  In an October 21, 2020 presentation, SWAPA boasted that it was "[i]nstrumental in the development of [the] FAQs" and admitted that "SWA and SWAPA jointly developed and shaped the Extended Time Off (ExTO) Program."  CK Decl. at D. App. 4-5, ¶12.

Through the implementation of the ETO and ExTO programs and other cost-saving measures, SWA entirely avoided involuntary layoffs for pilots.  CK Decl. at D. App. 5, ¶13.  Such layoffs, which SWA has the right to implement under Section 22 of the parties' CBA, would have provided pilots "time off" on much less favorable terms than what they received under the voluntary ETO and ExTO programs.  CK Decl. at D. App. 5, ¶13.

SWA has deployed two rounds of ExTO for its pilots: a first round in September 2020 and a second round in March 2021.  CK Decl. at D. App. 5, ¶14.  During both rounds of the ExTO Program, there were not enough available ExTO "slots" to accommodate all pilots who wanted to

participate in the program.  CK Decl. at D. App. 5, ¶16.  In March 2021, 1026 pilots bid for ExTO, but SWA was only able to offer ExTO to 791 pilots.  CK Decl. at D. App. 5, ¶16.  In a December 9, 2020 communication to its members, SWAPA's Gregory Auld described the ExTO Program as "wildly successful."  CK Decl. at D. App. 5, ¶15.  In another communication to its membership, SWAPA claimed it was pushing SWA to "offer[] another round" of ExTO due to strong demand from its membership.  CK Decl. at D. App. 5, ¶15.

### D.      The Flight Crew Training Instructor Program.

Pursuant to the ETO and ExTO programs, a significant number of SWA pilots have taken paid leave during the COVID-19 pandemic.  CK Decl. at D. App. 10, ¶31.  As pilots return from leave, they are often required to complete requalification or upgrade training prior to resuming flying duties.  CK Decl. at D. App. 10, ¶31.  As air travel demand increases and the ETO and ExTO programs wind down, SWA has experienced a significant backlog of pilots waiting to undergo requisite training.  CK Decl. at D. App. 10, ¶32.  To relieve the backlog, SWA pilots have assisted as instructors in the program.  CK Decl. at D. App. 10, ¶32.  SWA and SWAPA engaged in discussions regarding the program and entered into a Memorandum of Understanding ("MOU") on September 24, 2021.  CK Decl. at D. App. 10, ¶32.  This MOU was not ratified by SWAPA's Board of Directors, however.  CK Decl. at D. App. 10, ¶32.

### E.      The President's Executive Order.

On September 9, 2021, President Biden issued Executive Order 14042, *Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors* (the "EO").  *See* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/09/09/executive-order-on-ensuring-adequate-covid-safety-protocols-for-federal-contractors/.  On September 24, 2021, the Safer Federal Workforce Task Force issued guidance regarding the EO (the "Guidance").  Justin Schiffner ("JS") Decl. at D. App. 320, ¶4.  The Guidance provides that employees of covered

federal contractors must be fully vaccinated by no later than December 8, 2021 unless the employee is entitled to a medical or religious accommodation.  *Id.*

SWA is a federal contractor.  CK Decl. at D. App. 7, ¶21.  In fact, the federal government is SWA's single largest customer.  CK Decl. at D. App. 7, ¶21.  On October 1, 2021, SWA informed SWAPA that the federal government directed its contracting officers to insert clauses into SWA's federal contracts requiring SWA to comply with the EO.  CK Decl. at D. App. 8, ¶23.  SWAPA took the position that SWA must "cease and desist" from implementing the vaccine mandate, as required by the EO, "without bargaining and reaching agreement with SWAPA."  Pl. Br. ¶ 46.

On October 4, 2021, SWA's CEO, Gary Kelly, announced that employees must be fully vaccinated by December 8, 2021, in accordance with the EO.  CK Decl. at D. App. 8, ¶24.  Before making that announcement, SWA again briefed SWAPA on the vaccine mandate.  Pl. Br. ¶ 47.  Also on October 4, SWA's Vice President of Daily Operations, Alan Kasher, met with SWAPA's Board of Directors to field their questions about the vaccine mandate.  Pl. Br. ¶ 48.

To comply with the December 8, 2021 deadline to be "fully vaccinated," as defined in the Guidance, employees must receive the first dose of a two-dose series on or before October 27 (Moderna) or November 3 (Pfizer) and must receive a single-dose vaccine or second dose in a two-dose series before noon on November 24.  CK Decl. at D. App. 8, ¶25.  Employees may request a medical or religious accommodation from the vaccination requirement.  SWA has published a COVID-19 Vaccine Policy and FAQs for its employees about the vaccination requirement and the process for requesting a medical or religious accommodation.  CK Decl. at D. App. 8, ¶25.  SWA also has extended its Vaccine Participation Pay Program ("VPPP") until November 24, 2021 in

order to compensate all employees who provide proof of vaccination by the federally mandated deadline.  CK Decl. at D. App. 8, ¶26.

SWA has continued to engage in extensive discussions with SWAPA in an effort to resolve disputes about the vaccine mandate.  On October 5, 2021, SWA's Labor Relations Department wrote to SWAPA, stating that, without prejudice to any legal or contractual arguments either party may have, "the Company is willing to discuss with SWAPA how [the vaccine] mandate will be implemented and how this mandate may affect the pilots that SWAPA represents."  CK Decl. at D. App. 8-9, ¶27.  As noted in the October 5 letter, the Company met with SWAPA that very day to discuss the vaccine mandate and was prepared to engage in additional meetings to expedite the parties' discussions.  CK Decl. at D. App. 9, ¶28.  Since October 5, SWA has continued to meet regularly with SWAPA to discuss issues related to the implementation of the vaccine mandate, as well as the process for pilots to request medical or religious accommodations.  CK Decl. at D. App. 9, ¶28.

## III.   ARGUMENT

### A.   The Court Should Reject SWAPA's Motion for Emergency Injunctive Relief Because the Court Lacks Subject Matter Jurisdiction over This Minor Dispute.

Plaintiff must first establish that this Court has jurisdiction before it can consider any additional motions, including a motion for injunctive relief.  *See, e.g.*, *Easwarankudyil v. Hazuda*, No. 3:13-CV-4166-P, 2014 WL 11498059, at *4 (N.D. Tex. May 19, 2014), *aff'd*, 600 F. App'x 254 (5th Cir. 2015) (finding that because "the Court has determined it does not have jurisdiction . . . equitable relief is unavailable" and therefore denying request for a temporary restraining order); *Marable v. Dep't of Commerce*, No. 3:17-CV-3030-D, 2018 WL 3900903, at *1, *3 (N.D. Tex. June 15, 2018), *report and recommendation adopted*, No. 3:17-CV-3030-D, 2018 WL

3869577 (N.D. Tex. Aug. 15, 2018) (analyzing plaintiff's motion to dismiss and dismissing claims while application for preliminary injunction remained pending).

As SWA will further detail in its forthcoming Motion to Dismiss the Amended Complaint, the dispute over SWA's various COVID-related programs and policies are all "minor disputes" because the CBA's Management Rights provision permits implementation of a broad range of "rules, regulations, and orders." *See* CK Decl. at D. App. 2-3, ¶7.  Although notice to SWAPA is required—except in emergency circumstances or when required by law—SWA need not bargain or obtain SWAPA's agreement to rules, regulations, or orders implemented pursuant to the Management Rights clause.

To the extent SWAPA believes that the Management Rights provision does not apply to the vaccine mandate or the other policies at issue in this case, it has the remedy of final and binding arbitration under the existing terms of the CBA.  The RLA delineates two tracks for dispute resolution, depending upon whether the dispute is "major" or "minor." *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transportation Workers*, 973 F.3d 326, 334 (5th Cir. 2020) (citing *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n* ("*Conrail*"), 491 U.S. 299, 302–04 (1989)).  A major dispute relates to the "formation of collective agreements or efforts to secure them." *BNSF Ry. Co.*, 973 F.3d at 334 (internal citations and quotations omitted).  Accordingly, in a major dispute, the "issue is not whether an existing agreement controls the controversy" or an "assertion of rights claimed to have vested in the past" but "the acquisition of rights for the future." *Id.*  If a dispute is "major," the carrier cannot act until it obtains the union's agreement or exhausts a multi-step process of bargaining and mediation that often takes years to complete.  The Supreme Court has characterized the major dispute process as "almost interminable." *Detroit, Toledo & St. Louis R.C.*, 396 U.S. at 149.

Conversely, minor disputes "contemplate the existence of a collective agreement" and "relate[ ] either to the meaning or proper application of a particular provision." *Id.* at 335. Minor disputes are left to the *exclusive* jurisdiction of System Boards of Adjustment, not federal courts. *See Conrail,* 491 U.S. at 304. Specifically, "after failed negotiation, a 'minor dispute' . . . is subject to compulsory and binding arbitration before an adjustment board established by the employer and the unions representing the employees." *BNSF Ry. Co.* 973 F.3d at 335 (quoting *Conrail,* 491 U.S. at 303–04). In a minor dispute, a party is permitted to move unilaterally on its "own interpretation of the agreement pending exhaustion of arbitration." *BNSF Ry. Co.* 973 F.3d at 335 (citing *Int'l Bhd. of Teamsters v. Sw. Airlines,* 875 F.2d 1129, 1133 (5th Cir. 1989) ("*Teamsters*") (en banc)).

By seeking relief in this Court rather than through arbitration, SWAPA is acting contrary to well-settled precedent in this Court and in the Fifth Circuit, including cases involving SWA and its other labor unions. Those cases involved policies or programs that were unilaterally implemented by SWA pursuant to Management Rights provisions that are *nearly identical* to the one in SWAPA's CBA. In a case involving another union at SWA, the Fifth Circuit found that there was a minor dispute because the Management Rights provision established sufficient contractual justification for Southwest's unilateral action. *See, e.g.*, *Teamsters*, 875 F.2d at 1131 (holding that SWA's unilateral implementation of a drug and alcohol testing program gave rise to a "minor" dispute based on the Management Rights provision in the CBA).

In *TWU Local 555 v. Southwest Airlines Co.*, SWA declared an "operational emergency" due to an increased number of employees taking "sick days" and began to require employees to present a doctor's note to take a sick day. No. 3:14-CV-103-M, 2014 WL 200700, at *5 (N.D. Tex. Jan. 17, 2014). The union sought a restraining order to enjoin this policy, but the court, *without considering the merits of the union's TRO request*, concluded that the parties' dispute was

-12-

minor given that the policy was "arguably justified" under the CBA's language and therefore the dispute properly belonged in arbitration. *Id.*

Given this precedent, this Court should not consider SWAPA's motion until it has first ruled on SWA's Motion to Dismiss or, at the very least, addressed the major/minor dispute issue central to the Court's jurisdiction or lack thereof. *See also Bhd. of Maint. of Way Emps. Div. of Int'l Bhd. of Teamsters v. Union Pac. R. R. Co.*, 475 F. Supp. 2d 819, 831, 843 (N.D. Iowa 2007) (considering a Rule 12(b)(1) motion before a motion for preliminary injunction because the jurisdictional question of whether the dispute was "minor" concerned the court's fundamental ability to hear the case); *Addington v. US Airline Pilots Ass'n*, 588 F. Supp. 2d 1051, 1068 (D. Ariz. 2008) (granting defendant's motion to dismiss for lack of jurisdiction and holding that "[b]ecause there is no jurisdiction over [union's] claims against the airline, there should be no need to consider whether a preliminary injunction against the airline is warranted"); *Airline Prof'ls Ass'n, Teamsters Local Union 1224 v. ABX Air, Inc.*, No. 07-820, 2007 WL 4460619, at *3, *6 (S.D. Ohio Dec. 14, 2007) (granting carrier's motion to dismiss and denying union's motion for a preliminary injunction for lack of subject matter jurisdiction).

None of SWA's other unions have taken the approach that SWAPA has taken here. Some of the unions have accepted the vaccine mandate, and those that have contested it are treating it as a minor dispute that is subject to the grievance and arbitration procedure detailed in the applicable CBA. CK Decl. at D. App. 9-10, ¶30. SWAPA should be required to do the same. SWAPA should not be permitted to circumvent the final and binding arbitration procedure that is mandated by the RLA by attempting to frame this as a "major dispute." While the parties are separately engaged in "major dispute" negotiations for the terms of a *new* CBA, the policies that SWA has implemented during the pandemic are governed by the *existing* terms of the CBA—primarily, the

-13-

Management Rights provision.  Because SWAPA has the remedy of final and binding arbitration if it disagrees with SWA's interpretation of the existing terms of the CBA, the Court has no subject matter jurisdiction over this dispute and Plaintiff's motion should be denied.

> **B.     SWAPA Has Failed to Satisfy the Standard for Preliminary Injunctive Relief.**

"[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."  *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003) (quoting *Miss. Power & Light Co. v. United Gas PipeLine Co.*, 760 F.2d 618, 621 (5th Cir. 1985)); *see also Jacksonville Mar. Ass'n v. Int'l Longshoremen's Ass'n*, 571 F.2d 319, 322 (5th Cir. 1978) ("[A] preliminary injunction remains an extraordinary remedy, and the district court may exercise its discretion only within certain well-established guidelines.").

In the Fifth Circuit, the party seeking a preliminary injunction must show:

> (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is not granted; (3) that the harm the [movant] will suffer if the injunction is not granted would outweigh the harm to the [non-movant] if the injunction were granted; and (4) that the grant of the injunction will not disserve the public interest.

*Local Union No. 733 of Int'l Bhd. of Elec. Workers v. Ingalls Shipbuilding Div., Litton Sys., Inc.*, 906 F.2d 149, 151 (5th Cir. 1990).  Plaintiff bears the burden of persuasion on each preliminary injunction factor.  *See Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994).  In addition, the Norris-LaGuardia Act contains specific requirements that must be met before the Court may issue an injunction in a labor dispute.  29 U.S.C. § 107.

Although the Court need not reach these issues because there is no subject matter jurisdiction over this dispute, Plaintiff has failed to meet all of these requirements for obtaining preliminary injunctive relief.

1.    <u>SWAPA Is Not Likely to Succeed on the Merits of Its Claims.</u>

To obtain a preliminary injunction, a movant must present a prima facie case to show a likelihood of success on the merits.  *Daniels Health Sciens., L.L.C. v. Vascular Health Sciens., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

a.    *SWA Has Acted in Accordance with the CBA and Dealt with SWAPA in Good Faith.*

SWAPA attempts to frame this case as a major dispute by characterizing SWA's actions as an "abrogation" or "alteration" of the CBA, Pl. Br. 18, rather than a dispute over the interpretation or application of its existing provisions.  SWAPA is not likely to succeed on the merits of its claim that SWA has abrogated or altered the existing terms of the CBA.

As explained above (and as will be explained more fully in its Motion to Dismiss), SWA has acted pursuant to the terms of the CBA's Management Rights provision.  Indeed, that provision exists specifically for circumstances such as those that have been presented by the pandemic.  The provision explicitly states that SWA may make "immediate changes" when "required by law" or in an "emergency circumstance."  CK Decl. at D. App. 2-3, ¶7.

Even though advance notice to SWAPA is not required in these circumstances, SWA has provided SWAPA with notice and has discussed the vaccine mandate and the various other policies at issue in this case.  In some cases, those discussions have resulted in an agreement—as in the case of the ETO program and the Flight Crew Instructor Training Program (although the latter agreement was not ratified by SWAPA's Board).  Pl. Br. ¶¶ 13 & 45; CK Decl. at D. App. 10, ¶32. In other cases, those discussions have substantially narrowed the scope of the dispute and resulted in arrangements that were mostly—if not completely—acceptable to SWAPA and its members. For example, an agreement was not reached with respect to the ExTO program, but SWAPA nonetheless boasted that it was "[i]nstrumental" in developing "frequently asked questions" about

the ExTO Program and admitted that SWA and SWAPA "jointly developed and shaped the Program."  CK Decl. at D. App. 4-5, ¶12.  SWAPA has described the ExTO program as "wildly successful" and has urged SWA to offer another round of ExTO.  CK Decl. at D. App. 5, ¶15.

Similarly, SWA has engaged in extensive—and ongoing—discussions with SWAPA regarding the vaccine mandate.  SWA briefed SWAPA before the vaccine mandate was announced on October 4 and, then, on October 5—just three days before SWAPA moved for injunctive relief—SWA reaffirmed that it was "willing to discuss with SWAPA how [the vaccine] mandate will be implemented and how this mandate may affect the pilots that SWAPA represents."  CK Decl. at D. App. 8-9, ¶27.  These ongoing discussions have covered many issues related to the EO and the vaccine mandate, including the process for pilots to request medical or religious accommodations.  CK Decl. at D. App. 9, ¶28.

Thus, SWAPA is not likely to succeed on the merits of its claim that SWA is acting in bad faith or attempting to undermine SWAPA as the collective bargaining representative of its pilots. SWA has taken unilateral action when necessary in order to respond to the circumstances of the pandemic or the EO's mandate, but SWA has still engaged with SWAPA in a good faith effort to resolve disputes and adjust its policies in a way that would be acceptable to SWAPA and its members.

        b.      *SWA Is Not Required to Bargain over Its Status as a Federal Government Contractor or Compliance with the Executive Order.*

To the extent SWAPA argues that SWA is obligated to bargain over whether to comply with the EO or continue to be a federal government contractor subject to the EO, SWAPA is unlikely to succeed on the merits of such a claim.  The Supreme Court has made it clear that employers are not required to bargain over such fundamental business decisions as whether to continue doing business with certain customers.  *See First Nat'l Maint. Corp. v. NLRB*, 452 U.S.

-16-

666, 676 (1981) ("[I]n establishing what issues must be submitted to the process of bargaining, Congress had no expectation that the elected union representative would become an equal partner in the running of the business enterprise in which the union's members are employed."). This fundamental principle of federal labor law has been applied under the RLA. In *Pittsburgh & Lake Erie Railroad Co. v. Railway Labor Executives' Ass'n*, 491 U.S. 490 (1989), the Court explained that a company need not bargain regarding its decision to sell a line of business to a third party, which is analogous to the question of whether to continue in the business of being a federal government contractor.

Although SWA does not have a duty to bargain over whether to continue serving the federal government and comply with the EO, SWA *has* engaged with SWAPA over the "effects" of that decision—i.e., how the vaccine mandate will be implemented and how the mandate "may affect the pilots that SWAPA represents." CK Decl. at D. App. 9, ¶29.

c.      *Some of SWAPA's Claims Are Time-Barred.*

SWAPA is unlikely to succeed on the merits of its claims that relate to policies that were implemented more than six months ago. "A party wishing to sue under the RLA must do so within six months of the accrual of the cause of action." *Allen v. Am. Airlines, Inc.,* No. 3:98-CV-2990, 2000 WL 4257, at *3 (N.D. Tex. Jan. 3, 2000), *aff'd,* 247 F.3d 241 (5th Cir. 2001); *see also Hill v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, IAMAW,* 828 F. App'x 216, 218 (5th Cir. 2020) (affirming district court's application of RLA's six-month statute of limitations, which began to run on the deadline to file a grievance under the CBA); *Ry. Lab. Execs.' Ass'n v. S. Ry. Co.,* 860 F.2d 1038, 1042 (11th Cir. 1988) (holding "that the six-month limitations period found in [Section] 10(b) of the NLRA applies to actions brought under [Section] 6 of the RLA"); *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Aloha Airlines, Inc.,* 790 F.2d 727, 735 (9th Cir. 1986) (finding that "the limitations period applicable to a combined claim for breach of

-17-

the collective bargaining agreement and breach of the status quo provisions of the RLA is the six-month period contained in section 10(b) of the NLRA").

SWA introduced its Infectious Disease Control Policy on March 11, 2020, almost 18 months before SWAPA filed its original Complaint in this case.  CK Decl. at D. App. 5-6, ¶17. Although SWA revised that Policy on May 11, 2021, SWAPA's claims relate almost exclusively to the original Policy.  Similarly, the ExTO program was implemented in June 2020, well outside the six-month statute of limitations.  Although there was a second round of ExTO bidding in March 2021, there was no dispute about offering that additional round. CK Decl. at D. App. 5., ¶¶ 14, 16.

Furthermore, SWAPA's delay in bringing claims related to these policies undercuts its argument that emergency injunctive relief is warranted.  *See, e.g.*, *Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*, No. 3:05-CV-0094-D, 2006 WL 1540587, *4 (N.D. Tex. June 6, 2006) ("Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."); *see also Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's denial of temporary injunctive relief where movant, *inter alia*, delayed three months in making its request).

### 2.   SWAPA Has Failed to Demonstrate Irreparable Harm.

SWAPA argues that it need not prove irreparable harm and cites *Brotherhood of Railroad Trainmen v. Central of Georgia Railway Company*, 305 F.2d 605, 609 (5th Cir. 1962), for the proposition that "the public interest, if nothing else, would make injunctive relief appropriate if not compelled."  Dkt. No. 12 at 15.  That case, however, dealt with a carrier's plan "to destroy the process of collective bargaining and resolution of industrial grievances by wrongfully destroying the effectiveness of the chosen representative."  305 F.2d at 608; *see also Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Alaska Airlines, Inc.*, 813 F.2d 1038, 1040 (9th Cir. 1987)

-18-

(noting that *Central of Georgia*, in which "the court exercised jurisdiction over a union's claims that the carrier's discipline of a union representative was an attempt to interfere with its employees in their choice of representation" "has been limited to its facts").

*Central of Georgia* has no application here.  Contrary to SWAPA's hyperbolic claims, SWA is not engaged in an effort to destroy SWAPA or to interfere with the pilots' choice of SWAPA as their collective bargaining representative.  As described above, SWA has worked with SWAPA to address pilots' concerns with all of the policies at issue in this case.  In some instances, those good faith discussions have led to an agreement with SWAPA.  And even when those discussions did not lead to an agreement, they resulted in policies or programs that were generally acceptable to pilots, and even "wildly" popular (as in the case of ExTO).  CK Decl. at D. App. 5, ¶14.  SWA continues to deal with SWAPA in a good faith effort to address pilots' concerns about the vaccine mandate.  CK Decl. at D. App. 9, ¶28.  And even if those discussions do not result in an agreement with SWAPA, SWA will abide by the arbitration process under the CBA if there are disputes about the impact of the vaccine mandate on pilots.

SWAPA's heavy reliance on *Conrail* is similarly misplaced.  There, while the U.S. Supreme Court commented that it had "jurisdiction to grant [a preliminary] injunction 'without the customary showing of irreparable injury,'" 491 U.S. at 303, the decision does not *preclude* this Court from conditioning the issuance of a preliminary injunction upon a showing of irreparable harm—an important point that SWAPA seemingly acknowledges in its Motion.  *See* Dkt. No. 12 at 15 ("[T]he court need not make a finding of irreparable harm or injury and may issue a preliminary injunction to put an end to the non-moving party's actions.").  Other courts have held that this sentence in *Conrail* was dicta because the Court ultimately held that the dispute at issue was minor.  *See, e.g.*, *Air Line Pilots Ass'n, Int'l v. Guildford Transp. Indus., Inc.*, 399 F.3d 89, 96

(1st Cir. 2005) (explaining that plaintiff's argument that "a show[ing] of irreparable harm is not a condition precedent to preliminary injunctive relief . . . rests on Supreme Court dictum [in *Conrail*]").

To the extent SWAPA claims irreparable harm, it is institutional in nature.  SWAPA claims that it is receiving a "flood of questions and worry" and that it is "having to use internal resources to respond and to put out this fire each time it happens."  Pl. Br. at 24–25.  Responding to members' questions and concerns is not irreparable harm.  It is part and parcel of what unions do.  While this is no doubt a stressful and difficult time, performing one of the fundamental duties of a union is not irreparable harm.

Aside from this asserted institutional harm, SWAPA has not demonstrated that any particular pilot will suffer irreparable harm because of the vaccine mandate.  Nor can SWAPA do so.  SWA and SWAPA are continuing to discuss how the vaccine mandate will be applied to pilots, including the process for accommodating pilots who have religious or medical reasons for not getting vaccinated.  CK Decl. at D. App. 9, ¶28.  Because the accommodation process, and the specific accommodations that may be offered through that process, are a subject of ongoing discussion, this case is distinguishable from *David Sambrano, et al. v. United Airlines, Inc.*, No. 4:21-cv-1074-P, Doc. 66 at *2 (N.D. Tex. Oct. 12, 2021), where Judge Pittman entered a temporary restraining order prohibiting United Airlines from placing employees on an unpaid leave of absence if they have been granted a medical or religious accommodation or denying medical or religious accommodations on timeliness grounds.

Ultimately, if SWAPA believes that a pilot or group of pilots is being unfairly denied an accommodation, they will have an avenue of recourse to address that potential harm.  Specifically, SWAPA could file a grievance that would be subject to final and binding arbitration under the

CBA.  As another court recently held, injunctive relief is not warranted even if employees believe they will suffer harm because of a policy mandating COVID-19 vaccination because they have other avenues of recourse.  *See, e.g.*, *Beckerich v. St. Elizabeth Med. Ctr.*, No. CIV 21-105-DLB-EBA, 2021 WL 4398027, at \*7 (E.D. Ky. Sept. 24, 2021) ("Even if they believe the condition or the consequences are wrong, the law affords them an avenue of recourse—and that avenue is not injunctive relief.").

Harms that are compensable through money damages are not irreparable.  *See, Sampson v. Murray*, 415 U.S. 61, 88–90 (1974) (finding that plaintiff could not establish irreparable harm even though she had lost her employment altogether); *DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990) (per curiam) ("There can be no irreparable injury where money damages would adequately compensate a plaintiff."), *cert denied*, 498 U.S. 985 (1990).

For all of these reasons, SWAPA has failed to demonstrate irreparable harm that would justify an injunction.

### 3.  The Balance of Harms Weighs Against an Injunction.

SWAPA also has failed to demonstrate that the balance of harms weighs in favor of an injunction.  *See Brown v. DFW Gateway Oaks Apartments LLC*, No. 3:19-CV-1928-B-BH, 2020 WL 1942139, at \*2 (N.D. Tex. Apr. 6, 2020), *report and recommendation adopted*, No. 3:19-CV-1928-B-BH, 2020 WL 1940568 (N.D. Tex. Apr. 22, 2020) (finding that plaintiff failed to "address this element in either her motion or pleadings" and "therefore also failed to meet her burden with respect to the third element of the preliminary injunction standard") (citing *Thompson v. Hughes, Watters & Askanase*, LLP, No. 3:13-CV-429-G-BH, 2013 WL 705123, at \*3 (N.D. Tex. Jan. 31, 2013), *adopted by* 2013 WL 705883 (N.D. Tex. Feb. 27, 2013)).

The balance of harms tips sharply in favor of SWA.  Any injunction that blocks SWA from implementing the vaccine requirement in accordance with the federal EO and Guidance would put

SWA's business, employees, and customers at risk.  The federal government is SWA's single largest customer.  CK Decl. at D. App. 7, ¶21.  As SWA has explained to its employees, the operating revenue from federal contracts, pre-pandemic, was *hundreds of millions of dollars* per year and is crucial to SWA's recovery and the viability of its business.  CK Decl. at D. App. 7, 296, ¶21.  A loss of the business from its largest customer would result in hardship not just to SWA, but also to all of its employees, including the pilots.

An injunction also would severely disrupt SWA's effort to ensure the safety of its workforce and customers.  As explained above, SWAPA's requested injunction would force SWA to repeal its Infectious Disease Control Policy, which implements basic CDC guidance and has been in effect since March 2020.  CK Decl. at D. App. 5-6, ¶17.  SWAPA further seeks to enjoin SWA's "COVID quarantine policies," which govern how SWA manages employees who have been exposed to the COVID-19 virus.  CK Decl. at D. App. 6, ¶18.

Not only would the injunction require SWA to rescind these basic—but critical—policies, it would block SWA from implementing new policies unless SWAPA agrees to those policies (subject to ratification by its Board) or else only after the "almost interminable" process for resolving "major disputes" has been exhausted.  *Detroit, Toledo & St. Louis R.C.*, 396 U.S. at 149.

The harms that would result from freezing SWA's ability to implement policies and programs necessary to combat the COVID-19 pandemic would outweigh any harm that SWAPA claims will be suffered if these policies and procedures are continued.

                 4.      <u>The Public Interest Weighs Against an Injunction.</u>

 "In this case, . . . the proper determination of where the public interest lies" is not "a close question."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008).  Vaccination is a critical part of the national effort to end the COVID-19 pandemic.  Courts that have considered requests to enjoin a vaccine mandate have found that the public interest clearly weighs against such an

injunction.  *See, e.g., Harsman et al. v. Cincinnati Children's Hosp. Med. Ctr. et al.*, No. 1:21-CV-597, 2021 WL 4504245, at *5 (S.D. Ohio Sept. 30, 2021) ("[T]here is no question that balancing the equities requires the Court to deny Plaintiffs' motion. Denying injunctive relief serves the public's interest in combating COVID-19, at an infinitesimally small risk to Plaintiffs' health or liberty."); *Harris v. Univ. of Mass., Lowell*, No. 21-CV-11244-DJC, 2021 WL 3848012, at *8 (D. Mass. Aug. 27, 2021) ("[G]iven the public health efforts promoted by the Vaccine Policy, enjoining the continuation of same is not in the public interest.").

The President of the United States has declared that implementing a vaccine mandate for federal contractors is necessary to ensure that employees are "adequately protected from COVID-19" and to bolster the "economy and efficiency in Federal procurement."  *See* E.O. 14042, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/09/09/executive-order-on-ensuring-adequate-covid-safety-protocols-for-federal-contractors/.

Cancellation of SWA's federal contracts for non-compliance with the EO also would not be in the public interest.  These contracts include the Department of Defense's Civil Reserve Air Fleet ("CRAF") program, through which commercial air carriers provide additional airlift to supplement available military aircraft during emergencies (such as the recent airlifting of personnel from Afghanistan).  CK Decl. at D. App. 7, 296, ¶21; JS Decl. at D. App. 335, ¶4.

The President has made clear that there is a public interest in implementing a vaccine mandate even for employers who are not federal contractors. The White House announced that employers with 100 or more employees will be required to ensure their workers are vaccinated or tested weekly.  *See* https://www.whitehouse.gov/covidplan/.  Therefore, even if SWA were not a federal contractor, it will be required to implement a vaccination mandate as a private sector employer.

### C.      SWAPA Has Failed to Meet the "Clean Hands" Requirement of the Norris-LaGuardia Act.

SWAPA's motion also should be denied because it fails the Norris-LaGuardia Act's "clean hands" requirement.  Under Section 8 of the NLGA, any party "who has failed to *make every reasonable effort to settle such dispute* either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration" cannot obtain injunctive relief in a labor dispute.  29 U.S.C. § 108 (emphasis added).[1]

In applying Section 8, the Supreme Court has explained that "[t]he policy of the [RLA] was to encourage use of any nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes.  The [overall] policy of the Norris-LaGuardia Act was the same." *Bhd. of R.R. Trainmen v. Toledo, Peoria & W.R.R.*, 321 U.S. 50, 58–59 (1944).

Here, SWAPA has not made "every reasonable effort" to resolve this dispute through non-judicial processes.  As stated above, if SWAPA believes that SWA does not have the Management Right to implement the vaccine mandate or any of the other policies at issue here, it can file a grievance and arbitrate it through the minor dispute procedure under the CBA.  *See BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers*, 973 F.3d 326, 342 (5th Cir. 2020) ("While the Railroads made valiant efforts to negotiate with [the union], the fact remains that there is an administrative avenue provided by the RLA that has not been deployed: arbitration. . . . And because this unexhausted remedy remains, an injunction is not the only effective way to guard the Railroads' right to bargain in good faith with [the union].");  *see also Bhd. of R.R. Trainmen, Enter.*

---

[1] This language mirrors Section 2, First of the RLA, which requires that parties make every reasonable effort to settle disputes.  *See Local 553, TWU v. E. Air Lines*, 695 F.2d 668, 679 (2d Cir. 1982); *see also Bhd. of R.R. Trainmen v. Akron & B.B.R. Co.*, 385 F.2d 581, 614 (D.C. Cir. 1967 (noting that the clean hands provision of Section 8 of the NLGA effectuates the RLA by "ensur[ing] compliance by complainant carriers or unions which cannot seek an injunction until and unless it has discharged the obligations imposed by the Railway Labor Act").  This duty has been called "the heart of the Railway Labor Act" and is specifically enforceable.  *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 368, 377–78 (1969).

*Lodge, No. 27*, 321 U.S. at 65 ("Arbitration under the [RLA] was available, afforded a method for settlement Congress itself has provided, and until respondent accepted this method it had not made 'every reasonable effort to settle' the dispute, as Section 8 requires.").

SWAPA also did not exhaust the process of discussing how the vaccine mandate will be implemented and how it may affect the pilots that SWAPA represents, as SWA made clear that it was willing to do on October 5.  CK Decl. at D. App. 8-9, ¶27.  SWAPA filed its motion just three days after SWA sent that letter.  Similarly, SWAPA has not exhausted the process of resolving the dispute over the Flight Crew Training Instructor Program.  The parties reached an agreement on September 24, 2021, which SWAPA's Board did not ratify.  CK Decl. at D. App. 10, ¶32.  But the failure of ratification does not mean that discussions should end or that further efforts could not be made to ratify that agreement.

## IV.     CONCLUSION

For all these reasons, SWA respectfully requests that the Court deny SWAPA's motion for lack of subject matter jurisdiction.  If the Court addresses this motion on the merits, SWA respectfully requests that it be denied, as SWAPA has failed to carry its burden on every factor necessary to obtain preliminary injunctive relief.

Respectfully submitted,

Dated:  October 16, 2021               MORGAN, LEWIS & BOCKIUS LLP

*/s/Robert E. Sheeder*
Robert E. Sheeder, attorney-in-charge
Texas Bar No. 18174300
robert.sheeder@morganlewis.com
Clayton M. Davis
Texas Bar No. 24092323
clayton.davis@morganlewis.com
1717 Main Street, Suite 3200
Dallas, Texas 75201
Telephone: (214) 466-4000
Facsimile: (214) 466-4001

-25-

Jonathan C. Fritts *(admitted pro hac vice)*
D.C. Bar No. 464011
jonathan.fritts@morganlewis.com
David R. Broderdorf II
D.C. Bar No. 984847
dbroderdorf@morganlewis.com
Geoffrey J. Rosenthal*
D.C. Bar No. 198404
geoffrey.rosenthal@morganlewis.com
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  202-739-3000
Facsimile:  202-739-3001

Shannon L.C. Ammon*
PA Bar No. 318939
1701 Market Street
Philadelphia, PA 19103
shannon.ammon@morganlewis.com
Telephone:  215-963-4690
Facsimile:  215-963-5001

*pro hac vice application forthcoming*

*Attorneys for Defendant Southwest Airlines Co.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served upon all counsel of record via the Court's CM/ECF Filing System on this 16th day of October 2021, as follows:

*/s/Robert E. Sheeder*

Robert E. Sheeder