## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWEST AIRLINES PILOTS ASSOCIATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:21-cv-02065-M |
| SOUTHWEST AIRLINES CO., | § § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Temporary and Preliminary Injunctive Relief, filed by Plaintiff Southwest Airlines Pilots Association. ECF No. 11. On October 22, 2021, the Court held a hearing on the Motion. For the reasons below, Plaintiff's Motion for Temporary and Preliminary Injunctive Relief is **DENIED**. The case is **DISMISSED** for lack of subject matter jurisdiction.

### I.  FACTUAL BACKGROUND

#### a.  The Collective Bargaining Agreement

Plaintiff Southwest Airlines Pilots Association ("SWAPA") is the sole collective bargaining unit on behalf of more than 9,000 pilots employed by Defendant Southwest Airlines Co. ("Southwest"). The current collective bargaining agreement ("CBA") between SWAPA and Southwest has an effective date of September 1, 2012, through August 31, 2020. Section 1(A) provides that the CBA's purpose "is to provide for the operation of the Company under methods which will further, to the fullest extent possible, the safety of air transportation, the efficiency of

operation and the continuation of employment of all pilots under safe and reasonable working conditions and proper compensation."  SWAPA's App'x (ECF No. 13) at App. 52.

Section 1(M) of the CBA describes various specific situations in which negotiation of the CBA will be reopened, including should Southwest "[e]stablish any new classification of employees employed within the bargaining unit and not in existence" when the CBA was enacted.  App. 62.  Section 1(O), entitled "Management Rights," provides:

> The right to manage and direct the work force, subject to the provisions of this Agreement, is vested in the Company. Employees covered by this Agreement shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement and which have been made available to the affected employees and the Association prior to becoming effective. The Association shall be advised of any changes to rules, regulations, or orders governing pilots at least fourteen (14) calendar days before such rules, regulations, or orders become effective, unless the parties mutually agree to a shorter advance notification period. This fourteen (14) calendar day requirement will not apply when the Company is required by law to make immediate changes or in the event of an emergency circumstance that reasonably requires immediate change.

App. 63.

Section 4(H) contains a schedule line guarantee provision, providing that if a pilot's scheduled line pay is less than the amount guaranteed under the CBA, it will be adjusted up to the minimum.  App. 84.  The CBA also contains various provisions describing the relationship between SWAPA, pilots, and Southwest, including § 12 - Leaves of Absences (App. 184), § 15 - Investigation and Discipline (App. 200), § 16 - Grievance Procedure (App. 204), § 17 - Mediation and System Board of Adjustment (App. 208), § 20 - Physical Examination (App. 222), and § 22 - Reduction in Force, Furlough and Recall (App. 228).  The CBA does not contain a force majeure clause.

On November 4, 2019, in advance of the CBA's expiration in August 2020, SWAPA provided notice of its intent to open negotiations of the CBA, as provided in § 28 of the CBA.

App. 16.  Negotiations began on January 9, 2020, but were halted in March 2020 due to the onset

of the COVID-19 pandemic.  SWAPA Reply App'x (ECF No. 23) at Reply App. 1–2.

Negotiations resumed in April 2021, and the parties have met at least monthly since that time.

Reply App. 2.  The parties agree that under § 6 of the Railway Labor Act, the CBA remains in

effect pending completion of negotiations.  *See* App. 34; Opp. (ECF No. 15) at 10.

>    **b.  COVID-Era Policies**

In response to the COVID-19 pandemic beginning in March 2020, Southwest adopted

various policies and programs relevant to this dispute, summarized as follows.

>    i.  Emergency Time Off ("ETO") and Extended Emergency Time Off
>        ("ExTO") Programs

On April 1, 2020, as a result of record low passenger counts, Southwest adopted the

voluntary Emergency Time Off ("ETO") program as a cost saving initiative in lieu of

involuntary layoffs.  Def.'s App. (ECF No. 16) at D. App. 3, D. App. 238.  Under the ETO

program, Southwest pilots could voluntarily submit bids to receive partial pay and full benefits in

exchange for receiving one or more months free from work duties; participating pilots would

also be permitted to hold other jobs outside of Southwest.  D. App. 238.

Southwest announced its intention to offer the ETO program on March 25, 2020.  Reply

App. 10.  The next day, on March 26, 2020, SWAPA sent a letter to Southwest expressing its

belief that the proposed ETO program impacted pilots' work rules and conditions, and that

Southwest could not unilaterally make such an offering without violating the status quo.  *Id*.  In

May 2020, following negotiations and with the reservation that their agreement did not constitute

a waiver of either parties' rights or legal arguments under the Railway Labor Act ("RLA"),

Southwest and SWAPA executed a Memorandum of Understanding ("MOU") relating to the

ETO program.  App. 4; D. App. 236; Reply App. 3.  The MOU states that SWAPA is

"agreeable" to the ETO program, and that the parties will continue to discuss other cost savings initiatives, including "the extension of the ETO program for future months."  D. App. 236–37.

In September 2020, Southwest extended the ETO program into the Extended Emergency Time Off ("ExTO") program.  Like the ETO program, the ExTO program is voluntary and participating pilots receive partial pay and full benefits in exchange for a set amount of time free from work duties.  The announcement and first rounds of ExTO bidding took place in June and July 2020, with the leave beginning in September 2020.  D. App. 5.  SWAPA has described the ExTO program as "wildly successful," and represented to its members that the program was jointly developed and shaped by Southwest and SWAPA.  D. App. 250, 255.  Before the second round of ExTO bidding was announced, SWAPA represented to its members that it was "advocating for another round of voluntary savings under the same terms as last year," and wanted "all ExTOs approved for the length of our Pilots' first choices."  D. App. 255.

After Southwest provided SWAPA with notice of its intent to extend the ETO program in the summer of 2020, the parties worked towards a MOU covering the ExTO program, again with both parties' agreement that the negotiations did not constitute a waiver of either side's arguments under the RLA.  D. App. 4–5; Reply App. 4–5.  Although the parties almost reached agreement on a draft MOU covering the ExTO program, SWAPA objected to the inclusion of a clause granting Southwest full discretion to make changes to the ExTO program, resulting in negotiations ceasing in October 2020.  *Id.*  A second round of leave under the ExTO program commenced in March 2021.  D. App. 5.

The ExTO program has apparently been popular with pilots; for the March 2021 round, 1026 pilots bid for ExTO leave, but Southwest was only able to offer ExTO to 791 pilots.  D. App. 5.  Based on the implementation of the ETO and ExTO programs, along with other cost-

saving measures, Southwest avoided involuntary layoffs for pilots. *Id.* No evidence that future ExTO leaves are contemplated was presented to the Court.

ii. <u>Infectious Disease Control Policy</u>

On March 11, 2020, Southwest promulgated the Infectious Disease Control Policy applicable to all Southwest employees. It has provisions relating to preventing the spread of infection (for example, by avoiding close contact with people who are sick and frequent handwashing), limiting business and leisure travel, staying home when ill, and quarantine after exposure to COVID-19. D. App. 261. The policy provided that "the Company will continue to pay the Employee for scheduled hours/shifts/trips missed during quarantine." *Id*. SWAPA did not object to this policy or Southwest's right to issue it when the policy first issued. D. App. 6. However, SWAPA maintains that the policy was inconsistently applied and pilots were told "different things depending on domicile and chief pilots," but that when SWAPA reached out to voice those objections, their concerns were rebuffed. App. 10.

On May 11, 2021, the Infectious Disease Control Policy was revised to state that if an employee must quarantine at the CDC's or Southwest's direction "the Company *may* continue to pay the Employee for all or a portion of scheduled hours/shifts/trips missed during quarantine." D. App. 265 (emphasis added). SWAPA did not raise specific objections to the May 11, 2021, revisions to the Infectious Disease Control Policy. D. App. 6.

On June 1, 2021, Southwest informed SWAPA that because COVID cases had decreased dramatically and vaccinations were widely available, it would be discontinuing pay for quarantining employees, effective June 16, 2021. D. App. 6; D. App. 269–70. On September 2, 2021, due to the rise in Delta variant COVID-19 cases, Southwest reinstated pay for COVID-related quarantine. D. App. 272. The change was retroactive to June 16, 2021, and any prior

sick time used to quarantine was restored.  *Id.*  The evidence before the Court is that no employees actually lost pay due to quarantine.

### iii.   The Vaccine Participation Pay Program ("VPPP")

On September 14, 2021, Southwest notified SWAPA that it was implementing the Vaccine Participation Pay Program ("VPPP") to encourage Southwest employees to get the COVID-19 vaccine, by compensating for the time and burden of vaccination.  Reply App. 6; D. App. 275.  The program was implemented the next day, on September 15, 2021, and provides all employees with 16 hours of pay in exchange for submission of proof of vaccination by the policy's November 15, 2021, deadline.  D. App. 275–80.  Southwest subsequently extended the VPPP deadline from November 15 to November 24 to compensate all employees who submit proof of vaccination.  D. App. 8.

### iv.   The Flight Crew Training Instructors Program

On September 23, 2021, SWAPA learned about Southwest's "Flight Crew Training Instructors Program."  App. 13; Reply App. 005.  Pursuant to the ETO and ExTO programs, many Southwest pilots took paid leave during the COVID-19 pandemic and now require additional training or requalification prior to resuming their flying duties; this has resulted in a backlog of pilots waiting to undergo the requisite training.  D. App. 10.  In an effort to relieve the backlog, Southwest engaged pilots to assist as instructors, under what the parties refer to as the Flight Crew Training Instructors program.  *Id.*  SWAPA and Southwest engaged in discussions regarding the program and entered a MOU on September 24, 2021, which was subsequently voted down by SWAPA's Board of Directors.  Reply App. 7.

v.  COVID Vaccine Policy

On September 9, 2021, President Biden issued Executive Order 14042, *Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors*.  Exec. Order No. 14,042, 86 Fed. Reg. 50,985, 2021 WL 4148112 (Sept. 9, 2021).  On September 24, 2021, the Safer Federal Workforce Task Force, a federal agency, issued guidance regarding the Executive Order, and stated that employees of covered federal contractors must be fully vaccinated no later than December 8, 2021, unless the employee is entitled to a medical or religious accommodation. *See* Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (Sept. 24, 2021), *available at* https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20 210922.pdf.

Southwest is a federal contractor, and the federal government is its single largest customer.  D. App. 7.  On October 4, 2021, Southwest announced that its employees must be fully vaccinated by December 8, 2021, unless they qualify for a medical or religious accommodation.  D. App. 8; D. App. 294.  Southwest's COVID Vaccine Policy and FAQs, provides that "[a]ll Employees must become fully vaccinated against COVID-19 and submit documentation of their vaccination status" and "[f]ailure to comply with this policy will result in termination of employment."  *Id.* at D. App. 294, 296–303.  To be fully vaccinated by December 8, 2021, employees must receive the first dose of a two-dose series on or before October 27, 2021, for the Moderna vaccine or November 3, 2021, for the Pfizer vaccine, and must receive a single-dose vaccine or second dose in a two-dose series before noon on November 24, 2021.  D. App. 294.  Southwest has subsequently stated that employees who do not get vaccinated will not be terminated under the Vaccine Policy.

7

###### c.   The Current Dispute

On August 11, 2021, SWAPA's President, Captain Casey Murray, wrote a demand letter to Captain Bob Waltz, Southwest's Vice President of Flight Operations, stating that throughout the pandemic, SWAPA had "made its position clear that pilot rates of pay, rules[,] and working conditions, if impacted by COVID, must be negotiated by the parties," and that SWAPA would "continue[] to hold the Company to its obligations to provide a safe and healthy work environment" for pilots.  App. 34.  Captain Murray specifically emphasized that any mandatory vaccination policy—which, at the time, had not yet been enacted or announced—must be negotiated, and that mandatory quarantine and vaccination of Southwest pilots would constitute "illegal unilateral action in violation of *status quo*," for which SWAPA would seek legal relief in federal court.  *Id.*

On August 21, 2021, Captain Waltz responded to Captain Murray that there were no current plans to mandate the vaccine nor provide additional incentives to get vaccinated.  App. 36.  Captain Waltz further expressed Southwest's disagreement that mandatory quarantine and mandatory vaccination would require negotiation, on the grounds that the current CBA contains broad language granting Southwest the right to take action on those issues unilaterally.  *Id.*

On August 30, 2021, SWAPA filed suit against Southwest under the Railway Labor Act, accusing Southwest of failing to maintain the status quo during the ongoing "major" dispute between the parties, and failing to exert every reasonable effort to reach agreement as to the ExTO program and COVID-related conditions of employment and pay.  Compl. (ECF No. 1) ¶¶ 51–63 (Aug. 30, 2021).

Southwest issued three additional policies impacting pilots in the weeks following the filing of the Complaint: the VPPP on September 15, the Flight Crew Training Instructors

program on September 23, and the COVID Vaccine Policy on October 4.  On September 14, 2021, when SWAPA learned of the VPPP, Captain Murray sent another letter to Southwest's Captain Waltz, demanding that Southwest cease and desist unilaterally rolling out any programs that impact pilots' working conditions, rules, and pay, and accusing Southwest of bargaining in bad faith by rolling out the VPPP unilaterally in the midst of the parties' RLA § 6 negotiations. App. 36–37.  On September 17, Captain Waltz responded, inviting Captain Murray and SWAPA to discuss the VPPP the following week.  App. 39.

On September 23, 2021, after learning of the Flight Crew Training Instructors program's planned implementation, SWAPA communicated to Southwest its position that the program created a new classification of workers under the CBA, necessitating a reopening of the CBA under § 1(M); the next day, following negotiation, the parties reached a tentative MOU covering the program.  App. 13; Reply App. 6–7.  However, in reaction to news that Southwest was implementing a COVID-19 vaccine mandate containing a termination provision, SWAPA's Board of Directors voted against adopting the MOU.  Reply App. 6–7.

On October 1, Southwest informed SWAPA that under Executive Order 14042, the U.S. government was requiring federal contractors to require their employees to be fully vaccinated or have an approved accommodation, and that a vaccine mandate was imminent.  App. 13.  On October 3, Captain Murray communicated directly to Southwest's CEO, Gary Kelly, demanding that Southwest immediately cease and desist from imposing a vaccine mandate on the pilots until an agreement between SWAPA and Southwest could be reached.  App. 40.  The letter detailed SWAPA's "repeated pleas" for the parties to bargain over COVID-related issues, and reiterated SWAPA's position that Southwest's failure to bargain violated both the RLA and § 1 of the CBA, constituting bad faith.  *Id.*

The COVID Vaccine Policy was announced on October 4, 2021.  On October 5, 2021, Southwest and SWAPA met to discuss the policy, and in a letter to SWAPA dated that same day, Southwest's Senior Director of Labor Relations represented that, without waiving any rights under the CBA, Southwest was willing to discuss with SWAPA "how this mandate will be implemented and how this mandate may affect the pilots that SWAPA represents."  D. App. 305. Southwest represents it is continuing to discuss the Vaccine Policy and issues relating to its implementation with SWAPA, including the process for pilots to request medical or religious accommodations.  D. App. 8–10.

On October 6, 2021, SWAPA filed an Amended Complaint, adding additional allegations relating to the VPPP, the Flight Crew Training Instructors program, and the COVID Vaccine Policy.  *See generally* Am. Compl. (ECF No. 10).  On October 8, 2021, SWAPA filed its Motion for Temporary and Preliminary Injunctive Relief, seeking to enjoin Southwest from unilaterally imposing new rates of pay, rules, and working conditions as they relate to Southwest pilots pending completion of the RLA's major dispute resolution procedures, and to enjoin enforcement of certain COVID-era policies as they related to pilots, namely, the Infectious Disease Control Policy, the ExTO Program,[1] the COVID quarantine policies, the VPPP, the Flight Crew Training Instructors program, and the COVID Vaccine Policy.  ECF No. 11, at 4–5.

SWAPA maintains that each of the complained-of policies violates the parties' status quo and "is an issue within a major dispute that requires Southwest Airlines to maintain the parties' status quo while negotiating with SWAPA."  Br. at 23.  SWAPA also requests that Southwest be stopped from using a "force majeure" clause that does not appear within the current CBA, as

---

[1] SWAPA does not contest the ETO program, on the grounds that the parties have adopted a MOU covering the program.

well as declaratory relief that Southwest's conduct violates the RLA.  Finally, SWAPA requests

that bond be set at $1,000, as required by the Norris-LaGuardia Act.

On October 21, 2021, the day before the hearing on SWAPA's Motion, Southwest's CEO

Gary Kelly announced on Southwest's Q3 2021 earnings conference call that no Southwest

employee would lose his or her job on December 9, 2021, even if not vaccinated by that date.[2]

## II.    APPLICABLE LAW

### a.   Railway Labor Act

The Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–65, 181–88, was enacted in 1926 as

"an agreement worked out between management and labor, and ratified by the Congress and the

President."  *Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 576 (1971).  The RLA

governs labor relations in the railroad and airline industries.  To effectuate peaceful dispute

resolution, the RLA sets out a "mandatory and 'virtually endless' process of 'negotiation,

mediation, voluntary arbitration, and conciliation.'"  *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal,

Air, Rail & Transp. Workers*, 973 F.3d 326, 334 (5th Cir. 2020) (quoting *Burlington N. R.R. v.

Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 444 (1987)).

The RLA imposes a duty on carriers and employees to make every reasonable effort to

make and maintain agreements concerning rates of pay, rules, and working conditions, and to

settle all disputes to avoid interruption to the carrier's operation.  45 U.S.C. § 152, First.  "Once

bargaining has resulted in an agreement, however, not all disputes over changes in the terms of

employment are subject to a continuing duty to negotiate."  *Int'l Bhd. of Teamsters, Chauffeurs,*

---

[2] Mr. Kelly's October 21, 2021, statement was not part of the written record submitted by the parties in advance of the October 22, 2021, hearing, but counsel for Southwest represented to the Court on the record that termination of employment is no longer part of Southwest's COVID Vaccine Policy.

*Warehousemen & Helpers of Am.-Airline Div. & Teamsters Loc. 19 v. Sw. Airlines Co.*

("*Teamsters*"), 875 F.2d 1129, 1133 (5th Cir. 1989) (en banc) (citation omitted).

Under the RLA, labor disputes are characterized as either "major" or "minor," and the RLA provides separate tracks of resolution for each. "'Major' and 'minor' do not necessarily refer to important and unimportant disputes, or significant and insignificant issues; rather, the terms refer to the bargaining context in which a dispute arises. Major disputes involve proposals for new agreements or for changes in existing agreements. Minor disputes, on the other hand, involve grievances over the application of an existing agreement." *Id.*

The Fifth Circuit recently summarized the difference between major and minor disputes and the respective procedures for resolving them under the RLA:

> A dispute is "major" where a party seeks new agreement terms "affecting rates of pay, rules, or working conditions." 45 U.S.C. § 152, Seventh; § 156. Major disputes "relate[ ] to ... the formation of collective agreements or efforts to secure them." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945). Therefore, in a major dispute the "issue is not whether an existing agreement controls the controversy" or an "assertion of rights claimed to have vested in the past" but "[t]hey look to the acquisition of rights for the future." *Id.*

> To initiate the major dispute procedures under Section 156 of the RLA, a party must first serve a Section 6 notice of the proposed changes. 45 U.S.C. § 156. Within thirty days after the notice is served, the parties are obligated to begin "conferences." *Id.* If no agreement can be reached voluntarily through negotiation, "[m]ajor disputes go first to mediation under the auspices of the National Mediation Board; if that fails, then to acceptance or rejection of arbitration; and finally[,] to possible presidential intervention to secure adjustment." *Elgin*, 325 U.S. at 725 (internal quotations and citations omitted). During the pendency of a major dispute, "the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions." *Conrail*, 491 U.S. at 302–03. Finally, it is only once "this protracted process ends and no agreement has been reached, the parties may resort to the use of economic force," such as striking. *Id.* at 303.

> Minor disputes, on the other hand, "contemplate[ ] the existence of a collective agreement already concluded" and "relate[ ] either to the meaning or proper application of a particular provision." *Elgin*, 325 U.S. at 723. Thus, a proposed action creates a minor dispute "if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims

are frivolous or obviously insubstantial, the dispute is major." *Conrail*, 491 U.S. at 307. A party faces a "relatively light burden" to show that a dispute is minor, *id.*, and "if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor." *Ry. Labor Execs. Ass'n v. Norfolk & W. Ry.*, 833 F.2d 700, 705 (7th Cir. 1987).

In Section 153, the RLA provides a more streamlined process for minor disputes. *See Elgin*, 325 U.S. at 727–28. After failed negotiation, "[a] minor dispute . . . is subject to compulsory and binding arbitration before the National Railroad Adjustment Board . . . or before an adjustment board established by the employer and the unions representing the employees." *Conrail*, 491 U.S. at 303–04 (citing 45 U.S.C. § 153). Striking and other self-help tactics arising out of minor disputes are prohibited. *Id.* at 304. And, in a minor dispute, a party is permitted to move unilaterally on its "own interpretation of the agreement pending exhaustion of arbitration." *Int'l Bhd. of Teamsters v. Sw. Airlines*, 875 F.2d 1129, 1133 (5th Cir. 1989) ("*Teamsters*") (en banc); *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 997 (2d Cir. 1989) ("The status quo provisions of the RLA generally do not apply in minor disputes, enabling the carrier to act on its own interpretation pending arbitration.").

*BNSF*, 973 F.3d at 334 (some citations omitted).

Whether or not a labor dispute is major or minor controls whether injunctive relief is available under the RLA. For major disputes, injunctive relief is available to maintain the status quo while the dispute is being resolved. *Teamsters*, 875 F.3d at 1134. In contrast, the Fifth Circuit has recognized that injunctive relief is rarely available during resolution of a minor dispute. *Id.* ("[O]nly in a narrow set of cases may unilateral action be enjoined during resolution of a minor dispute."); *Int'l Ass'n of Machinists & Aerospace Workers, Airline Dist. 146 v. Frontier Airlines, Inc*. ("*Frontier*"), 664 F.2d 538, 541 (5th Cir. 1981) ("[I]njunctive relief is inappropriate in a 'minor' dispute case, because the statutorily established grievance procedures are mandatory and exclusive."). That is because minor disputes are subject to "compulsory and binding" arbitration, and federal courts do not have jurisdiction to resolve minor disputes. *See Allied Pilots Ass'n v. Am. Airlines, Inc*., 898 F.2d 462, 465 (5th Cir. 1990); *Teamsters*, 875 F.3d at 1136. The Fifth Circuit in *Frontier* identified instances in which injunctive relief could be appropriate in a minor dispute, namely to prevent strikes that would deprive the congressionally

established grievance process (*i.e.*, arbitration) of jurisdiction, or to prevent disruptions to the status quo where not enjoining the carrier would result in irreparable injury of such a magnitude to render a decision in favor of the union virtually meaningless. 664 F.3d at 542.

### b. Norris-LaGuardia Act

The Norris-LaGuardia Act ("NLGA") refers to 29 U.S.C. §§ 101–16, a 1932 federal labor law that bans "yellow dog" contracts (*i.e.*, employment contracts that prohibit employees from joining unions as a condition of employment), permits employees to form unions without employer interference, and—most relevant here—limits federal courts from issuing injunctions in nonviolent labor disputes.

The Fifth Circuit in *BNSF* recently provided the following guidance regarding a district court's authority to issue an injunction under the RLA and NLGA:

> Further limiting a court's authority to issue an injunction in a railway labor dispute is the Norris-LaGuardia Act ("NLGA"). 29 U.S.C. § 108, *et seq.* Congress enacted the NLGA in 1932 intending to "tak[e] the federal courts out of the labor injunction business." *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712, 102 S. Ct. 2672, 73 L.Ed.2d 327 (1982) (quoting *Marine Cooks & Stewards v. Panama S.S. Co.*, 362 U.S. 365, 369, 80 S. Ct. 779, 4 L.Ed.2d 797 (1960)) (emphasis omitted). By narrowing the courts' jurisdiction to enjoin labor disputes, Congress hoped to stop courts from indiscriminately awarding injunctions against striking employees—a practice that had become commonplace across federal courts. *See Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B.*, 386 U.S. 612, 620, 87 S. Ct. 1250, 18 L.Ed.2d 357 (1967) (stating that "[f]ederal court injunctions freely issued against all manner of strikes and boycotts under rulings that condemned virtually every collective activity of labor as an unlawful restraint of trade"). For example, Section 8 of the NLGA precludes injunctions except where the plaintiff has "ma[d]e every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." § 108.
>
> If the NLGA totally divested the courts of power to issue an injunction, however, the RLA's mandates would ring hollow. "To accommodate the competing demands of the RLA and the Norris-LaGuardia Act, our cases establish that the Norris-LaGuardia Act does not deprive the federal court of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *Burlington N. R.R. Co.*, 481 U.S. at 445, 107 S. Ct. 1841 (citing cases). But this exception is a limited one. "[W]hen a violation of a specific mandate of the RLA is shown, courts should

hesitate to fix upon the injunctive remedy ... unless that remedy alone can effectively guard the plaintiff's right." *Id.* at 446, 107 S.Ct. 1841.

973 F.3d at 337–38.

Section 101 of the NLGA provides that no injunctive relief in a labor dispute can issue absent strict compliance with the requirements of the NLGA.  29 U.S.C. § 101.  Section 107 describes specific requirements that must be met prior to an injunction being issued in a labor dispute, and § 108 provides that injunctive relief is not available to any party "who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

### III.    LEGAL STANDARD

In the Fifth Circuit, the party seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is not granted; (3) that the harm the movant will suffer if the injunction is not granted would outweigh the harm to the non-movant if the injunction were granted; and (4) that the grant of the injunction is in the public interest. *Local Union No. 733 of Int'l Bhd. of Elec. Workers v. Ingalls Shipbuilding Div., Litton Sys., Inc.*, 906 F.2d 149, 151 (5th Cir. 1990).  The party seeking the injunction bears the burden of persuasion on each preliminary injunction factor. *See Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994).

### IV.    ANALYSIS

SWAPA moves for temporary and preliminary injunctive relief, requesting that Southwest be enjoined from unilaterally imposing new rates of pay, rules, and working conditions relating to pilots pending completion of the RLA's "major" dispute resolution procedures under § 6.  As part of this requested relief, SWAPA requests that Southwest be enjoined from using and enforcing certain Southwest policies against pilots previously

summarized, namely the Infectious Disease Control Policy; the ExTO Program; the COVID quarantine policies[3]; the Vaccine Participation Pay Program; the Flight Crew Training Instructors program; and the mandatory COVID Vaccine Policy.  SWAPA also requests that Southwest stop using a "force majeure" clause that does not appear within the current CBA, as well as a declaratory judgment that Southwest's conduct violates the RLA.

Broadly, SWAPA maintains that it and Southwest are in the midst of a major dispute renegotiating the CBA, and that each of the complained-of policies affect the status quo because each alters the pilots' pay, rules, or working conditions.  Accordingly, SWAPA argues that each policy or program in question "is an issue within a major dispute that requires Southwest Airlines to maintain the parties' status quo while negotiating with SWAPA," and thus subject to injunctive relief.  SWAPA Br. (ECF No. 12) at 23.

Southwest responds that its unilateral actions promulgating the COVID-era policies are arguably justified by the terms of the parties' CBA, such that this is a "minor" dispute subject to the compulsory grievance and arbitration procedures under the RLA.  *See Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 435 (5th Cir. 2021) ("[D]istrict courts do not have jurisdiction over minor disputes, which are 'subject to compulsory and binding arbitration before the National Railroad Adjustment Board, [45 U.S.C. § 153], or before an adjustment board established by the employer and the unions representing the employees.'" (second alteration in original)).

The Court agrees that it lacks subject matter jurisdiction over the parties' disputes as to the complained-of policies.  Southwest's position that it had the power to enact the policies unilaterally based on the CBA's Scope and Management Rights provisions is neither frivolous

---

[3] The Court notes that, in its briefing, SWAPA considered the Infectious Disease Control Policy separate from the "COVID quarantine policies," but SWAPA's counsel acknowledged at the hearing that the COVID quarantine policies being complained of are contained within the Infectious Disease Control Policy.

nor obviously insubstantial.  *See Teamsters*, 875 F.3d at 1134 ("[I]f management's construction of the collective bargaining agreement and its unilateral action pursuant thereto create an issue that is not fictitious or merely colorable, then the issue should be resolved by the appropriate arbitration board.").  Accordingly, the dispute concerns the interpretation and application of the CBA, and thus is a minor dispute subject to compulsory and binding arbitration.

The CBA has a broad purpose under § 1(A), namely to "provide for the operation of the Company under methods which will further, to the fullest extent possible, the safety of air transportation, the efficiency of operation and the continuation of employment of all pilots under safe and reasonable working conditions and proper compensation."  CBA § 1(A) (App. 52).  The CBA further vests in Southwest, under the Management Rights provision, the ability to "manage and direct the work force" and employees covered by the CBA "shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement," and that are issued with sufficient notice under the CBA.  CBA § 1(O) (App. 63).  Thus, under the CBA, the pilots agreed to be governed by Southwest regulations that may issue in the future, so long as they do not conflict with the CBA.

As a preliminary matter, the Court notes that the Fifth Circuit's *en banc* decision in *Teamsters* is controlling in this case.  There, the Fifth Circuit considered a collective bargaining agreement—also involving Southwest—containing language nearly identical to the Management Rights provision at issue here.  *See* 875 F.3d at 1135 (providing that covered employees "'shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement, and which have been made available to the employee prior to becoming effective'").

In vacating the panel's decision that this language did not constitute a "clear and unmistakable" waiver of the union's right to bargain about rules, regulations, and orders, the *en banc* Fifth Circuit reasoned that "there is an obvious argument that this clause constitute[d] a clear waiver of the union's right to bargain over *all* rules," and thus, at minimum, satisfied the low burden that the company's position be arguably justified by the terms of the CBA. *Id.* at 1136. In the absence of any contrary authority, the Court concludes that, under *Teamsters*, Southwest's unilateral actions in promulgating rules, regulations, and orders is arguably justified by the CBA's Management Rights provision, *provided* that the policy in question at issue does not conflict with any term or condition of the CBA.

Thus, the Court considers each of the policies at issue to determine whether there exists a conflict with the CBA's terms and conditions, such that Southwest's reliance on the CBA to issue such policies unilaterally is not arguably justified. The Court also considers whether the policy in question is arguably justified under the goals articulated in the CBA's Scope provision, to further, "to the fullest extent possible, the safety of air transportation . . . and the continuation of all employment of all pilots under safe and reasonable working conditions." CBA § 1(A). In addition, the Court is cognizant of the "relatively light burden" to show that a dispute is minor, and that "if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor." *BNSF*, 973 F.3d at 335 (quoting *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 307 (1989)).

First, the Court concludes that Southwest's unilateral promulgation of the Infectious Disease Control Policy and VPPP was arguably justified by the CBA's goal of furthering "the safety of air transportation" and providing "safe and reasonable working conditions" for pilots, by preventing the spread of disease by adopting safe working practices, quarantining when

recommended by the CDC, and encouraging more employees to get vaccinated.[4]  In addition, SWAPA identifies no specific term or condition in conflict with the VPPP and the Infectious Disease Control Policy as it currently stands.  SWAPA points broadly to the CBA's compensation section, arguing that "each policy impacts all of the benefits that flow from pay." Reply (ECF No. 22) at 6.  However, whether a pilot's compensation is impacted by a policy is not the same as whether a policy is inconsistent with the CBA's terms.  Here, following Southwest's retroactive reinstatement of the pay reassurance provision for time spent in quarantine, the Infectious Disease Control Policy does not contradict the CBA's guaranteed minimum pay provision under § 4(H).  Moreover, the VPPP indicates only that participating employees will receive *additional* pay, which does not contradict the minimum compensation and other benefits articulated under the CBA, but rather supplements them.

The Court recognizes and is mindful of the position articulated by SWAPA that even voluntary policies conferring benefits or incentives are subject to negotiation under the RLA. Nor does the Court take lightly SWAPA's complaints that Southwest's repeated and frequent practice of unilaterally enacting policies without labor's involvement—even when those policies solely confer benefits—has the potential to undermine SWAPA's credibility and authority as the sole collective bargaining unit for Southwest pilots.  However, under the analysis delineated by the Fifth Circuit in *Teamsters*, the Court's inquiry is limited to whether Southwest's actions are arguably justified under the CBA, and in the absence of any provision prohibiting adoption of such policies, they are arguably justified under the Management Rights clause.  *See, e.g.*, *Transp.*

---

[4] The Court notes that SWAPA has previously interpreted the CBA's Scope provisions under § 1(A) as requiring "safe and reasonable working conditions."  Specifically, on April 15, 2020, SWAPA filed Grievance No. 2020-005 pursuant to the CBA's minor dispute resolution procedure; this grievance alleged that Southwest was not providing pilots with sufficient personal protective equipment, in violation of § 1(A) of the CBA's requirement of "safe and reasonable working conditions" and the Infectious Disease Control Policy.  D. App. 310–16.  This grievance was never arbitrated or resolved under the CBA's dispute resolution procedures.

*Workers Union of Am. (TWU) Loc. 555 v. Sw. Airlines Co*., No. 3:14-CV-103-M, 2014 WL

200700, at \*4 (N.D. Tex. Jan. 17, 2014) ("There is no provision in the CBA that prohibits [the

company] from making these types of decisions.").

In that vein, the Court is not convinced by the argument put forth by SWAPA's counsel

during closing arguments that Southwest's unilateral implementation of the subject policies is

inconsistent with § 1(B) of the CBA, which recognizes SWAPA "as the sole collective

bargaining representative of the Airline Pilots." App. 52.  In acting unilaterally, Southwest does

not necessarily recognize someone *else* as the pilots' representative, but rather avoids bargaining

altogether.  Southwest's unilateral action thus does not conflict with the CBA's provision

recognizing SWAPA as the sole collective bargaining unit for pilots.  Indeed, to conclude

otherwise would render all unilateral action under CBAs with similar recognition provisions

improper under the RLA, an absurd result considering that "in a minor dispute, a party is

permitted to move unilaterally on its 'own interpretation of the agreement pending exhaustion of

arbitration.'"  *BNSF*, 973 F.3d at 335 (quoting *Teamsters*, 875 F.2d at 1133).

As to the COVID Vaccine Policy, the Court similarly concludes that Southwest's action

in promulgating the policy is arguably justified by the CBA's goal for ensuring "the safety of air

transportation, the efficiency of operation," and "safe and reasonable working conditions" under

§ 1(A).  The Vaccine Policy was adopted to comply with Executive Order 14042, which

expressly contemplates that providing adequate COVID-19 safeguards in the workplace,

including vaccinations, decreases the spread of COVID-19, "which will decrease worker

absence, . . . and improve the efficiency of contractors and subcontractors" such as Southwest.

*See* Exec. Order No. 14,042, 86 Fed. Reg. at 50,985.  Requiring Southwest employees to be

vaccinated against COVID-19 will likewise improve the safety of air transportation, the

efficiency of Southwest's operations, and further the CBA's goal of safe and reasonable working conditions for pilots.  In addition, because Southwest is a federal contractor, the Vaccine Policy is required by law; SWAPA cannot require or demand that Southwest no longer be a federal contractor to avoid application of Executive Order 14042.  *See First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 676 (1981) ("[I]n establishing what issues must be submitted to the process of bargaining, Congress had no expectation that the elected union representative would become an equal partner in the running of the business enterprise in which the union's members are employed.").

Moreover, on the facts currently before the Court, the Vaccine Policy does not include a termination provision, and thus does not conflict with the CBA's discipline and termination provisions.  SWAPA argues that the Vaccine Policy is inconsistent with CBA § 20, Physical Examination, which provides that "[t]he physical standards required of a pilot will be the standards established by the FAA, by statute, or other applicable government regulation," and that in the event "of a change in the method of medical certification or standards," the CBA must be reopened.  § 20(A)(1) (App. 222).  However, the Court notes that the Vaccine Policy is a company-wide directive; the vaccine is not a physical standard for certification to fly that is "required of a *pilot*," but rather is an obligation of Southwest employees.  In light of the clear justification for increasing workplace safety and the lack of any apparent express conflict with the CBA, the COVID Vaccine Policy is arguably justified by the existing CBA and mandated by law.

The Court concludes that Southwest's promulgation of the ExTO program is likewise arguably justified by the CBA's vesting in Southwest of "[t]he right to manage and direct the work force" and stated goal to provide for "the continuation of employment of *all* pilots under

21

. . . proper compensation."  CBA §§ 1(A), 1(M) (emphasis added).  Like the ETO program, the ExTO program was adopted as a voluntary cost-savings initiative to avoid involuntary layoffs, and contributed to Southwest's avoidance of involuntary pilot layoffs as a result of the economic impact of the pandemic.

The ETO MOU provides further support that the ExTO program is arguably justified by the CBA.  The MOU's preamble expressly quotes § 1(A) of the CBA.  D. App. 236.[5]  In addition, the ETO MOU expressly provides that if Southwest plans to "*extend* or modify" the ETO program, Southwest will "notify, meet, and consult with [SWAPA] at least fourteen (14) days in advance."  D. App. 236–37.  The ETO MOU also provides that the parties will have discussions regarding the "extension of the ETO program" or if Southwest "plans to fully or partially rescind the ETO program."  *Id.*  Consistent with the ETO MOU, Southwest notified SWAPA prior to the ExTO program's implementation, and SWAPA itself acknowledged that it jointly developed the program with Southwest.  D. App. 250, 255.  Accordingly, the Court concludes that Southwest's promulgation of the ExTO program was arguably justified under both the CBA and the ETO MOU.  In addition, the Court notes that there appear to be no plans for continuing the ExTO program or offering additional rounds of ExTO leave, and accordingly the dispute over the ExTO program does not concern "the acquisition of rights for the future," as would indicate a major dispute.  *See Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945).

The Flight Crew Training Instructors program presents the closest question as to whether Southwest's unilateral action in promulgating the policy is arguably justified under the CBA.

---

[5] Specifically, the MOU states: "Southwest Airlines Co. (the "Company") and Southwest Airlines Pilots Association (the "Association") (collectively the "Parties") recognize the global public health crisis and economic distress created by COVID-19, and the Company's desire to offer cost savings initiatives to Pilots in response. The Parties also acknowledge their mutual interest, as restated from the Parties' Collective Bargaining Agreement ("CBA"), of providing "for the operation of the Company under methods which will further, to the fullest extent possible, the safety of air transportation, the efficiency of operation and the continuation of employment of all pilots under safe and reasonable working conditions and proper compensation."  D. App. 236.

SWAPA contends that the program created a new classification of employee covered by the CBA, one not in existence as of the date the CBA was entered into and that would have required a reopening of CBA negotiations under § 1(M).  At oral argument, Southwest responded that there is a long past practice of allowing pilots to come to the training center and assist with retraining employees, seemingly arguing that there is an implied contractual basis under the CBA to find arguable justification based on past practices.

However, the Court need not reach the question of whether the Flight Crew Training Instructors program is a minor or a major dispute, because the Court lacks jurisdiction over SWAPA's requests for injunctive relief under § 8 of the NLGA.  Under § 8, injunctive relief is not available to any party "who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."  29 U.S.C. § 108; *BNSF*, 973 F.3d at 432.  The requirements of § 8 are jurisdictional.  29 U.S.C. §§ 101, 108; *In re Dist. No. 1-Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n*, 723 F.2d 70, 80 (D.C. Cir. 1983) ("[A] district court has no jurisdiction to issue a restraining order or injunction in any case arising out of a labor dispute where the complainant has failed to make every reasonable effort to settle such dispute by arbitration.").

Here, the record reflects that Southwest and SWAPA reached a MOU relating to the Flight Crew Training Instructors program on September 24, 2021, but SWAPA's Board of Directors subsequently voted it down during the pendency of this Motion.[6]  The only evidence in

---

[6] The exact date of the Board's decision not to ratify the Flight Crew Training Instructors program MOU is unclear; based on the dates of various declarations in the record, the MOU appears to have been voted down by SWAPA's Board between the filing of SWAPA's Motion on October 8 and SWAPA's Reply on October 20.  *Compare* Mot. App'x (ECF No. 13) at App. 14 (declaration of Captain Murray, dated October 6, 2021, stating that the "Instructor MOU that the parties agreed to on September 24, 2021, . . . now awaits ratification by SWAPA Board of Directors as part of the Union's governance process"), *with* Reply App'x (ECF No. 23) at Reply App. 7 (declaration of Captain Reven, dated October 20, 2021, stating that "the pilot instructor MOU was voted down by the SWAPA Board of Directors in reaction to the contemporaneous news that broke out about Southwest's implementation of its vaccine mandate containing a termination provision").

the record as to why the MOU was rejected is in Captain Reven's declaration, which states that the MOU was voted down "in reaction to the contemporaneous news that broke out about Southwest's implementation of its vaccine mandate containing a termination provision," because the Board "was understandably frustrated with Management's repeated violations of the parties' *status quo*."  Reply App. 7.

The record contains no facts indicating an inability of the parties to return to the bargaining table and make additional efforts to settle the dispute relating to the Flight Crew Training Instructors program.  Negotiations over the since-rejected MOU appear to have lasted a day, at most, before the proposed MOU was submitted for approval through SWAPA's governance process.  Reply App. 23.  Returning to the bargaining table would not only be reasonable under the circumstances, but a necessary jurisdictional prerequisite for any further relief under the NLGA.  *See BNSF*, 973 F.3d at 342 n.13 (acknowledging that evidence of two years of negotiations and an intervention by the National Mediation Board could satisfy the exhaustion of remedies prerequisite for an injunction under the NLGA (citing *Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc*., 976 F.2d 541, 543 (9th Cir. 1992)).  Given that the record does not indicate a refusal to bargain or that SWAPA has made every reasonable effort to settle such dispute either by negotiation or some other mechanism, the Court lacks jurisdiction to issue injunctive relief under NLGA § 8.

Accordingly, given that the complained-of policies qualify as minor disputes subject to compulsory and binding arbitration and, in the case of the Flight Crew Training Instructors program, SWAPA has not exhausted all reasonable efforts to settle the dispute prior to seeking an injunction, the Court lacks subject matter jurisdiction over this dispute, justifying dismissal.

The Court takes care to emphasize that it goes no further today than holding, at most, that Southwest has met the relatively light burden under the law of persuading the Court that, with the exception of the Flight Crew Training Instructors program, its COVID-era policies are arguably justified under the existing CBA; the Court takes no position as to whether Southwest's interpretation of the CBA is correct or whether it should prevail on the merits of its disputes with SWAPA.  Moreover, although Southwest may have successfully avoided an injunction today, the Court by no means condones or endorses Southwest's apparent approach to its negotiations with SWAPA; on the contrary, the record suggests that Southwest appears to be both belated and reactive in its dealings with SWAPA, coming to the bargaining table only in response to SWAPA's prompting.  Such an approach is inconsistent with and contrary to both the CBA's mandate that the parties cooperate reasonably and in good faith, and the RLA's emphasis on a "'virtually endless'" process of negotiation and mediation, in an effort "[t]o effectuate peaceful dispute resolution."  *BNSF*, 973 F.3d at 334 (quoting *Burlington*, 481 U.S. at 444); *see* CBA § 1(A) ("It is recognized to be the duty of the Company, the Association and the employees to cooperate fully, reasonably, and in good faith for the attainment of these purposes.").

## V.    CONCLUSION

The Court concludes that because Southwest's actions that SWAPA seeks to enjoin are arguably justified under the CBA, the dispute between SWAPA and Southwest is minor and subject to compulsory and binding arbitration under the RLA.  In the case of the Flight Crew Training Instructors program, SWAPA's request for an injunction is premature under the NLGA. Accordingly, the Court concludes that it lacks subject matter jurisdiction, and need not reach the question of whether SWAPA has established entitlement to injunctive relief.  The Motion is **DENIED**, and the case is **DISMISSED**.

**SO ORDERED**.

October 26, 2021.

BARBARA M. G. LYNN
CHIEF JUDGE